## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO SERVICES, INC., *et al.*,[1] | § | Case No. 18-30167 (MI) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | (Formerly Jointly Administered under |
| | § | Lead Case: EXCO Resources, Inc., |
| | § | 18-30155) |

## REORGANIZED DEBTORS' (PROTECTIVE) OBJECTION TO
## PROOFS OF CLAIM FILED BY SHELL ENERGY NORTH AMERICA (US), LP[2]

---

**THIS IS AN OBJECTION TO YOUR CLAIM.**

**A STATUS CONFERENCE WILL BE CONDUCTED ON THIS MATTER ON JANUARY 29, 2020 AT 1:30 P.M., PREVAILING CENTRAL TIME, IN COURTROOM 404, 4th FLOOR, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK AVENUE, HOUSTON, TEXAS.**

**PLEASE NOTE THAT THE REORGANIZED DEBTORS SEEK TO ADJUDICATE THESE CLAIMS THROUGH ARBITRATION.  A DEADLINE FOR RESPONSE TO THIS OBJECTION WILL BE SET IF IT IS DETERMINED THAT THE BANKRUPTCY COURT HAS JURISDICTION OVER THIS DISPUTE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1]   The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Reorganized Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   Capitalized but undefined terms herein shall have the same meaning ascribed to them in the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* attached to the *Order Confirming Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 2128] (the "Plan").

The above-captioned reorganized debtors (before the Effective Date of the Plan, the "Debtors," and after the Effective Date of the Plan, the "Reorganized Debtors") respectfully submit this (protective) objection (the "Objection") to the SENA POCs (as defined herein).[3]

### Relief Requested

1.      Pursuant to the contracts underlying the dispute between the Reorganized Debtors and Shell Energy North America (US), LP ("SENA"), the parties agreed that "…any Dispute among the Parties shall be resolved through final and binding arbitration…in accordance with the Commercial Arbitration Rules of the American Arbitration Association…"[4]   As a result, the American Arbitration Association has jurisdiction over the dispute underlying this Objection, as set forth more fully in Raider's Original Demand for Arbitration attached hereto as **Exhibit A**.

2.      However, in the event it is determined that United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over the dispute, this Objection serves as a protective measure to preserve the Reorganized Debtors' right to seek entry of an order disallowing the following proofs of claim (collectively the "SENA POCs"):

- that certain proof of claim filed by SENA designated as Claim No. 892 against Debtor EXCO Operating Company, LP ("EOC") in the amount of $45,750,202.85; and

- that certain proof of claim filed by SENA designated as Claim No. 898 against Debtor Raider Marketing, LP ("Raider") in the amount of $45,750,202.85.[5]

---

[3]   The Reorganized Debtors submit that the SENA POCs are Disputed Claims (as defined in the Plan) pursuant to the Confirmation Order.  In an abundance of caution, the Reorganized Debtors file this protective Objection in accordance with the Plan.  *See* Plan, Article I.75.

[4]   *See Raider's Original Demand for Arbitration* ("Raider's Original Demand for Arbitration") filed on October 22, 2019 in the matter entitled *Raider Marketing, L.P. vs. Shell Energy North America (US), L.P.,* Case No. 01-19-0003-3652 before the American Arbitration Association (the "Arbitration Proceeding").

[5]   Claim No. 898 is substantially similar to Claim No. 892, except that the claimant indicated the former as a Claim against Debtor Raider.

**Background**

3.        On January 15, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.        On January 26, 2018, the Debtors commenced an adversary proceeding against SENA, *EXCO Operating Co., LP v. Shell Energy North America (US)*, Adversary Proceeding No. 18-03015 [Adv. Docket No. 1], seeking declaratory relief and damages for SENA's preemptive breach of contract.

5.        On March 2, 2018, SENA filed the *Motion of Shell Energy North America (US), L.P. and BG US Production Company, LLC to Compel Arbitration and Stay Litigation* [Adv. Docket No. 9] and their answer to the Debtors' complaint [Adv. Docket No. 11].

6.        On March 23, 2018, the Debtors filed the *Plaintiffs' Emergency Motion to Dismiss Without Prejudice* [Adv. Docket No. 14], which was amended on March 29, 2018 [Adv. Docket No. 22].

7.        On March 29, 2018, the Court entered an order dismissing the adversary case without prejudice [Adv. Docket No. 24].

8.        On April 13, 2018, SENA filed the SENA POCs.

9.        On October 19, 2018, the Debtors filed the *Objection to Proof of Claim of Shell Energy North America (US), LP (Proof of Claim No. 892)* [Docket No. 1147] (the "Divisional Merger Objection").

10.        On November 7, 2018, the Debtors filed the *Debtors' Motion to Estimate Proof of Claim of Shell Energy North America (US), LP* [Docket No. 1243] to estimate SENA's Claim No. 892 at $0.00 (the "Claims Estimation Motion").

11.     On November 16, 2018, SENA filed the *Response of Shell Energy North America (US), L.P. to Debtors' Objection to Proof of Claim of Shell Energy North America (US), L.P. (Proof of Claim No. 892)* [Docket No. 1268] in response to the Divisional Merger Objection.

12.     On December 3, 2018, SENA and Raider entered into a settlement agreement, wherein the Debtors agreed to withdraw the Divisional Merger Objection and Claims Estimation Motion upon the entry of the Confirmation Order and provided SENA with explicit assurances preserving its right to arbitration.

13.     On June 18, 2019, the Court entered the Confirmation Order confirming the Plan and, to accommodate SENA's wishes, explicitly preserving SENA's right to arbitration.[6]  The Effective Date of the Plan occurred on June 28, 2019.[7]

14.     On October 22, 2019, Raider filed Raider's Original Demand for Arbitration.  On November 13, 2019, SENA filed the *Special Appearance, Objection to Arbitration, and Plea to the Jurisdiction* in the Arbitration Proceeding to challenge the jurisdiction of the American Arbitration Association, to which Raider filed *Raider's Response in Opposition to Respondent's Special Appearance, Objection to Arbitration, and Plea to the Jurisdiction* on November 26, 2019.

15.     On December 10, 2019, SENA filed the *Motion of Shell Energy North America (US) L.P. to Enforce Bankruptcy Court's Jurisdiction* [Docket No. 242] seeking entry of an order declaring the Court retains exclusive jurisdiction over the underlying dispute.

---

[6]     Confirmation Order, ¶ 177-79.

[7]     Pursuant to the Plan, if an objection is filed to a Claim by the applicable Claims Objection Deadline, the Claim shall be Disputed.  Accordingly, pursuant to this Objection, the SENA POCs are Disputed Claims.  *See* Plan, Article I.

**Objection to the SENA POCs**

16.     Section 502 of the Bankruptcy Code provides, in pertinent part, as follows: "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Further, section 502(b)(1) of the Bankruptcy Code provides that the court "shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—such claim is unenforceable against the debtor and the property of the debtor" 11 U.S.C. § 502(b)(1).

17.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code.  *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010).  However, a proof of claim loses the presumption of *prima facie* validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency.  *See In re Fidelity Holding Co., Ltd*., 837 F.2d 696, 698 (5th Cir. 1988).  Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence.  *See id*.  Despite this shifting burden during the claim objection process, "the ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

18.     The Reorganized Debtors incorporate the arguments and evidentiary support therefor set forth in Raider's Original Demand for Arbitration attached hereto as **Exhibit A** by reference herein.

19.     For the avoidance of doubt, by this Objection, the Reorganized Debtors do not seek a ruling on the abitrability of the dispute underlying the SENA POCs but rather to preserve their

right to seek disallowance of the SENA POCs if this Court is determined to have jurisdiction over liquidation of the SENA POCs.

## **Reservation of Rights**

20.     Nothing contained in this Objection or in the exhibits and pleadings referenced in this Objection or the Order, or any actions taken by the Reorganized Debtors are intended or should be construed as:   (a) an admission as to the validity of any prepetition claim against a Reorganized Debtor entity; (b) a waiver of the Reorganized Debtors' right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Reorganized Debtors' rights under the Bankruptcy Code or any other applicable law, including the Reorganized Debtors' right to adjudication through arbitration.

## **Notice**

21.     The Reorganized Debtors will provide notice of this Objection to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (c) SENA.  The Reorganized Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

Respectfully Submitted,

*/s/ Christopher T. Greco*

Dated:  December 23, 2019

Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:        patrick.nash@kirkland.com
               alexandra.schwarzman@kirkland.com

- and -

T. Gregory Jackson (State Bar No. 24004718)
Heather L. Summerfield (State Bar 24095772)
**ARCADI JACKSON, LLP**
2911 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
Telephone:   (214) 865-6458
Facsimile:   (214) 865-6522
Email:        greg.jackson@arcadijackson.com
               heather.summerfield@arcadijackson.com

*Co-Counsel for the Reorganized Debtors*

**<u>Certificate of Service</u>**

I certify that on December 23, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Christopher T. Greco*
Christopher T. Greco, P.C.

## <u>Exhibit A</u>

**Raider's Original Demand for Arbitration**



**T. Gregory Jackson**
Partner
214.865.6587
greg.jackson@arcadijackson.com


October 22, 2019


**Via CMRRR No. 7017 3380 0000 2687 3711**
Shell Energy North America (US), L.P.
1000 Main Street Level 12
Houston, TX 77002
**Attn:  Contracts North America**

　　　　Re:　*Raider Marketing, L.P. vs. Shell Energy North America (US), L.P.:* Original
　　　　　　　Demand for Arbitration


To Whom It May Concern:

In connection with the above-referenced matter, attached please find a file-stamped copy of the Original Demand for Arbitration.

If you have any questions, please do not hesitate to contact me.

Sincerely,


Thomas Gregory Jackson

cc:　　Heather L. Summerfield, w/enc. (Of the Firm)


**ARCADI JACKSON, LLP**
2911 Turtle Creek Blvd., Suite 800
Dallas, TX 75219
214.865.6458



AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit www.adr.org for appropriate forms.*

| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. |||
|---|---|---|
| Name of Respondent:  SHELL ENERGY NORTH AMERICA (US), LP |||
| Address:  1000 MAIN STREET LEVEL 12 |||
| City:  HOUSTON | State:  Texas | Zip Code: 77002 |
| Phone No.:  (877) 504-2491 | Fax No.: (713) 767-5414 ||
| Email Address: |||
| Name of Representative (if known): |||
| Name of Firm (if applicable): |||
| Representative's Address: |||
| City: | State:  Select... | Zip Code: |
| Phone No.: | Fax No.: ||
| Email Address: |||

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:
Raider is seeking relief based on SENA's breach of contract and other unlawful conduct. SENA took delivery of gas based on certain contracts with Raider and then refused to pay for the gas. Raider is seeking payment for this gas in the amount of $33,429,769.35, as well as interest, attorneys' fees, costs, and other relief to which Raider is entitled. See Exhibit 1.

Dollar Amount of Claim: $ 33,429,769.35

Other Relief Sought: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☑ Punitive/Exemplary ☑ Other:  Legal Expenses

Amount enclosed: $ $13,342.98 to be wired by Claimant
In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Hearing locale:
*(check one)* ☐ Requested by Claimant ☑ Locale provision included in the contract

Estimated time needed for hearings overall:          hours  or          days

*Please visit our website at www.adr.org if you would like to file this case online.*
*AAA Case Filing Services can be reached at 877-495-4185.*



AMERICAN ARBITRATION ASSOCIATION[®] | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION[®]

**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

| Type of Business: | | |
|---|---|---|
| Claimant: oil and gas marketing company | Respondent: energy marketing company | |
| Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? No | | |
| Signature (may be signed by a representative): | Date: 10/22/2019 | |
| Name of Claimant: RAIDER MARKETING, L.P. | | |
| Address (to be used in connection with this case): 12377 MERIT DRIVE, SUITE 1700 | | |
| City: DALLAS | State: Texas | Zip Code: 75251 |
| Phone No.: (214) 368-2084 | Fax No.: | |
| Email Address: | | |
| Name of Representative: GREG JACKSON | | |
| Name of Firm (if applicable): ARCADI JACKSON, LLP | | |
| Representative's Address: 2911 TURTLE CREEK BLVD., SUITE 800 | | |
| City: DALLAS | State: Texas | Zip Code: 75219 |
| Phone No.: (214) 865-6458 | Fax No.: (214) 865-6522 | |
| Email Address: GREG.JACKSON@ARCADIJACKSON.COM | | |
| To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent. | | |

*Please visit our website at www.adr.org if you would like to file this case online.
AAA Case Filing Services can be reached at 877-495-4185.*

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| RAIDER MARKETING, L.P., | § | |
| | § | |
| Claimant, | § | |
| | § | |
| v. | § | AAA Case No. _____ |
| | § | |
| SHELL ENERGY NORTH | § | |
| AMERICA (US), L.P. | § | |
| | § | |
| Respondent. | § | |

## RAIDER MARKETING, L.P.'S ORIGINAL DEMAND FOR ARBITRATION

Claimant Raider Marketing, L.P. hereby files this Original Demand for Arbitration (the "Demand") against Respondent Shell Energy North America (US), L.P. and, respectfully states as follows:

### I. PARTIES

1.     Claimant Raider Marketing, L.P. ("Raider" or "Seller") is a Delaware limited partnership with its principal place of business at 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

2.     Respondent Shell Energy North America (US), L.P. ("SENA" or "Buyer" and collectively with Raider, the "Parties") is a Delaware limited partnership with its principal place of business at 1000 Main, 12th Floor, Houston, Texas 77002.

### II.     RELEVANT AGREEMENTS AND AGREEMENT TO ARBITRATE

3.     The Parties to this dispute have entered into two separate, but related, agreements which are the subject of this Demand and contain the Parties' agreement to arbitrate disputes arising under such agreements.

---

4.      The first such agreement is the Base Contract for Sale and Purchase of Natural Gas, commonly known in the oil and gas industry as a "NAESB."[1]  The NAESB was entered into on August 14, 2009 between EXCO Operating Company, LP ("EOC") and EXCO Production Company, LP,[2] on the one hand, and BG Energy Merchants, LLC ("BGEM") on the other.  On June 1, 2016, BGEM assigned the NAESB to SENA, and on August 18, 2016, Raider succeeded to EOC's rights and obligations under the NAESB as result of a divisional merger.[3]  Thus, from August 18, 2016 through the present, the parties to the NAESB are Raider and SENA (and not EOC and BGEM).

5.      The second relevant agreement is the Transaction Confirmation for Immediate Delivery entered into between EOC and BGEM on July 9, 2010 (the "Tiger Confirmation" and together with the NAESB, the "Contracts").[4]  BGEM assigned the Tiger Confirmation to SENA on June 1, 2016.  On August 18, 2016 Raider also succeeded to EOC's rights and obligations under the Tiger Confirmation as a result of the divisional merger.  Thus, from August 18, 2016 through the present, the parties to the Tiger Confirmation are Raider and SENA (and not EOC and BGEM).[5]

---

[1] The NAESB is attached as Exhibit A.
[2] After the parties entered into the NAESB, EXCO Production Company, LP was merged into EOC.
[3] On August 18, 2016, EXCO Resources, Inc. ("EXCO"), executed a divisional merger pursuant to the Texas Business Organizations Code.  Raider was formed through the divisional merger and certain contracts previously held by EOC succeeded to Raider by operation of law.  The NAESB as well as the Tiger Confirmation were two such contracts.
[4] The Tiger Confirmation is attached as Exhibit B.
[5] For clarity hereinafter, and regardless of the point in time at issue, the Parties are referred to as the successor entities SENA and Raider.

6.    The NAESB contains an arbitration provision which states "…any Dispute among the Parties shall be resolved through final and binding arbitration…in accordance with the Commercial Arbitration Rules of the American Arbitration Association…"[6]

### III. LOCATION OF ARBITRATION AND CHOICE OF LAW

7.    Pursuant to the NAESB, the Parties have agreed to conduct the arbitration before the American Arbitration Association in Dallas, Texas[7] and have selected Texas law as the governing law.[8]

### IV. NATURE OF CLAIM AND RELIEF SOUGHT

8.    Raider files this Demand seeking relief based on SENA's breach of the Contracts and other unlawful conduct. Pursuant to the Contracts, Raider sold natural gas to SENA in November and December 2017 and invoiced SENA. SENA took delivery of the gas but refused to pay for the gas. Therefore, Raider seeks payment for this gas in the amount of at least $33,429,769.35, as well as interest, attorneys' fees, costs and any other relief to which Raider is entitled.

### V. BACKGROUND FACTS

*A.    EOC and BG Agree to Develop the Haynesville Shale and Transport Gas to Market*

9.    On August 14, 2009, EOC and BG US Production Company, LLC ("BG"), an affiliate of BGEM, entered into a Joint Development Agreement (the "JDA").[9]

---

[6] *See* Exhibit A, Special Provisions to NAESB, at paragraph 18, incorporating by reference Section 15.2 of the Limited Liability Company Agreement of TGGT Holdings, LLC (the "TGGT LLC Agreement"), which contains an arbitration provision. *See* Exhibit C, Section 15.2 of the TGGT LLC Agreement.
[7] *See* Exhibit C, TGGT LLC Agreement, § 15.2.
[8] *See* Exhibit A, p.2, § 15.5.
[9] The JDA is attached as Exhibit D.

10.     The purpose of the JDA was to govern development of certain oil and gas assets in East Texas and North Louisiana, including the Haynesville shale.[10] Pursuant to the JDA, EOC and BG each had a 50% interest in the assets subject to the JDA.[11]

11.     To ensure transportation was available for the natural gas produced from the Haynesville shale, EOC and BG desired to enter into a long-term firm transportation contract with a pipeline (the "Tiger Pipeline") operated by ETC Tiger Pipeline, LLC ("Tiger").

12.     To that end, BGEM entered into a ten-year agreement with Tiger under which Tiger agreed to transport 200,000 mmBtu/day on the Tiger Pipeline for a fixed transportation fee of $.36/mmBtu.

13.     In turn, SENA, as Buyer, and Raider, as Seller, entered into the Tiger Confirmation. The Tiger Confirmation required Raider to sell gas to SENA, which SENA would purchase and transport on the Tiger Pipeline.[12]

14.     Specifically, under the Tiger Confirmation, Raider's performance obligation as Seller was: "Each Day during the Delivery Period (as hereinafter defined) Seller shall deliver and sell to Buyer and Buyer shall receive and purchase from Seller one hundred thousand (100,000) mmBtu/Day plus fuel retainage on a firm and fixed quantity basis (the "DCQ").[13]

15.     The Tiger Confirmation provided: "The term of this Transaction Confirmation (the "Delivery Period") shall be ten (10) years beginning on the commencement of firm transportation service by Buyer on the Tiger Pipeline."[14]

---

[10] *See* Exhibit D, § 3.1.
[11] *See* Exhibit D, § 3.2.
[12] *See generally* Exhibit B.
[13] *See* Exhibit B at p. 1. DCQ means Daily Contract Quantity.
[14] *See* Exhibit B at p. 1.

16.     Further, the Tiger Confirmation provided a methodology for calculating the contract price (the "Contract Price") of the gas Raider sold to SENA. The Tiger Confirmation also provided for a fixed payment of $0.39 per DCQ (the "Fixed Payment"). Raider was responsible for the Fixed Payments each month regardless of whether Raider sold SENA the DCQ of 100,000 mmBtu. SENA paid Raider each month for gas actually purchased by it based on the Contract Price less the Fixed Payment.

17.     Under Section 7.2 of the NAESB, SENA was obligated to make payment "on or before the later of the Payment Date or 10 Days after receipt of the Invoice..."[15] The NAESB set the "Payment Date" as the 25th day of the month following the month of delivery.[16]

18.     The Fixed Payment on the DCQ of 100,000 mmBtu equaled $39,000/day. On average, the total Fixed Payments deducted from the Contract Price were $1,170,000 per month.

19.     For the majority of the months under the Tiger Confirmation, SENA, as Buyer, owed Raider, as Seller, significantly more for gas sales each month than the amount of the Fixed Payments. And in total, from the effective date in 2010 through when SENA refused to pay Raider's November and December 2017 invoices, SENA paid Raider approximately $540,000,000 for gas sales under the Tiger Confirmation.

**B.     *SENA Breaches Its Payment Obligations to Raider***

20.     In November 2017, Raider sold gas to SENA for each day of November.

21.     Raider invoiced SENA for the Contract Price of the gas it delivered net of the Fixed Payments.[17] The November invoices are summarized as follows:

---

[15] *See* Exhibit A, p.8, § 7.2.
[16] *See* Exhibit A, p. 2, § 7.2.
[17] The November 2017 invoices are attached as Exhibit E.

| SUMMARY OF NOVEMBER 2017 RAIDER INVOICES TO SENA | | | | |
|---|---|---|---|---|
| Invoice Name | Production Month | Invoice Date | Invoice Due Date | Invoiced Amount |
| Enable Holly 2 | 11/17 | 12/8/17 | 12/25/17[18] | $421,816.94 |
| Holly 8 | 11/17 | 12/8/17 | 12/25/17 | $5,584,757.62 |
| Mansfield 12 | 11/17 | 12/8/17 | 12/25/17 | $5,942,302.75 |
| Shelby 16 | 11/17 | 12/8/17 | 12/25/17 | $2,776,105.08 |
| Wildcat 21 | 11/17 | 12/8/17 | 12/25/17 | $1,415,626.36 |
| Springridge 59 | 11/17 | 12/19/17 | 12/29/17 | $393,985.34 |

TOTAL: $16,534,594.09

22.     On December 22, 2017, Raider was copied on an internal SENA email string in which Eric Reese, a SENA employee, directed SENA to "halt all payments" to Raider.[19]  Mr. Reese's directive was given on December 14, 2017, but Raider was not copied into the email chain until December 22, 2017.

23.     EXCO immediately responded to Mr. Reese, stating: "Raider hereby provides notice that if SENA fails to make the payments owed to Raider on Tuesday, December 26, 2017, Raider will pursue all available remedies available at law and equity for SENA's breach of the NAESB, which include, but are not limited to, Raider's right to terminate the NAESB for non-payment after expiration of the two day cure period following receipt of default notice per Sections 2.7 and 10.2(vii) of the NAESB."[20]

24.     SENA did not respond to EXCO's email.  And although SENA took receipt of the

---

[18] Pursuant to Section 7.2 of the NAESB, because December 25th is a holiday, SENA had until December 26 to make payment on the five invoices with a payment date of December 25.  (*See* Exhibit A, p.8, § 7.2).
[19] The December 22, 2017 SENA email string is attached as Exhibit F.
[20] EXCO's December 22, 2017 email response is attached as Exhibit G.

gas, SENA refused to pay, and to date has not paid, Raider's November 2017 invoices.

25.    Raider continued to deliver gas each day to SENA until December 27th. After December 27th, when SENA's payment became past due, Raider stopped nominating gas to SENA.

26.    On December 27, 2017, Raider sent SENA a letter notifying SENA it was in default under the Contracts for failure to pay Raider's November 2017 invoices.[21]

27.    In January 2018, Raider invoiced SENA for the December 2017 production, again net of the Fixed Payments.[22]  The December invoices are summarized as follows:

| Summary of December 2017 Raider Invoices to SENA | | | | |
|---|---|---|---|---|
| Invoice Name | Production Month | Invoice Date | Invoice Due Date | Invoiced Amount |
| Wildcat 10 | 12/17 | 1/2/18 | 1/25/18 | $1,411,268.98 |
| Springridge 7 | 12/17 | 1/2/18 | 1/25/18 | $318,239.08 |
| Shelby 6 | 12/17 | 1/2/18 | 1/25/18 | $2,718,069.89 |
| Mansfield | 12/17 | 1/2/18 | 1/25/18 | $5,225,951.41 |
| Enable Holly | 12/17 | 1/2/18 | 1/25/18 | $348,449.49 |
| Holly 73 | 12/17 | 1/11/18 | 1/25/18 | $6,873,296.41 |
| | | | Total: | $16,895,175.26 |

28.    Although SENA took receipt of the December 2017 gas, SENA refused to pay, and to date has not paid, Raider's December 2017 invoices.

---

[21] The December 27, 2017 letter is attached as Exhibit H.
[22] The December 2017 invoices are attached as Exhibit I.

29.     SENA's refusal to pay Raider the $33,429,769.35 owed for the gas provided by

EXCO in November and December 2017 is a breach of the Contracts, and SENA's failure to

disclose to Raider that, as of at least December 14, 2017, it had no intention to pay for any gas it

took receipt of in November and December 2017, was fraudulent.

*C.     SENA Did Not Validly Terminate the Tiger Confirmation*

30.     As explained below, SENA attempted to justify its failure to pay Raider's

November and December 2017 invoices by manufacturing a contractual default by Raider.  Under

this ruse, SENA purported to lawfully terminate the Tiger Confirmation and retain the proceeds

from Raider's November and December 2017 gas deliveries. SENA's position, however, was

baseless and its termination of the Tiger Confirmation and acceleration of the remaining Fixed

Payments was invalid. As such, SENA owes Raider for the November and December 2017 gas

sales.

**i.     SENA's Unreasonable Demand for Adequate Assurance**

31.     On December 22, 2017, SENA sent Raider a letter (the "Demand Letter")[23]

demanding Raider provide SENA "Adequate Assurance of Performance" in the form of cash or

an irrevocable standby letter of credit in the amount of $44,353,140.00 (the "Adequate

Assurance").[24]

---

[23] The Demand Letter is attached as Exhibit J.
[24] Pursuant to Section 10.1 of the NAESB, "[i]f either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Contract (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y or its Guarantor, if applicable), X may demand Adequate Assurance of Performance."  Adequate Assurance of Performance is defined in the NAESB as "sufficient security in the form, amount, for a term, and from an issuer, all as reasonably acceptable to X" and can include "cash" or "a standby irrevocable letter of credit." (*See* Exhibit A, p. 9, § 10.1).

32.     The Demand Letter unreasonably directed Raider to either: 1) wire the full amount of $44,353,140.00 within two business days; or 2) post an irrevocable letter of credit for the same amount.[25]

33.     The Demand Letter further threatened SENA would withhold the $16,543,594.09 payment due to Raider for gas SENA received in November 2017 if Raider did not wire the cash or post the letter of credit.[26]

34.     Specifically, the Demand Letter asserted: "Shell Energy has reasonable grounds for insecurity regarding Exco's ability to perform its obligations under the Contract including the ongoing gas deliveries to Shell Energy and the payment of all amounts owing to Shell Energy, including without limitation, with respect to the Fixed Payment."[27]

35.     SENA's demand was unreasonable for several independent reasons and not supported by the facts.

36.     *First,* SENA's demand was unreasonable because SENA was the net payor under the Contracts, and did not collect Fixed Payments directly from Raider.

37.     On December 22, 2017 when SENA sent the Demand Letter, SENA owed Raider in excess of $16,534,594.09 for gas SENA received in November. That amount was net of the Fixed Payments for November (which totaled $1,170,000).

38.     SENA, as Buyer, did not have to collect the Fixed Payments directly from Raider. Rather, SENA controlled a much larger payment each month owed to Raider and could, as it had for the last seven and a half years of the Tiger Confirmation, collect the Fixed Payment by deducting it from the amount owed to Raider for purchasing Raider's gas.

---

[25] *See* Exhibit J.
[26] *See id.*
[27] *See id.*

39.     And SENA had no reasonable basis to believe the payment arrangements from the last seven and a half years between SENA and Raider would change so that SENA would no longer have the ability to deduct the much smaller Fixed Payments from the much larger gas proceeds payment SENA made to Raider each month. Because SENA had within its control the ability to recoup the Fixed Payments from the gas sales proceeds, credit assurances were not necessary to assure SENA of Raider's performance.  As a result, SENA's Adequate Assurance demand was unreasonable and a breach of the Contracts.

40.     *Second,* SENA's demand was unreasonable because SENA had no reasonable basis to believe Raider would not be able to meet its performance obligations under the Contracts.

41.     The Demand Letter stated: "Exco has publicly announced that it may seek bankruptcy protection or otherwise need to restructure its debt obligations in the coming days or weeks (as reported in Exco's recent press releases and in filings made by Exco with the United States Securities and Exchange Commission)."[28]

42.     The announcements made by EXCO, however, did not provide a reasonable basis for SENA to believe Raider would no longer be able to meet its performance obligations under the Tiger Confirmation.  In fact on December 21, 2017 (the day before the Demand Letter) EXCO filed a Form 8-K[29] (the "8-K") with the SEC which included the following disclosures: 1) EXCO had entered into forbearance agreements with certain of its creditors under which the creditors agreed to forbear from exercising their rights under the agreements with EXCO through January 15, 2018; and 2) EXCO secured a debtor-in-possession commitment in connection with a potential voluntary filing of Chapter 11 petitions.

---

[28] *See id.*
[29] The December 21, 2017 8-K is attached as Exhibit K.

43.     The fact EXCO entered into forbearance agreements with its creditors strongly suggested an involuntary bankruptcy filing was not imminent.  Further, the fact EXCO had entered into a commitment for debtor-in-possession financing demonstrated that, if EXCO did file for bankruptcy, it would likely be a Chapter 11 debtor-in-possession proceeding.

44.     The 8-K assured SENA even in the event of a future bankruptcy proceeding, EXCO would likely continue to operate as a debtor-in-possession with control over its production (and the ability to continue to sell such production to SENA).  Thus, the 8-K did not provide a reasonable basis for SENA to believe Raider would not continue to meet its performance obligation to deliver gas and for SENA's $44.3 million Adequate Assurance demand.

45.     *Third,* SENA's demand was unreasonable because SENA had decided by at least December 14, 2017 (well before the Demand Letter was sent) to take Raider's gas and not pay Raider.

46.     Thus, SENA's Adequate Assurance demand was pretextual.  SENA's email disclosure establishes SENA intended to breach the Contracts by withholding payments due to Raider well before SENA sent the Demand Letter and well before SENA knew whether Raider would meet the Adequate Assurance demand.[30]

47.     As a result, the Adequate Assurance demand cannot be based on a reasonable grounds for insecurity (as the Contracts require) because SENA had already decided to withhold payments due to Raider and to breach the Contracts.

48.     *Fourth,* despite the fact there were no reasonable grounds for insecurity regarding Raider's ability to perform, SENA's demand was also unreasonable because the amount was excessive and not rationally related to the Contracts.

---

[30] *See* Exhibit F, SENA December 22, 2017 email string.

49.     The Demand Letter provides no explanation of why SENA believed that $44,353,140.00 was a reasonable amount to demand from Raider and no explanation of how SENA came up with that amount.

50.     In fact, four days later on December 26, 2017, SENA sent a second letter and stated the amount of the remaining Fixed Payments under the Tiger Confirmation was $43,914,000.[31] And in this letter SENA stated the amount was "calculated pursuant to the formula contained in the Transaction Confirmation."[32]

51.     Thus, by SENA's own admission the amount of its Adequate Assurance demand ($44,353,140.00) did not represent the remaining Fixed Payments under the Tiger Confirmation.

52.     Presumably, SENA was attempting to demand the Fixed Payments for the remaining term of the Tiger Confirmation. However, SENA provided no basis for how the amount was calculated, and if it was attempting to calculate the remaining amount of Fixed Payments, its calculation was wrong.

53.     The Adequate Assurance demand was unreasonable and in bad faith because: 1) SENA had within its control the ability to recoup the monthly Fixed Payments from the amounts it owed to Raider each month for purchasing Raider's gas; 2) SENA had no reasonable basis to believe that Raider would not be able to meet its performance obligations under the Contracts; 3) SENA had decided to not pay Raider regardless of whether Raider met the Adequate Assurance demand; and 4) SENA provided no explanation of how it calculated the demand amount, which in any event was not related to any amounts allegedly owed under the Contracts.

---

[31] SENA's December 26, 2017 letter is attached as Exhibit L.
[32] *See* Exhibit L.

ii.    Raider Had No Duty to Meet the Adequate Assurance Demand

54.    Even if SENA's Adequate Assurance demand was reasonable, which it was not, Raider had no duty to meet the demand because SENA had anticipatorily breached the Contracts, and therefore, Raider's future performance was excused.

55.    SENA's unequivocal decision on December 14, 2017 to not pay Raider for the November 2017 gas sales was a repudiation of SENA's obligations under the Contracts.[33]

56.    SENA's anticipatory breach of the Contracts excused all future performance of Raider, including any purported obligation of Raider to meet SENA's unreasonable Adequate Assurance demand.   Therefore, Raider had no obligation to continue to perform under the Contracts, including to respond to the Adequate Assurance demand.

iii.    SENA's Invalid Termination of the Tiger Confirmation

57.    On December 26, 2017, Raider informed SENA that its demand for Adequate Assurance was unreasonable, unjustified, and in bad faith.  Raider also informed SENA it had breached its payment obligation for the November 2017 gas sales. [34]

58.    Also, on December 26, 2017, SENA sent Raider a second letter asserting Raider's failure to provide the Adequate Assurance was an "Event of Default" under the NAESB, allowing SENA to terminate the Tiger Confirmation.[35] Specifically, SENA informed Raider it was: 1) terminating the Tiger Confirmation effective the earlier of the date Raider filed bankruptcy or 20 days from the date of the December 26, 2017 letter; 2) continuing to withhold payments due to Raider for the November 2017 gas (and would withhold payment for the December 2017 gas); and

---

[33] *See* Exhibit F, SENA December 22, 2017 email string.

[34] Raider's December 26, 2017 response letter is attached as Exhibit M.
[35] *See* Exhibit L, SENA's December 26, 2017 letter.

3) demanding accelerated payment of the Fixed Payments for the remainder of the NAESB/Tiger Confirmation term (an amount SENA again incorrectly calculated at $43,914,000).[36]

59.     Raider sold SENA gas for every day in December until December 28th, at which time it became apparent SENA was not going to pay for the gas it took from Raider.

60.     To date, SENA has not paid Raider for the November and December 2017 gas it received from Raider.[37]

## VI. CLAIM FOR RELIEF: BREACH OF CONTRACT

61.     The above factual allegations are incorporated by reference.

62.     The NAESB and the Tiger Confirmation were valid, enforceable contracts between Raider and SENA under which Raider sold gas to SENA and SENA was obligated to pay for such gas.

63.     Raider delivered gas to SENA on each day of the month for November 2017 and from the 1st to the 27th of December 2017.

64.     SENA refused to pay Raider for the gas Raider delivered, which is a material breach of the Contracts.

65.     As a result of SENA's breach, Raider was damaged in the amount of $33,429,769.35, the amount of the November and December 2017 invoices, plus interest, attorneys' fees and costs.

---

[36] The Tiger Confirmation, in the section entitled "Default," states SENA may immediately accelerate all the remaining transportation costs otherwise owed during the remaining term in the event of a default. (*See* Exhibit B, p. 4). The Tiger Confirmation contains a specific formula for calculating the accelerated amount. (*See id.*).

[37] On January 15, 2018, EXCO filed for bankruptcy protection for itself and 13 of its affiliates, including Raider. EXCO's Chapter 11 proceedings sought authorization from the Court to continue to operate as a "debtor-in-possession." The Court granted EXCO's request, and as a result, EXCO continued its operations throughout the pendency of the bankruptcy and since emergence in June 2019 continues to operate as a reorganized company. As part of the bankruptcy and pursuant to its rights available under the Bankruptcy Code, EXCO rejected several out of market transportation contracts, including the Contracts.

---

## VII. CLAIM FOR RELIEF: CONTRACT INTEREST

66.    The above factual allegations are incorporated by reference.

67.    Raider seeks all interest due to Raider pursuant to Section 7.5 of the NAESB as a result of SENA's refusal to pay Raider for the November and December 2017 gas deliveries.[38]

## VIII. CLAIM FOR RELIEF: UNJUST ENRICHMENT

68.    The above factual allegations are incorporated by reference.

69.    Raider delivered gas to SENA for the months of November and December 2017.

70.    SENA accepted Raider's gas deliveries for November and December 2017 but did not pay Raider for the gas.

71.    As per the Contracts and the parties' course of dealing, Raider reasonably expected SENA to pay Raider for all gas deliveries from November and December 2017 when due, net the Fixed Payments.

72.    As a result, SENA has been unjustly enriched by taking Raider's gas and withholding the proceeds due to Raider.

73.    Raider has been damaged in the amount of the withheld gas proceeds for November and December 2017 in the amount of $33,429,769.35.

## IX. CLAIM FOR RELIEF: FRAUD BY NONDISCLOSURE

74.    The above factual allegations are incorporated by reference.

75.    SENA made a decision by at least December 14, 2017 (if not earlier) to stop paying Raider's invoices and to keep Raider's gas.

76.    SENA did not disclose to Raider that SENA did not intend to pay for the gas it received and that it had a contractual obligation to pay for.

---

[38] *See* Exhibit A, p. 8.

77.     SENA made the decision to stop paying Raider well before it sent the Demand Letter on December 22, 2017 and well before SENA knew whether Raider would meet the (unreasonable) Adequate Assurance demand.

78.     SENA knew Raider did not know and could not reasonably know of SENA's decision to not pay Raider.  Nevertheless, SENA remained silent and continued to accept Raider's daily nominations of gas.

79.     SENA had a duty to disclose to Raider that SENA did not intend to pay for the gas, but SENA did not make the disclosure.

80.     SENA continued to accept delivery of Raider's gas for each day Raider nominated volumes up until December 28, 2017, when Raider stopped nominating volumes to SENA.

81.     If Raider had known SENA had no intention of paying for the gas, Raider would have stopped nominating daily volumes to SENA.

82.     SENA's failure to disclose its decision to not pay Raider harmed Raider in an amount to be determined at hearing.

83.     SENA's fraudulent conduct also entitles Raider to exemplary damages from SENA.

## X. ATTORNEYS' FEES

84.     The above factual allegations are incorporated by reference.

85.     Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, Raider is entitled to recover its reasonable and necessary attorneys' fees from SENA for the prosecution of Raider's breach of contract claim.

## XI. CONDITIONS PRECEDENT

86.    The above factual allegations are incorporated by reference.

87.    All conditions precedent, to Raider's right to recover herein have been fully performed or have been excused or waived.

## XI. PRAYER

88.    The above factual allegations are incorporated by reference.

89.    Claimant Raider requests judgment against Respondent SENA and relief against SENA for:

    a.    Actual damages of at least $33,429,769.35;

    b.    Exemplary damages;

    c.    Reasonable and necessary attorneys' fees and expenses as allowed by law;

    d.    Pre- and post-judgment interest at the Default Interest Rate (as defined in the TGGT Company Agreement);

    e.    Interest pursuant to the Section 7.5 of the NAESB;

    f.    Arbitration costs, including filing fees, arbitrator fees, and expert witness fees; and

    g.    All such other and further relief to which Raider may be entitled.


*[Signature page to follow]*

Date: October 22, 2019

Respectfully Submitted,

*/s/ T. Gregory Jackson*
T. Gregory Jackson
State Bar No. 24004718
greg.jackson@arcadijackson.com
Heather L. Summerfield
State Bar No. 24095772
heather.summerfield@arcadijackson.com
Aaron C. Christian
State Bar No. 24076089
aaron.christian@arcadijackson.com

ARCADI JACKSON, LLP
2911 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
Telephone: 214-865-6458
Facsimile:  214-865-6522

## Base Contract for Sale and Purchase of Natural Gas

This Base Contract is entered into as of the following date:  August 14, 2009

The parties to this Base Contract are the following:

| PARTY A<br>EXCO OPERATING COMPANY, LP   (EOC)<br>EXCO PRODUCTION COMPANY, LP (EPC) | PARTY NAME | PARTY B<br>BG ENERGY MERCHANTS, LLC |
|---|---|---|
| 12377 Merit Drive, Suite 1700<br>Dallas, Texas 75251 | ADDRESS | 5444 Westheimer, Suite 1200<br>Houston, Texas 77056 |
| www.excoresources.com | BUSINESS WEBSITE | www.bg-group.com |
| | CONTRACT NUMBER | |
| | D-U-N-S® NUMBER | 62-121-6428 |
| ☒ US FEDERAL _____<br>(EOC) 16-1771261     (EPC) 75-1891191 | TAX ID NUMBERS | ☒ US FEDERAL: 20-4130200<br>☐ OTHER: |
| EXCO OPERATING COMPANY, LP- Delaware<br>EXCO PRODUCTION COMPANY, LP- Texas | JURISDICTION OF ORGANIZATION | Delaware |
| ☐ Corporation          ☐ LLC<br>☒ Limited Partnership    ☐ Partnership<br>☐ LLP          ☐ Other: | COMPANY TYPE | ☐ Corporation          ☒ LLC<br>☐ Limited Partnership    ☐ Partnership<br>☐ LLP          ☐ Other: |
| | GUARANTOR<br>(IF APPLICABLE) | |

### CONTACT INFORMATION

| | | |
|---|---|---|
| EXCO Operating Company, LP; EXCO Production Company, LP<br>ATTN: Mike McBurney<br>TEL#: 214) 368-2084   FAX#: 214) 438-1401<br>EMAIL: mmcburney@excoresources.com | • COMMERCIAL | BG Energy Merchants, LLC<br>ATTN: MLO Contracts<br>TEL#: 713-599-5000 FAX#: 713-599-3924 |
| EXCO Operating Company, LP; EXCO Production Company, LP<br>ATTN: Whitney Hough<br>TEL#: 214) 368-2084   FAX 214) 438-1401<br>EMAIL: Whough@excoresources.com | • SCHEDULING | BG Energy Merchants, LLC<br>ATTN: MLO Logistics<br>TEL#: 713-599-5000 FAX#: 713-599-3924 |
| EXCO Operating Company, LP; EXCO Production Company, LP<br>ATTN: Becky Lopez<br>TEL#: 214) 706-3348  FAX 214) 438-1401<br>EMAIL: blopez@excoresources.com | • CONTRACT AND LEGAL NOTICES | BG Energy Merchants, LLC<br>ATTN: MLO Contracts<br>TEL#: 713-599-5000 FAX#: 713-599-3924 |
| EXCO Operating Company, LP; EXCO Production Company, LP<br>ATTN: Terry Rice<br>TEL#: 214) 368-2084  FAX#: _____<br>EMAIL: trice@excoresources.com | • CREDIT | BG Energy Merchants, LLC<br>ATTN: Credit Department<br>TEL#: 713-599-5000 FAX#: 713-599-3924 |
| EXCO Operating Company, LP; EXCO Production Company, LP<br>ATTN: Becky Lopez<br>TEL#: 214) 706-3348  FAX  214) 438-1401<br>EMAIL: blopez@excoresources.com | • TRANSACTION CONFIRMATIONS | BG Energy Merchants, LLC<br>ATTN: Confirmations Analyst<br>TEL#: 713-599-5000 FAX#: 713-599-3931 |

### ACCOUNTING INFORMATION

| | | |
|---|---|---|
| EXCO Operating Company, LP; EXCO Production Company, LP<br>ATTN: Becky Lopez -- same as above | • INVOICES<br>• PAYMENTS<br>• SETTLEMENTS | BG Energy Merchants, LLC<br>ATTN: Accounting<br>TEL#: 713-599-5000 FAX#: 713-599-3931 |
| BANK: JP Morgan Chase<br>(EOC)  ABA:   021000021    ACCT: 725671291<br>(EOC)  ABA:   021000021    ACCT: 725671317 | WIRE TRANSFER NUMBERS<br>(IF APPLICABLE) | BANK:  HSBC Bank USA, N.A.,<br>One HSBC Center, 20th Floor, Buffalo, NY 14203<br>ABA:  021001088   ACCT:  000162566<br>OTHER DETAILS: For the Account of BG Energy Merchants, LLC |
| BANK: _____<br>ABA: _____  ACCT: _____<br>OTHER DETAILS: _____ | ACH NUMBERS<br>(IF APPLICABLE) | BANK:  HSBC Bank USA, N.A.,<br>One HSBC Center, 20th Floor, Buffalo, NY 14203<br>ABA:  021001088   ACCT:  000162566<br>OTHER DETAILS: For the Account of BG Energy Merchants, LLC |
| ATTN: _____<br>ADDRESS: _____ | CHECKS<br>(IF APPLICABLE) | ATTN: BG Energy Merchants, LLC Accounting<br>ADDRESS: 5444 Westheimer, Suite 1200, Houston, Texas 77056 |

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

NAESB Standard 6.3.1
September 5, 2006

# EXHIBIT A

# Base Contract for Sale and Purchase of Natural Gas

(Continued)

This Base Contract incorporates by reference for all purposes the General Terms and Conditions for Sale and Purchase of Natural Gas published by the North American Energy Standards Board. The parties hereby agree to the following provisions offered in said General Terms and Conditions. In the event the parties fail to check a box, the specified default provision shall apply. Select the appropriate box(es) from each section:

| | | | | | |
|---|---|---|---|---|---|
| **Section 1.2** Transaction Procedure | ☒ OR ☐ | Oral (default) <br> Written | **Section 10.2** Additional Events of Default | ☒ ☐ | No Additional Events of Default (default) <br> Indebtedness Cross Default |
| | | | | ☐ ☐ | Party A: _____ <br> Party B: _____ |
| **Section 2.7** Confirm Deadline | ☒ OR ☐ | 2 Business Days after receipt (default) <br> 5 Business Days after receipt | | ☐ | Transactional Cross Default <br> Specified Transactions: |
| | | | | | _____ <br> _____ |
| **Section 2.8** Confirming Party | ☐ ☐ ☒ | Seller (default) <br> Buyer <br> BG Energy Merchants, LLC | | | _____ |
| **Section 3.2** Performance Obligation | ☒ OR ☐ | Cover Standard (default) <br> Spot Price Standard | **Section 10.3.1** Early Termination Damages | ☐ OR ☒ | Early Termination Damages Apply (default) <br> Early Termination Damages Do Not Apply |
| *Note: The following Spot Price Publication applies to both of the immediately preceding.* | | | **Section 10.3.2** Other Agreement Setoffs | ☒ | Other Agreement Setoffs Apply (default) |
| **Section 2.31** Spot Price Publication | ☒ OR ☐ | Gas Daily Midpoint (default) <br> _____ | | ☒ ☐ OR | Bilateral (default) <br> Triangular |
| **Section 6** Taxes | ☒ OR ☐ | Buyer Pays At and After Delivery Point (default) <br> Seller Pays Before and At Delivery Point | | ☐ | Other Agreement Setoffs Do Not Apply |
| **Section 7.2** Payment Date | ☒ OR ☐ | 25th Day of Month following Month of delivery (default) <br> Day of Month following Month of delivery | **Section 15.5** Choice Of Law | | Texas |
| **Section 7.2** Method of Payment | ☒ ☐ ☐ | Wire transfer (default) <br> Automated Clearinghouse Credit (ACH) <br> Check | **Section 15.10** Confidentiality | ☒ OR ☐ | Confidentiality applies (default) <br> Confidentiality does not apply |
| **Section 7.7** Netting | ☒ OR ☐ | Netting applies (default) <br> Netting does not apply | | | |

☒ Special Provisions Number of sheets attached: ___7___
☐ Addendum(s): _____

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

NAESB Standard 6.3.1
September 5, 2006

IN WITNESS WHEREOF, the parties hereto have executed this Base Contract in duplicate.

| EXCO OPERATING COMPANY, LP | PARTY NAME | BG ENERGY MERCHANTS, LLC |
|---|---|---|
| By:  EXCO Partners OLP GP, LLC – it's general partner<br>By: _[signature]_ | SIGNATURE | By: _[signature]_ |
| Steve Smith | PRINTED NAME | Elizabeth Spower   [Insert Name] |
| President / CFO | TITLE | Vice President   [Insert Title] |
| | | |
| EXCO PRODUCTION COMPANY, LP | | |
| By:  Vaughan DE, LLC – it's general partner<br>By: _[signature]_ | | |
| Steve Smith | | |
| President / CFO | | |

## General Terms and Conditions
## Base Contract for Sale and Purchase of Natural Gas

### SECTION 1.   PURPOSE AND PROCEDURES

1.1.      These General Terms and Conditions are intended to facilitate purchase and sale transactions of Gas on a Firm or Interruptible basis.  "Buyer" refers to the party receiving Gas and "Seller" refers to the party delivering Gas.  The entire agreement between the parties shall be the Contract as defined in Section 2.9.

**The parties have selected either the "Oral Transaction Procedure" or the "Written Transaction Procedure" as indicated on the Base Contract.**

**Oral Transaction Procedure:**

1.2.      The parties will use the following Transaction Confirmation procedure.  Any Gas purchase and sale transaction may be effectuated in an EDI transmission or telephone conversation with the offer and acceptance constituting the agreement of the parties.  The parties shall not be legally bound from the time they so agree to transaction terms and may each rely thereon.  Any such transaction shall be considered a "writing" and to have been "signed".  Notwithstanding the foregoing sentence, the parties agree that Confirming Party shall, and the other party may, confirm a telephonic transaction by sending the other party a Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means within three Business Days of a transaction covered by this Section 1.2 (Oral Transaction Procedure) provided that the failure to send a Transaction Confirmation shall not invalidate the oral agreement of the parties.  Confirming Party adopts its confirming letterhead, or the like, as its signature on any Transaction Confirmation as the identification and authentication of Confirming Party.  If the Transaction Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation conditions), which modify or supplement the Base Contract or General Terms and Conditions of this Contract (e.g., arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to Section 1.3 but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any transaction agreed to by the parties.

**Written Transaction Procedure:**

1.2.      The parties will use the following Transaction Confirmation procedure.  Should the parties come to an agreement regarding a Gas purchase and sale transaction for a particular Delivery Period, the Confirming Party shall, and the other party may, record that agreement on a Transaction Confirmation and communicate such Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means, to the other party by the close of the Business Day following the date of agreement.  The parties acknowledge that their agreement will not be binding until the exchange of nonconflicting Transaction Confirmations or the passage of the Confirm Deadline without objection from the receiving party, as provided in Section 1.3.

1.3.      If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, such receiving party shall notify the sending party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party.  The failure of the receiving party to so notify the sending party in writing by the Confirm Deadline constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation.  If there are any material differences between timely sent Transaction Confirmations governing the same transaction, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations.  In the event of a conflict among the terms of (i) a binding Transaction Confirmation pursuant to Section 1.2, (ii) the oral agreement of the parties which may be evidenced by a recorded conversation, where the parties have selected the Oral Transaction Procedure of the Base Contract, (iii) the Base Contract, and (iv) these General Terms and Conditions, the terms of the documents shall govern in the priority listed in this sentence.

1.4.      The parties agree that each party may electronically record all telephone conversations with respect to this Contract between their respective employees, without any special or further notice to the other party.  Each party shall obtain any necessary consent of its agents and employees to such recording.  Where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, the parties agree not to contest the validity or enforceability of telephonic recordings entered into in accordance with the requirements of this Base Contract.

### SECTION 2.   DEFINITIONS

The terms set forth below shall have the meaning ascribed to them below.  Other terms are also defined elsewhere in the Contract and shall have the meanings ascribed to them herein.

2.1.      "Additional Event of Default" shall mean Transactional Cross Default or Indebtedness Cross Default, each as and if selected by the parties pursuant to the Base Contract;

2.2.      "Affiliate" shall mean, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of at least 50 percent of the voting power of the entity or person.

Copyright © 2006 North American Energy Standards Board, Inc.                                                                                           NAESB Standard 6.3.1
All Rights Reserved                                                      Page 4 of 14                                                             September 5, 2006
DB1/63501107.1

2.3.     "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation. In the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

2.4.     "Base Contract" shall mean a contract executed by the parties that incorporates these General Terms and Conditions by reference; that specifies the agreed selections of provisions contained herein; and that sets forth other information required herein and any Special Provisions and addendum(s) as identified on page one.

2.5.     "British thermal unit" or "Btu" shall mean the International BTU, which is also called the Btu (IT).

2.6.     "Business Day(s)" shall mean Monday through Friday, excluding Federal Banking Holidays for transactions in the U.S.

2.7.     "Confirm Deadline" shall mean 5:00 p.m. in the receiving party's time zone on the second Business Day following the Day a Transaction Confirmation is received or, if applicable, on the Business Day agreed to by the parties in the Base Contract; provided, if the Transaction Confirmation is time stamped after 5:00 p.m. in the receiving party's time zone, it shall be deemed received at the opening of the next Business Day.

2.8.     "Confirming Party" shall mean the party designated in the Base Contract to prepare and forward Transaction Confirmations to the other party.

2.9.     "Contract" shall mean the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations and (iii) where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, any and all transactions that the parties have entered into through an EDI transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation, all of which shall form a single integrated agreement between the parties.

2.10.     "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a transaction.

2.11.     "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a transaction.

2.12.     "Cover Standard", as referred to in Section 3.2, shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Contract, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available), or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with: the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

2.13.     "Credit Support Obligation(s)" shall mean any obligation(s) to provide or establish credit support for, or on behalf of, a party to this Contract such as cash, an irrevocable standby letter of credit, a margin agreement, a prepayment, a security interest in an asset, guaranty, or other good and sufficient security of a continuing nature.

2.14.     "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

2.15.     "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a transaction.

2.16.     "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a transaction.

2.17.     "EDI" shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of Transaction Confirmations under this Contract.

2.18.     "EFP" shall mean the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts. EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the Commodity Exchange Act.

2.19.     "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

2.20.     "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

2.21.     "Guarantor" shall mean any entity that has provided a guaranty of the obligations of a party hereunder.

2.22.     "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

2.23.     "Indebtedness Cross Default" shall mean if selected on the Base Contract by the parties with respect to a party, that it or its Guarantor, if any, experiences a default, or similar condition or event however therein defined, under one or more agreements or instruments, individually or collectively, relating to indebtedness (such indebtedness to include any obligation whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of borrowed

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

NAESB Standard 6.3.1
September 6, 2006

money in an aggregate amount greater than the threshold specified in the Base Contract with respect to such party or its Guarantor, if any, which results in such indebtedness becoming immediately due and payable.

2.24.　　"Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

2.25.　　"MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

2.26.　　"Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

2.27.　　"Payment Date" shall mean a date, as indicated on the Base Contract, on or before which payment is due Seller for Gas received by Buyer in the previous Month.

2.28.　　"Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

2.29.　　"Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

2.30.　　"Specified Transaction(s)" shall mean any other transaction or agreement between the parties for the purchase, sale or exchange of physical Gas and any other transaction or agreement identified as a Specified Transaction under the Base Contract.

2.31.　　"Spot Price " as referred to in Section 3.2 shall mean the price listed in the publication indicated on the Base Contract, under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day; provided, if there is no single price published for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices.  If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

2.32.　　"Transaction Confirmation" shall mean a document, similar to the form of Exhibit A, setting forth the terms of a transaction formed pursuant to Section 1 for a particular Delivery Period.

2.33.　　"Transactional Cross Default" shall mean if selected on the Base Contract by the parties with respect to a party, that it shall be in default, however therein defined, under any Specified Transaction.

2.34.　　"Termination Option" shall mean the option of either party to terminate a transaction in the event that the other party fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer for a designated number of days during a period as specified on the applicable Transaction Confirmation.

2.35.　　"Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular transaction.

## SECTION 3.　　PERFORMANCE OBLIGATION

3.1.　　Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract.  Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a transaction.

| The parties have selected either the "Cover Standard" or the "Spot Price Standard" as indicated on the Base Contract. |
| Cover Standard: |

3.2.　　The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s) excluding any quantity for which no replacement is available; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s) excluding any quantity for which no sale is available; and (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available for all or any portion of the Contract Quantity of Gas, then in addition to (i) or (ii) above, as applicable, the sole and exclusive remedy of the performing party with respect to the Gas not replaced or sold shall be an amount equal to any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the quantity of such Gas not replaced or sold.  Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3.  The

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

NAESB Standard 6.3.1
September 5, 2006

amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's Invoice, which shall set forth the basis upon which such amount was calculated.

**Spot Price Standard:**

3.2.     The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price.  Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3.  The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's Invoice, which shall set forth the basis upon which such amount was calculated.

3.3.     Notwithstanding Section 3.2, the parties may agree to Alternative Damages in a Transaction Confirmation executed in writing by both parties.

3.4.     In addition to Sections 3.2 and 3.3, the parties may provide for a Termination Option in a Transaction Confirmation executed in writing by both parties.  The Transaction Confirmation containing the Termination Option will designate the length of nonperformance triggering the Termination Option and the procedures for exercise thereof, how damages for nonperformance will be compensated, and how liquidation costs will be calculated.

## SECTION 4.     TRANSPORTATION, NOMINATIONS, AND IMBALANCES

4.1.     Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s).  Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

4.2.     The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s).  Each party shall give the other party timely prior Notice, sufficient to meet the requirements of all Transporter(s) involved in the transaction, of the quantities of Gas to be delivered and purchased each Day.  Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

4.3.     The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges.  If Buyer or Seller receives an Invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges.  If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller.  If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer.

## SECTION 5.     QUALITY AND MEASUREMENT

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter.  The unit of quantity measurement for purposes of this Contract shall be one MMBtu dry.  Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

## SECTION 6.     TAXES

**The parties have selected either "Buyer Pays At and After Delivery Point" or "Seller Pays Before and At Delivery Point" as indicated on the Base Contract.**

**Buyer Pays At and After Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

**Seller Pays Before and At Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

## SECTION 7.     BILLING, PAYMENT, AND AUDIT

7.1.     Seller shall Invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged.  If the actual quantity delivered is not known by the

billing date, billing will be prepared based on the quantity of Scheduled Gas. The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

7.2. Buyer shall remit the amount due under Section 7.1 in the manner specified in the Base Contract, in immediately available funds, on or before the later of the Payment Date or 10 Days after receipt of the invoice by Buyer; provided that if the Payment Date is not a Business Day, payment is due on the next Business Day following that date. In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this Section 7.2.

7.3. In the event payments become due pursuant to Sections 3.2 or 3.3, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated. Payment from the nonperforming party will be due five Business Days after receipt of invoice.

7.4. If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed without undue delay. In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Section.

7.5. If the invoiced party fails to remit the full amount payable when due, interest on the unpaid portion shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

7.6. A party shall have the right, at its own expense, upon reasonable Notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under the Contract. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to transactions under this Contract. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery. All retroactive adjustments under Section 7 shall be paid in full by the party owing payment within 30 Days of Notice and substantiation of such inaccuracy.

7.7. Unless the parties have elected on the Base Contract not to make this Section 7.7 applicable to this Contract, the parties shall net all undisputed amounts due and owing, and/or past due, arising under the Contract such that the party owing the greater amount shall make a single payment of the net amount to the other party in accordance with Section 7; provided that no payment required to be made pursuant to the terms of any Credit Support Obligation or pursuant to Section 7.3 shall be subject to netting under this Section. If the parties have executed a separate netting agreement, the terms and conditions therein shall prevail to the extent inconsistent herewith.

## SECTION 8.    TITLE, WARRANTY, AND INDEMNITY

8.1. Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and assume any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

8.2. Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS SECTION 8.2 AND IN SECTION 15.8, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

8.3. Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury (including death) or property damage from said Gas or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury (including death) or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

8.4. The parties agree that the delivery of and the transfer of title to all Gas under this Contract shall take place within the Customs Territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States 19 U.S.C. §1202, General Notes, page 3); provided, however, that in the event Seller took title to the Gas outside the Customs Territory of the United States, Seller represents and warrants that it is the importer of record for all Gas entered and delivered into the United States, and shall be responsible for entry and entry summary filings as well as the payment of duties, taxes and fees, if any, and all applicable record keeping requirements.

8.5. Notwithstanding the other provisions of this Section 8, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of Section 5.

## SECTION 9.    NOTICES

9.1. All Transaction Confirmations, invoices, payment instructions, and other communications made pursuant to the Base Contract ("Notices") shall be made to the addresses specified in writing by the respective parties from time to time.

9.2. All Notices required hereunder shall be in writing and may be sent by facsimile or mutually acceptable electronic means, a nationally recognized overnight courier service, first class mail or hand delivered.

9.3.    Notice shall be given when received on a Business Day by the addressee.  In the absence of proof of the actual receipt date, the following presumptions will apply.  Notices sent by facsimile shall be deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission.  If the day on which such facsimile is received is not a Business Day or is after five p.m. on a Business Day, then such facsimile shall be deemed to have been received on the next following Business Day.  Notice by overnight mail or courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving party.  Notice via first class mail shall be considered delivered five Business Days after mailing.

9.4.    The party receiving a commercially acceptable Notice of change in payment instructions or other payment information shall not be obligated to implement such change until ten Business Days after receipt of such Notice.

## SECTION 10.    FINANCIAL RESPONSIBILITY

10.1.    If either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Contract (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y or its Guarantor, if applicable), X may demand Adequate Assurance of Performance.  "Adequate Assurance of Performance" shall mean sufficient security in the form, amount, for a term, and from an issuer, all as reasonably acceptable to X, including, but not limited to cash, a standby irrevocable letter of credit, a prepayment, a security interest in an asset or guaranty.  Y hereby grants to X a continuing first priority security interest in, lien on, and right of setoff against all Adequate Assurance of Performance in the form of cash transferred by Y to X pursuant to this Section 10.1.  Upon the return by X to Y of such Adequate Assurance of Performance, the security interest and lien granted hereunder on that Adequate Assurance of Performance shall be released automatically and, to the extent possible, without any further action by either party.

10.2.    In the event (each an "Event of Default") either party (the "Defaulting Party") or its Guarantor shall: (i) make an assignment or any general arrangement for the benefit of creditors; (ii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise become bankrupt or insolvent (however evidenced); (iv) be unable to pay its debts as they fall due; (v) have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; (vi) fail to perform any obligation to the other party with respect to any Credit Support Obligations relating to the Contract; (vii) fail to give Adequate Assurance of Performance under Section 10.1 within 48 hours but at least one  Business Day of a written request by the other party; (viii) not have paid any amount due the other party hereunder on or before the second Business Day following written Notice that such payment is due; or ix) be the affected party with respect to any Additional Event of Default; then the other party (the "Non-Defaulting Party") shall have the right, at its sole election, to immediately withhold and/or suspend deliveries or payments upon Notice and/or to terminate and liquidate the transactions under the Contract, in the manner provided in Section 10.3, in addition to any and all other remedies available hereunder.

10.3.    If an Event of Default has occurred and is continuing, the Non-Defaulting Party shall have the right, by Notice to the Defaulting Party, to designate a Day, no earlier than the Day such Notice is given and no later than 20 Days after such Notice is given, as an early termination date (the "Early Termination Date") for the liquidation and termination pursuant to Section 10.3.1 of all transactions under the Contract, each a "Terminated Transaction".  On the Early Termination Date, all transactions will terminate, other than those transactions, if any, that may not be liquidated and terminated under applicable law ("Excluded Transactions"), which Excluded Transactions must be liquidated and terminated as soon thereafter as is legally permissible, and upon termination shall be a Terminated Transaction and be valued consistent with Section 10.3.1 below.  With respect to each Excluded Transaction, its actual termination date shall be the Early Termination Date for purposes of Section 10.3.1.

The parties have selected either "Early Termination Damages Apply" or "Early Termination Damages Do Not Apply" as indicated on the Base Contract.

Early Termination Damages Apply:

10.3.1.    As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract and (ii) the Market Value, as defined below, of each Terminated Transaction.  The Non-Defaulting Party shall (x) liquidate and accelerate each Terminated Transaction at its Market Value, so that each amount equal to the difference between such Market Value and the Contract Value, as defined below, of such Terminated Transaction(s) shall be due to the Buyer under the Terminated Transaction(s) if such Market Value exceeds the Contract Value and to the Seller if the opposite is the case; and (y) where appropriate, discount each amount then due under clause (x) above to present value in a commercially reasonable manner as of the Early Termination Date (to take account of the period between the date of liquidation and the date on which such amount would have otherwise been due pursuant to the relevant Terminated Transactions).

For purposes of this Section 10.3.1, "Contract Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the Contract Price, and "Market Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the market price for a similar transaction at the Delivery Point determined by the Non-Defaulting Party in a commercially reasonable manner.  To ascertain the Market Value, the Non-Defaulting Party may consider, among other valuations, any or all of the settlement prices of NYMEX Gas futures contracts, quotations from leading dealers in energy swap

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

Page 9 of 14

NAESB Standard 6.3.1
September 5, 2006

contracts or physical gas trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term and differences in transportation costs. A party shall not be required to enter into a replacement transaction(s) in order to determine the Market Value. Any extension of the term of a transaction to which parties are not bound as of the Early Termination Date (including but not limited to "evergreen provisions") shall not be considered in determining Contract Values and Market Values. For the avoidance of doubt, any option pursuant to which one party has the right to extend the term of a transaction shall not be considered in determining Contract Values and Market Values. The rate of interest used in calculating net present value shall be determined by the Non-Defaulting Party in a commercially reasonable manner.

**Early Termination Damages Do Not Apply:**

10.3.1.   As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract.

**The parties have selected either "Other Agreement Setoffs Apply" or "Other Agreement Setoffs Do Not Apply" as Indicated on the Base Contract.**

**Other Agreement Setoffs Apply:**

**Bilateral Setoff Option:**

10.3.2.   The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount"). At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party is hereby authorized to setoff any Net Settlement Amount against (i) any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract; and (ii) any amount(s) (including any excess cash margin or excess cash collateral) owed or held by the party that is entitled to the Net Settlement Amount under any other agreement or arrangement between the parties.

**Triangular Setoff Option:**

10.3.2.   The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount"). At its sole option, and without prior Notice to the Defaulting Party, the Non-Defaulting Party is hereby authorized to setoff (i) any Net Settlement Amount against any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract; (ii) any Net Settlement Amount against any amount(s) (including any excess cash margin or excess cash collateral) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Net Settlement Amount owed to the Non-Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Non-Defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement; (iv) any Net Settlement Amount owed to the Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Defaulting Party to the Non-Defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Net Settlement Amount owed to the Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Defaulting Party or its Affiliates to the Non-Defaulting Party under any other agreement or arrangement.

**Other Agreement Setoffs Do Not Apply:**

10.3.2.   The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount"). At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff any Net Settlement Amount against any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract.

10.3.3.   If any obligation that is to be included in any netting, aggregation or setoff pursuant to Section 10.3.2 is unascertained, the Non-Defaulting Party may in good faith estimate that obligation and net, aggregate or setoff, as applicable, in respect of the estimate, subject to the Non-Defaulting Party accounting to the Defaulting Party when the obligation is ascertained. Any amount not then due which is included in any netting, aggregation or setoff pursuant to Section 10.3.2 shall be discounted to net present value in a commercially reasonable manner determined by the Non-Defaulting Party.

10.4.     As soon as practicable after a liquidation, Notice shall be given by the Non-Defaulting Party to the Defaulting Party of the Net Settlement Amount, and whether the Net Settlement Amount is due to or due from the Non-Defaulting Party. The Notice shall include a written statement explaining in reasonable detail the calculation of the Net Settlement Amount, provided that failure to give such Notice shall not affect the validity or enforceability of the liquidation or give rise to any claim by the Defaulting Party against the Non-Defaulting Party. The Net Settlement Amount as well as any setoffs applied against such amount pursuant to Section 10.3.2, shall be paid by the close of business on the second Business Day following such Notice, which date shall not be earlier than the Early Termination Date. Interest on any unpaid portion of the Net Settlement Amount as adjusted by setoffs, shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

10.5.    The parties agree that the transactions hereunder constitute a "forward contract" within the meaning of the United States Bankruptcy Code and that Buyer and Seller are each "forward contract merchants" within the meaning of the United States Bankruptcy Code.

10.6.    The Non-Defaulting Party's remedies under this Section 10 are the sole and exclusive remedies of the Non-Defaulting Party with respect to the occurrence of any Early Termination Date.  Each party reserves to itself all other rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from the Contract.

10.7.    With respect to this Section 10, if the parties have executed a separate netting agreement with close-out netting provisions, the terms and conditions therein shall prevail to the extent inconsistent herewith.

## SECTION 11.   FORCE MAJEURE

11.1.    Except with regard to a party's obligation to make payment(s) due under Section 7, Section 10.4, and Imbalance Charges under Section 4, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure.  The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2.

11.2.    Force Majeure shall include, but not be limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (iii) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars, or acts of terror; and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction.  Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

11.3.    Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (i) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, or Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Contract; (iv) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in Section 11.2; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.  The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

11.4.    Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

11.5.    The party whose performance is prevented by Force Majeure must provide Notice to the other party.  Initial Notice may be given orally; however, written Notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible.  Upon providing written Notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

11.6.    Notwithstanding Sections 11.2 and 11.3, the parties may agree to alternative Force Majeure provisions in a Transaction Confirmation executed in writing by both parties.

## SECTION 12.   TERM

This Contract may be terminated on 30 Day's written Notice, but shall remain in effect until the expiration of the latest Delivery Period of any transaction(s).  The rights of either party pursuant to Section 7.8, Section 10, Section 13, the obligations to make payment hereunder, and the obligation of either party to indemnify the other, pursuant hereto shall survive the termination of the Base Contract or any transaction.

## SECTION 13.   LIMITATIONS

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY.  A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY.  SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH

NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

## SECTION 14.    MARKET DISRUPTION

If a Market Disruption Event has occurred then the parties shall negotiate in good faith to agree on a replacement price for the Floating Price (or on a method for determining a replacement price for the Floating Price) for the affected Day, and if the parties have not so agreed on or before the second Business Day following the affected Day then the replacement price for the Floating Price shall be determined within the next two following Business Days with each party obtaining, in good faith and from non-affiliated market participants in the relevant market, two quotes for prices of Gas for the affected Day of a similar quality and quantity in the geographical location closest in proximity to the Delivery Point and averaging the four quotes. If either party fails to provide two quotes then the average of the other party's two quotes shall determine the replacement price for the Floating Price. "Floating Price" means the price or a factor of the price agreed to in the transaction as being based upon a specified index. "Market Disruption Event" means, with respect to an index specified for a transaction, any of the following events: (a) the failure of the index to announce or publish information necessary for determining the Floating Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading on the exchange or market acting as the index; (c) the temporary or permanent discontinuance or unavailability of the index; (d) the temporary or permanent closing of any exchange acting as the index; or (e) both parties agree that a material change in the formula for or the method of determining the Floating Price has occurred. For the purposes of the calculation of a replacement price for the Floating Price, all numbers shall be rounded to three decimal places. If the fourth decimal number is five or greater, then the third decimal number shall be increased by one and if the fourth decimal number is less than five, then the third decimal number shall remain unchanged.

## SECTION 15.    MISCELLANEOUS

15.1.    This Contract shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective parties hereto, and the covenants, conditions, rights and obligations of this Contract shall run for the full term of this Contract. No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed; provided, either party may (i) transfer, sell, pledge, encumber, or assign this Contract or the accounts, revenues, or proceeds hereof in connection with any financing or other financial arrangements, or (ii) transfer its interest to any parent or Affiliate by assignment, merger or otherwise without the prior approval of the other party. Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder.

15.2.    If any provision in this Contract is determined to be invalid, void or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Contract.

15.3.    No waiver of any breach of this Contract shall be held to be a waiver of any other or subsequent breach.

15.4.    This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s). This Contract may be amended only by a writing executed by both parties.

15.5.    The interpretation and performance of this Contract shall be governed by the laws of the jurisdiction as indicated on the Base Contract, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction.

15.6.    This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any governmental authority having jurisdiction over the parties, their facilities, or Gas supply, this Contract or transaction or any provisions thereof.

15.7.    There is no third party beneficiary to this Contract.

15.8.    Each party to this Contract represents and warrants that it has full and complete authority to enter into and perform this Contract. Each person who executes this Contract on behalf of either party represents and warrants that it has full and complete authority to do so and that such party will be bound thereby.

15.9.    The headings and subheadings contained in this Contract are used solely for convenience and do not constitute a part of this Contract between the parties and shall not be used to construe or interpret the provisions of this Contract.

15.10.    Unless the parties have elected on the Base Contract not to make this Section 15.10 applicable to this Contract, neither party shall disclose directly or indirectly without the prior written consent of the other party the terms of any transaction to a third party (other than the employees, lenders, royalty owners, counsel, accountants and other agents of the party, or prospective purchasers of all or substantially all of a party's assets or of any rights under this Contract, provided such persons shall have agreed to keep such terms confidential) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Contract , (iii) to the extent necessary to implement any transaction, (iv) to the extent necessary to comply with a regulatory agency's reporting requirements including but not limited to gas cost recovery proceedings; or (v) to the extent such information is delivered to such third party for the sole purpose of calculating a published index. Each party shall notify the other party of any proceeding of which it is aware which may result in disclosure of the terms of any transaction (other than as permitted hereunder) and use reasonable efforts to prevent or limit the disclosure. The existence of this Contract is not subject to this confidentiality obligation. Subject to Section 13, the parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with this

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

NAESB Standard 6.3.1
September 5, 2006

confidentiality obligation.  The terms of any transaction hereunder shall be kept confidential by the parties hereto for one year from the expiration of the transaction.

In the event that disclosure is required by a governmental body or applicable law, the party subject to such requirement may disclose the material terms of this Contract to the extent so required, but shall promptly notify the other party, prior to disclosure, and shall cooperate (consistent with the disclosing party's legal obligations) with the other party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the other party.

15.11.    The parties may agree to dispute resolution procedures in Special Provisions attached to the Base Contract or in a Transaction Confirmation executed in writing by both parties

15.12.    Any original executed Base Contract, Transaction Confirmation or other related document may be digitally copied, photocopied, or stored on computer tapes and disks (the "Imaged Agreement"). The Imaged Agreement, if introduced as evidence on paper, the Transaction Confirmation, if introduced as evidence in automated facsimile form, the recording, if introduced as evidence in its original form, and all computer records of the foregoing, if introduced as evidence in printed format, in any judicial, arbitration, mediation or administrative proceedings will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither Party shall object to the admissibility of the recording, the Transaction Confirmation, or the Imaged Agreement on the basis that such were not originated or maintained in documentary form. However, nothing herein shall be construed as a waiver of any other objection to the admissibility of such evidence.

---

DISCLAIMER:  The purposes of this Contract are to facilitate trade, avoid misunderstandings and make more definite the terms of contracts of purchase and sale of natural gas.  Further, NAESB does not mandate the use of this Contract by any party.  NAESB DISCLAIMS AND EXCLUDES, AND ANY USER OF THIS CONTRACT ACKNOWLEDGES AND AGREES TO NAESB'S DISCLAIMER OF, ANY AND ALL WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THIS CONTRACT OR ANY PART THEREOF, INCLUDING ANY AND ALL IMPLIED WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT NAESB KNOWS, HAS REASON TO KNOW, HAS BEEN ADVISED, OR IS OTHERWISE IN FACT AWARE OF ANY SUCH PURPOSE), WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, OR BY COURSE OF DEALING.  EACH USER OF THIS CONTRACT ALSO AGREES THAT UNDER NO CIRCUMSTANCES WILL NAESB BE LIABLE FOR ANY DIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY USE OF THIS CONTRACT.

TRANSACTION CONFIRMATION
FOR IMMEDIATE DELIVERY

EXHIBIT A

| Letterhead/Logo | Date: _____ , _____ |
|---|---|
| | Transaction Confirmation #: _____ |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated  August 14, 2009.  The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| SELLER: | BUYER: |
|---|---|
| EXCO OPERATING COMPANY, LP | BG ENERGY MERCHANTS, LLC |
| EXCO PRODUCTION COMPANY, LP | |
| | |
| Attn: _____ | Attn: _____ |
| Phone: _____ | Phone: _____ |
| Fax: _____ | Fax: _____ |
| Base Contract No. _____ | Base Contract No. _____ |
| Transporter: _____ | Transporter: _____ |
| Transporter Contract Number: ____ | Transporter Contract Number: ____ |

Contract Price:  $_____ /MMBtu or _____

Delivery Period:  Begin: _____ , ____          End: _____ , ____

**Performance Obligation and Contract Quantity:  (Select One)**

| Firm (Fixed Quantity): | Firm (Variable Quantity): | Interruptible: |
|---|---|---|
| _____ MMBtus/day | _____ MMBtus/day Minimum | Up to _____ MMBtus/day |
| □ EFP | _____ MMBtus/day Maximum | |
| | subject to Section 4.2. at election of | |
| | □ Buyer or □ Seller | |

Delivery Point(s): _____
(If a pooling point is used, list a specific geographic and pipeline location):

Special Conditions:

| Seller: EXCO OPERATING COMPANY, LP | Buyer:  BG ENERGY MERCHANTS, LLC |
|---|---|
| By:  EXCO Partner OLP GP, LLC – it's general partner | |
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

| Seller:  EXCO PRODUCTION COMPANY, LP | |
|---|---|
| By:  Vaughan DE, LLC – it's general partner | |
| By: _____ | |
| Title: _____ | |
| Date: _____ | |

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

NAESB Standard 6.3.1
September 5, 2006

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
DB1/63501107.1

NAESB Standard 6.3.1
September 5, 2006

Special Provisions to Base Contract for Sale and Purchase of Natural Gas among EXCO
Operating Company, LP, EXCO Production Company, LP and BG Energy Merchants, LLC
dated August 14, 2009 (the "Base Contract")

BG Energy Merchants, LLC, a Delaware limited liability company ("Buyer"), and EXCO
Operating Company, LP, a Delaware limited partnership ("EOC"), and EXCO Production
Company, LP, a Texas limited partnership ("EPC", and EPC and EOC, collectively, "Seller"),
hereby agree, effective as of the 14th day of August, 2009, to the following special provisions
("Special Provisions") to the Base Contract, which hereby modifies and amends the Base
Contract dated and effective as of the date hereof between Buyer and Seller. Unless specifically
agreed otherwise in a Transaction Confirmation, the Base Contract, as modified by these Special
Provisions, shall apply to all transactions for the purchase and sale of Gas between the parties.
All capitalized terms used but not otherwise defined herein shall have the meanings set forth in
the Base Contract.

1.    Section 1.1. shall be amended by adding the following sentence immediately after the
      first sentence therein:

      For all purposes of this Agreement, EXCO Operating Company, LP and EXCO
      Production Company, LP shall collectively be the "Seller" hereunder, and BG Energy
      Merchants, LLC shall be the "Buyer" hereunder.

2.    Section 1.2. "Oral Transaction Procedure" is modified by inserting the following
      immediately after the last sentence thereof:

      "Messages exchanged by the parties using internet messaging services (including but not
      limited to AOL Instant Messenger and Yahoo!Messenger) shall be treated in the same
      manner as telephonic conversations for purposes of this Base Contract, and any printed
      record of messages exchanged on such services shall be treated in the same manner as
      telephonic recordings for purposes of this Base Contract."

3.    Section 1.3. is amended by deleting the words "which may be" from the last sentence
      thereof and inserting "as" in lieu thereof.

4.    Section 1.4. is amended by inserting the following language immediately before the last
      sentence thereof:

      "Telephonic recordings may be relied upon to resolve any differences provided that a true
      and complete copy is made available to the other party.  No party may knowingly destroy
      or erase a recording once the possessing party becomes aware of an actual dispute in
      which the recording may reasonable be anticipated to be discoverable."

5.    Section 2.6. shall replaced in its entirety with the following:

      2.6.    "Business Day" means a day (other than a Saturday or Sunday) on which
      commercial banks in Texas are generally open for business, provided that if Business
      Days are used to calculate periods in which a party must make a payment hereunder,

DB1/63501448.4
US 37462v.1

"Business Day" means a day (other than a Saturday or Sunday) on which commercial banks in Texas and London are generally open for business.

6.   Section 2.10. shall replaced in its entirety with the following:

2.10.   "Contract Price" for a particular Month shall be the weighted average net realization price (WANRP) per MMBtu for all Other Gas sold by Seller at the Sale Point(s) during such Month, where the "WANRP" is the gross revenue realized by Seller at the Sale Point(s) for the sale of such Other Gas, less all transportation demand charges, usage charges and fuel associated with transporting (if applicable) such Other Gas downstream of the Delivery Point(s) to the applicable Sale Point(s). Any dispute arising hereunder regarding the determination of the Contract Price for any Month may be referred by either party hereto to an expert for resolution in accordance with Section 15.14. if such dispute is not resolved within thirty (30) days of the delivery of the invoice identifying such Contract Price.

7.   Section 2.11. shall replaced in its entirety with the following:

2.11.   "Contract Quantity" means, with respect to any Month, one-half (½) of the Total Gas for such Month, provided that if there is any Disproportionate Party Gas as of the first day of such Month, the Contract Quantity shall be the sum of: (a) one-half (½) of the Total Gas for such Month that is not Disproportionate Party Gas, and (b) that proportion of such Disproportionate Party Gas that the aggregate Participating Interests of Buyer and its Affiliates as of the first day of such Month bear to the aggregate Participating Interests of Buyer and its Affiliates and Seller and its Affiliates as of such time.

8.   Section 2.16. shall be replaced in its entirety with the following:

2.16.   "Delivery Points" shall mean the interconnections between any gathering system, including without limitation the Company Group System, upon which Seller is gathering Gas from the East Texas/North Louisiana Area (other than any such Gas produced pursuant to an operation in which neither Buyer nor an Affiliate of Buyer is participating), and any downstream pipeline system of a Transporter, whether heretofore or hereafter existing, and "Delivery Point" means any of them.

9.   The following language shall be inserted immediately after Section 2.35.:

2.36.   "Company Group Members" has the meaning provided in the TGGT LLC Agreement.

2.37.   "Company Group System" means all separation, gathering, processing, compression, measurement and other related facilities and equipment of any of the Company Group Members, whether heretofore or hereafter existing, installed, operated or leased by any of the Company Group Members during the term hereof.

2.38.   "Control" has the meaning provided in the TGGT LLC Agreement.

Page 2

2.39.   "Disproportionate Party Gas" means any Gas produced in a Month pursuant to an operation in the East Texas/North Louisiana Area in which less than all of the parties to the Joint Development Agreement participate, but in which  Buyer and/or its Affiliates that are parties to the Joint Development Agreement, and Seller and/or its Affiliates that are parties to the Joint Development Agreement participate, and the aggregate Participating Interests of Buyer and its Affiliates as of the first day of such Month are not equal to the aggregate Participating Interests of Seller and its Affiliates as of such time.

2.40.   "East Texas/North Louisiana Area" has the meaning provided in the TGGT LLC Agreement.

2.41.   "Joint Development Agreement" means the Joint Development Agreement by and among Seller and BGUSPC, dated August 14, 2009, as it may be amended from time to time.

2.42.   "Other Gas" shall mean, for any Month, that portion of the Total Gas in such Calendar Month that is not the Contract Quantity.

2.43.   "Participating Interest" has the meaning provided in the Joint Development Agreement.

2.44.   "Sale Point" means any point where Seller transfers title to the Other Gas to a Third Party.

2.45.   "TGGT" means TGGT Holdings, LLC, a Delaware limited liability company.

2.46.   "TGGT LLC Agreement" means the limited liability company agreement of TGGT, as it may be amended from time to time.

2.47.   "Third Party" means any Person that is not an Affiliate of Seller.

2.48.   "Total Gas" means, for any Month, all of the Gas which Seller has the right or obligation to market produced from the East Texas/North Louisiana Area during such Month, including all Gas owned by or attributable to Seller or its Affiliates, and all Gas owned by, attributable to or for the account of a Third Party for which Seller has the right or obligation to market on behalf of such Third Party, whether by contract, law or otherwise, provided that Total Gas shall not include any Gas which EXCO has the right to market that is produced pursuant to an operation in which neither Buyer nor any Affiliate of Buyer is participating; provided further that Total Gas shall not include any Gas owned by, attributable to or for the account of a Third Party that such Third Party elects to take in kind.

10.   Section 3.1. shall be replaced in its entirety with the following:

Commencing with September 2009, Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for each Month during the term of this Contract.

DB1/63501448.4
US 37462v.1

11.    Section 4.2. shall be replaced in its entirety with the following:

4.2.

(a)    <u>Monthly Scheduling</u>.  On or before the twentieth (20th) Day of a Month prior to a Month during which Buyer is to purchase the Contract Quantity for such Month (a "Sale Month"), Seller shall provide Buyer written notice of the estimated quantities of Total Gas, Other Gas, and the Contract Quantity for such Sale Month.  On or before the day that is five (5) Business Days prior to the first day of a Sale Month, Seller shall provide Buyer written notice (a "Schedule Notice") with an updated estimate of quantities of Total Gas, Other Gas, and the Contract Quantity for such Sale Month, the Sale Points for such Other Gas and the allocation of the quantities of such Other Gas among such Sale Points, and for each such Sale Point, the estimated price split for quantities of Other Gas sold at such Sale Point between first of the month pricing indices and daily indices.  Not later than one (1) Business Day after receipt of a Schedule Notice for a Sale Month, Buyer shall provide Seller written notice of the Delivery Point(s) at which it will take receipt of the Contract Quantity during such Sale Month, and the daily quantities to be received at each such Delivery Point.

(b)    <u>Daily Nominations</u>.  At least twenty-four (24) hours prior to the Day of tender of Gas by Seller hereunder, Buyer may change its nomination for such Day by notifying Seller of the quantity of Gas Buyer desires to have delivered at each Delivery Point on such Day, and Seller shall deliver such quantities of Gas at such Delivery Point(s).  Seller shall waive any part of the twenty-four (24) hours' notice if, in its reasonable judgment, operating conditions permit such waiver.  The daily quantities of Gas so requested shall be taken by Buyer at the Delivery Point(s) as nominated and at a substantially constant hourly and daily rate.  Seller shall notify Buyer as soon as practicable of any changes in operational conditions that will cause daily rate variations in deliveries for Buyer's account.

(c)    <u>Available Capacity</u>.  Unless otherwise agreed by the Parties, to the extent that there is not available capacity at any Delivery Point to receive all quantities of Gas that Buyer nominated at such Delivery Point and that Seller desires to transport through such Delivery Point, Seller and Buyer shall share the available capacity at such Delivery Point on a pro-rata basis, with each party being entitled to that portion of the available capacity at such Delivery Point that its and its Affiliates' aggregate Participating Interests as of such time bear to the aggregate Participating Interests of Buyer and its Affiliates and Seller and its Affiliates.

12.    Section 6., Taxes – Buyer Pays At and After Delivery Point shall be amended by adding to the end of the last sentence the language "prior to the due date of the applicable tax return."

13.    Section 8.1. is amended by adding the words "at and" between "Gas" and "after" in the third sentence.

Page 4

14.    Section 10.2.(ii) is amended by inserting a comma after the word "creditors" and by inserting the words "and such petition or proceeding that is filed or commenced against it is not withdrawn, dismissed, discharged, stayed or restrained within 30 days of its presentation or commencement" between the words "commenced against it" and the semicolon.

15.    Section 11.3. is modified by deleting the word "or" before subsection (v) and adding the following at the end of the first sentence thereof:

"; or (vi) the failure to perform was caused by the gross negligence or willful misconduct of the party claiming excuse."

16.    The language in Section 12. shall be replaced in its entirety with the following:

(a)    This Contract shall be in full force and effect as of the date first written above and shall continue in effect until the first to occur of the following:

(i)    Buyer or any Affiliate of Buyer takes Gas produced from the East Texas/North Louisiana Area in kind at the wellhead (other than Gas produced pursuant to an operation in which neither Seller nor any Affiliate of Seller is participating);

(ii)    no Gas is being produced from any well in the East Texas/North Louisiana Area in which Buyer, Seller or any Affiliate of Buyer or Seller holds any portion of the associated working interest;

(iii)    at the election of Buyer, upon notice from Buyer to Seller given within 30 days following its receipt of notice from Seller to Buyer of a change in Control of Seller;

(iv)    at the election of Buyer, upon notice from Buyer to Seller given within 30 days following such removal if Seller or any Affiliate of Seller is removed as operator under any operating agreement or similar agreement governing joint operations of the parties and/or their Affiliates with respect to oil and gas properties in the East Texas/North Louisiana Area; or

(v)    upon written agreement of the parties hereto in writing.

(b)    In the event this Contract is terminated pursuant to Section 12(a)(i), the parties hereto shall use reasonable endeavors to agree upon an alternative marketing arrangement that would put Buyer in a similar position as to total quantities of Gas available for purchase hereunder had it or its Affiliate not taken the relevant Gas in kind.

(c)    Except for any termination pursuant to Section 12(a)(i)(ii) hereof, any termination pursuant to Section 12(a) shall be effective only on the last day of the Month in which the 30th day following the event or receipt of notice giving rising to such termination occurs.

DB1/63501448.4
US 37462v.1

17.   Section 15.1. shall be replaced in its entirety with the following:

No party hereto shall assign or otherwise transfer all or any part of this Contract, nor shall any party hereto delegate any of its rights or duties hereunder, without the prior written consent of the other party hereto, and any such transfer or delegation made without such consent shall be void, provided that no such consent shall be required for any such transfer by:  (a) Buyer made in connection with a transfer of Buyer's or its Affiliates' member interests in TGGT in accordance with the TGGT LLC Agreement; or (b) Seller made in connection with a transfer of all or a portion of Seller's or its Affiliates' upstream interests subject to the Joint Development Agreement.  As to each of Buyer and its Affiliates and Seller and its Affiliates, this Contract shall be deemed an "Associated Agreement" for all purposes under the Joint Development Agreement (notwithstanding anything to the contrary therein).

18.   The following language shall be inserted immediately after Section 15.12.:

15.13.  Arbitration.   Any dispute arising under this Contract shall be resolved in accordance with Section 15.2 of the TGGT LLC Agreement, the terms of which are incorporated herein, *mutatis mutandis.*

15.14.  Expert Proceedings.  For any decision referred to an expert under this Contract, the parties hereto hereby agree that such decision shall be conducted expeditiously by an expert selected unanimously by the parties hereto.  The expert is not an arbitrator of the dispute and shall not be deemed to be acting in an arbitral capacity.  The expert shall not (without the written consent of the parties hereto) be appointed to act as an arbitrator or as adviser to any party hereto in any dispute arbitrated pursuant to Section 15.13., provided that nothing in this sentence shall preclude any party hereto from using the expert as a witness regarding the proper conduct of the expert procedure.  The party desiring an expert determination shall give the other party written notice of the request for such determination.  If the parties are unable to agree upon an expert within ten (10) Days after receipt of the written notice of request for an expert determination, then, upon the request of any of the Parties, the American Arbitration Association shall appoint such expert.  The expert, once appointed, shall have no ex parte communications with the parties concerning the expert determination or the underlying dispute.   All communications between any party hereto and the expert shall be conducted in writing, with copies sent simultaneously to the other party hereto in the same manner, or at a meeting to which representatives of all parties hereto have been invited and of which such parties have been provided at least five (5) Business Days notice.  Within thirty (30) Days after the expert's acceptance of its appointment, the parties hereto shall provide the expert with a report containing their proposal for the resolution of the matter and the reasons therefor, accompanied by all relevant supporting information and data.  Within sixty (60) Days of receipt of the above-described materials and after receipt of additional information or data as may be required by the expert, the expert shall select the proposal which it finds more consistent with the terms of this Contract.  The expert may not propose alternate positions or award damages, interest or penalties to any parties with

Page 6

respect to any matter. The expert's decision shall be final and binding on the parties hereto. Either Party hereto that fails or refuses to honor the decision of an expert shall be in default under this Contract.

15.15. Downstream Nomination Adjustments for Force Majeure. With regard to references to Imbalance Charges in Sections 2.19., 2.24., 3.2., 4.3., 11.1. and 11.3., it is understood and agreed that upon receiving Notice of Force Majeure, the party not claiming Force Majeure shall adjust nominations with its Transporter(s) to account for any change in quantities to be delivered or received. Such nomination change shall be made immediately, if feasible, or as soon as practicable but not later than the next Business Day following notice of Force Majeure.

15.16. Netting. If on any date amounts would otherwise be payable by Buyer to Seller hereunder, and by Seller to Buyer or any Affiliate of Buyer in respect of the sale of Gas produced from the East Texas/North Louisiana Area marketed by Seller on behalf of Buyer or any Affiliate of Buyer (any such amounts, "BG Gas Sale Proceeds"), such BG Gas Sale Proceeds shall be credited against Buyer's obligation to make payment hereunder up to the amount of the payment required to be made by Buyer hereunder, and Seller's obligation to pay Buyer or the Affiliate of Buyer such BG Gas Sale Proceeds shall be reduced by the amount so credited against Buyer's obligation to make payment hereunder. Buyer shall cause any of its Affiliates affected by this Section 15.16. to enter into any agreements reasonably requested by Seller to reflect the netting arrangements contemplated herein.

IN WITNESS WHEREOF, the parties hereto have caused these Special Provisions to be attached to the Base Contract on and as of August 14, 2009.

SELLER:                              BUYER:

EXCO OPERATING COMPANY, LP           BG ENERGY MERCHANTS, LLC

By: _____          By: _____
Name: R. L. Hodges                   Name: _Elizabeth Spomer_
Title: Vice President                 Title: _Vice President_

EXCO PRODUCTION COMPANY, LP

By: _____
Name: R. L. Hodges
Title: Vice President

Page 7

**TRANSACTION CONFIRMATION**
**FOR IMMEDIATE DELIVERY**

| **g** | | Date: |
| | | Transaction Confirmation # : |

Unless otherwise stated herein, this Transaction Confirmation is subject to the Base Contract between Seller and Buyer, dated August 14, 2009 (the "Base Contract"), and the Special Provisions to such Base Contract, dated August 14, 2009 (the "Special Provisions"); provided that, in the event of a conflict between the Base Contract and/or the Special Provisions and this Transaction Confirmation, the terms of this Transaction Confirmation shall control. The terms of this Transaction Confirmation shall become binding and effective upon Buyer and Seller upon execution of this Transaction Confirmation by both such parties.

| **SELLER: EXCO Operating Company, LP** | **BUYER: BG Energy Merchants, LLC** |
| 12377 Merit Drive, Suite 1700 | 5444 Westheimer, Suite 1200 |
| Dallas, TX 75251 | Houston, TX 77056 |
| Attn: Steve Estes | Attn: Mark Englebart |
| Email: sestes@excoresources.com | Email: mark.englebart@bg-group.com |
| Phone: 972-367-3533 | Phone: 713-599-5202 |
| Fax: 214-438-1401 | Fax: 713-599-3781 |

**Contract Quantity:**

Each Day during the Delivery Period (as hereinafter defined) Seller shall deliver and sell to Buyer and Buyer shall receive and purchase from Seller one hundred thousand (100,000) mmBtu/Day plus fuel retainage on a firm and fixed quantity basis (the "DCQ"). The "Contract Quantity" of gas sold and purchased in accordance with this Transaction Confirmation for each Month shall be the DCQ multiplied by the number of Days in the applicable Month. For the avoidance of doubt, Section 7 of the Special Provisions to the Base Contract (amending the definition of "Contract Quantity") shall not apply for the purposes of this Transaction Confirmation.

**Term:**

The term of this Transaction Confirmation (the "Delivery Period") shall be ten (10) years beginning on the commencement of firm transportation service by Buyer on the Tiger Pipeline (the "ETC TGRPL"), owned and operated by ETC Tiger Pipeline, LLC ("ETC"), in accordance with the Precedent Agreement between Buyer and ETC dated September 30, 2009 (the "TGRPL Contract").

For the avoidance of doubt, (i) Section 16 of the Special Provisions to the Base Contract (amending the provisions of Section 12 of the Base Contract) shall not apply for the purposes of this Transaction Confirmation, and (ii) in the event that the Base Contract and/or the "Contract" (as such term is defined in the Base Contract) terminates in accordance with Section 12, as amended by Section 16 of the Special Provisions, this Transaction Confirmation shall not terminate and the transactions, rights and obligations contemplated by this Transaction Confirmation and the terms of the Base Contract and the Special Provisions applicable to this Transaction Confirmation shall survive such termination of the Base Contract and/or the Contract for the duration of the Delivery Period, unless this Transaction Confirmation is mutually terminated by the written agreement of both Buyer and Seller.

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
April 19, 2002

# EXHIBIT B

**Delivery Points:**

The "Delivery Points" for the gas sold and purchased in accordance with this Transaction Confirmation shall be the interconnect between the TGG Facilities and the ETC TGRPL located in DeSoto Parish, Louisiana and any other interconnect between the TGG Facilities and the ETC TGRPL that is agreed between the Parties in accordance with the procedures of the Base Contract.  For the avoidance of doubt, Section 8 of the Special Provisions to the Base Contract (amending the definition of "Delivery Points") shall not apply for the purposes of this Transaction Confirmation.  For the purposes of this Transaction Confirmation, the term "TGG Facilities" shall mean all separation, gathering, processing, compression, measurement and transportation facilities and other related facilities owned by TGG Pipeline, Ltd., whether heretofore or hereafter existing, installed or leased by TGG Pipeline Ltd. during the Delivery Period.

**Contract Price:**

The "Contract Price" for each mmBtu sold and purchased in accordance with this Transaction Confirmation for a particular Month shall be calculated in accordance with the following formula:

Contract Price = (Seller Election Index Price - Commodity Charge – ACA) * (1 – Fuel Loss))

where:

"ACA" is currently $0.0019/mmBtu, but actual ACA charges will apply.

"Commodity Charge" means $0.00/mmBtu.

"GDD Contract Price" means the Platt's Gas Daily Mid-point Index for Columbia Gulf Transmission Co. Mainline.

"Fuel Loss" means fuel consumed, lost or otherwise unaccounted for on the ETC TGRPL.

"IF Contract Price" means the Platt's Inside FERC First of the Month Index Price for the Columbia Gulf Transmission Co. Mainline.

"NYMEX Contract Price" means, for any Month, the final settlement price for the New York Mercantile Exchange's Henry Hub natural gas futures contract for delivery during such Month, with an agreed basis differential.

"Seller Election Index Price" means (i) the GDD Contract Price, (ii) the IF Contract Price, or (iii) the NYMEX Contract Price, as elected by Seller in accordance with this Transaction Confirmation.

Provided that:

The Contract Price may be adjusted by Buyer for (i) any changes to the Commodity Charge or the Fuel Loss deduction in accordance with the terms of the TGRPL Contract, or (ii) any change to, or new charge associated with, other rates or amounts that may be legally charged for transportation of Gas on the ETC TGRPL, whether in accordance with the TGRPL Contract or otherwise; provided that, without Seller's approval (which approval shall not be unreasonably withheld), the Contract Price may not be adjusted for changes to the ETC TGRPL Contract which are requested by Buyer.

For the avoidance of doubt, Section 6 of the Special Provisions to the Base Contract (amending the definition of "Contract Price") shall not apply for the purposes of this Transaction Confirmation.

**Fixed Payment**

In addition to the Contract Price, for each Month, Buyer shall charge to Seller a "Fixed Payment", where

"Fixed Payment" means ($0.39)*(Days in a Month)*(DCQ).

For the avoidance of doubt, Buyer's right to the Fixed Payment shall not be affected by any event of Force Majeure applicable to Buyer or Seller, including any event of Force Majeure that causes Seller not to deliver the daily DCQ for any Month.

Buyer's right to the Fixed Payment shall be in addition to, and shall not be limited by, whatever rights Buyer has in accordance with the "Cover Standard", "Early Termination Damages" or other applicable provisions of the Base Contract.  Buyer's right to the Fixed Payment shall not be subject to any set-off by Seller under any other agreement between Buyer and Seller or any of their Affiliates, except as otherwise provided for in this Transaction Confirmation. For the avoidance of doubt, in addition to the Fixed Payment, the provisions of Section 3.2 of the Base Contract (Cover Standard) shall apply in the event that Seller delivers an amount less than the DCQ for any Day during the Delivery Period; provided that the Fixed Payment recovered for such Day shall be taken into account and, if applicable, credited to Seller, with regard to any damages calculation conducted in accordance with such Section for such Day.

To the extent that Buyer is not required to pay a reservation charge under the TGRPL Contract, then Seller's Fixed Payment shall be reduced by the amount of Buyer's reservation charge reduction which relates to TGRPL Contract capacity which Buyer allocates to purchases made hereunder.

**Seller Election Index Price:**

On or before the day that is six (6) Business Days prior to the first day of a Sale Month, Seller shall provide Buyer written notice (a "Schedule Notice") containing the Seller Election Index Price for Gas sold by Seller to Buyer during such Month, provided that, (a) if the Schedule Notice does not contain a Seller Election Index Notice for a particular Month, the Seller Election Index Price for such Month shall be the IF Contract Price; and (b) Seller may only select the NYMEX Contract Price as the Seller Election Index Price if the Seller and Buyer have made an oral agreement, confirmed in accordance with the confirmation procedures of Section 1.1 of the Base Contract (with Buyer as the Confirming Party), with respect to the applicable basis differential to be used to calculate the NYMEX Contract Price.  The Seller Election Index Price stated in the Schedule Notice, or otherwise determined in accordance with this paragraph, shall be irrevocable for all sales of Gas during the applicable Month.

For the avoidance of doubt, Section 11 of the Special Provisions to the Base Contract (amending the provisions of Section 4.2 of the Base Contract) shall not apply for the purposes of this Transaction Confirmation.

**Credit Qualification:**

In event that (a) EXCO Resources, Inc. ("EXCO Parent") receives an upgrade of its senior unsecured debt rating to Investment Grade by at least two of the major credit rating agencies during the Delivery Period or (b) Seller posts sufficient collateral with ETC TGRPL such that Seller becomes eligible for a capacity release with ETC TGRPL on the terms described below, Seller will have the option to elect to reduce the volume of the DCQ in accordance with the provisions on this Transaction Confirmation ("Seller's Capacity Election").  In the event that Seller wishes to exercise the Seller's Capacity Election, it shall provide written notice to Buyer.  Such written notice shall contain the volume by which Seller wishes to reduce the DCQ (the "Reduction Amount"), where such amount may be any amount up to the DCQ.  Within ninety (90) Days of receiving Seller's notice, and subject to regulations of the Federal Energy Regulatory Commission and the terms and conditions of ETC's TGRPL FERC Gas Tariff, Buyer agrees to use its reasonable commercial efforts to post for release a recallable capacity release on a pre-arranged basis to Seller for an amount of capacity on the ETC TGRPL equal to the Reduction Amount (the "Capacity Release").  Subject to Section 14 of ETC's TGRPL FERC Gas Tariff, Buyer shall use its reasonable commercial efforts so that the Capacity Release provides for (i) a pricing rate for Seller that attempts to equal the current rate that Buyer pays under the TGRPL Contract, and (ii) a term period equivalent to the remaining term of the TGRPL Contract.  Seller's right to make Seller's Capacity Election, its right to the Capacity Release and Buyer's obligation to post the Capacity Release are each subject to (i) Seller's

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
April 19, 2002

eligibility to purchase the capacity on the ETC TGRPL, (ii) the successful negotiation of the Capacity Release between Seller, Buyer and ETC on terms that are not, in the Buyer's reasonable opinion, detrimental to the Buyer and that fully release Buyer for any obligation relating to the released capacity; and (iii) the actual release of capacity by ETC in accordance with the Capacity Release.  The Capacity Release shall provide Buyer with the right, but not the obligation, to recall the capacity on the ETC TGRPL released in accordance with the Capacity Release in the event that: (i) Seller defaults on any of its obligations to ETC or to Buyer; or (ii) Seller otherwise fails to maintain eligibility to own capacity on the ETC TGRPL.  For the purposes of this Transaction Confirmation, the term "Investment Grade" shall mean (i) a credit rating of BBB- or higher by Standard & Poor's, (ii) a credit rating of Baa3 or higher by Moody's, or (iii) a rating equivalent to the ratings in (i) or (ii) by another major credit rating agency.

**Default:**

In the event that (i) Seller commits or otherwise undergoes an "Event of Default" (as such term is defined in the Base Contract), (ii) Seller defaults under a material credit agreement, or (iii) Seller or any of its affiliates fails to pay to Buyer any amounts owed pursuant to this Transaction Confirmation or the Base Contract (including any amounts owed pursuant to Section 3.2 of the Base Contract following the application of the netting provisions of the Base Contract or this Transaction Confirmation) within five Business Days of receipt of any invoice for such amount (or such longer period as may be applicable pursuant to Section 7.1 of the Base Contract), then Buyer shall have the option, by providing written notice to Seller (the "Acceleration Notice"), to immediately accelerate all Fixed Payments that would otherwise be due during the remainder of the Delivery Period (the "Accelerated Amount").  The Acceleration Notice shall set forth the event that caused the acceleration of the Fixed Payments and the calculation of the Accelerated Amount.

The Accelerated Amount shall be calculated in accordance with the following formula:

Accelerated Amount = Remaining Days * 100,000 * Fixed Payment

where:

"Remaining Days" means the number of days remaining in the Delivery Period when Buyer provides the Acceleration Notice to Seller.

Buyer's right to the Accelerated Amount shall be in addition to, and shall not be limited by, whatever rights Buyer has in accordance with the "Cover Standard", "Early Termination Damages" or other applicable provisions of the Base Contract.  Buyer's right to the Accelerated Amount shall not be subject to any set-off by Seller under any other agreement between Buyer and Seller or any of their Affiliates, except as otherwise provided for in this Transaction Confirmation.

**Netting of Payments:**

(1) <u>Fixed Payment</u>.  The sum of all accumulated Fixed Payments and other amounts due by Seller to Buyer under the Base Contract or this Transaction Confirmation for an applicable Month (the "Monthly Charge Amount") shall be netted against any amounts owed by Buyer to Seller in accordance with sales under this Transaction Confirmation for such Month (the "Monthly Sale Amount").  In the event that, for a particular Month, the Monthly Charge Amount exceeds the Monthly Sale Amount, the resulting deficit (the "Net Charge") shall be owed by the Seller to the Buyer.  The Net Charge shall be netted against all other amounts otherwise owed by Buyer to Seller for a particular Month for all sales conducted in accordance with the Base Contract (the "Other Monthly Amounts").  In the event that the Net Charge for a particular Month shall exceed the Other Monthly Amounts for such Month, the Seller shall pay to the Buyer the amount remaining after deducting the Other Monthly Amounts from the Net Charge for such Month (a "Seller Payment").  Each Seller Payment shall be made in accordance with the Buyer payment terms of the Base Contract, applied *mutatis mutandis* to such payment.

(2) <u>Accelerated Amount</u>.  The Buyer shall have the option to net the Accelerated Amount (or any remaining balance thereon) owed by Seller against any Other Monthly Amounts owed by Buyer for each Month during which the Seller maintains a balance with respect to the Accelerated Amount.  In the event that the remaining balance of the Accelerated Amount exceeds the Other Monthly Amounts for a particular Month, the amount

( )                                        ( )

remaining after deducting the Other Monthly Amounts for such Month from the remaining balance of the Accelerated Amount may be applied against the Other Monthly Amounts for each subsequent Month until the balance of the Accelerated Amount is thereby reduced to zero.  Buyer shall have the option, at any time with at least thirty (30) days written notice to Seller, to require Seller to pay the entire remaining balance of the Accelerated Amount.  Such payment shall be made in accordance with the Buyer payment terms of the Base Contract, applied *mutatis mutandis* to such payment.

**Set Off:**

The Buyer shall have the option to set-off the Accelerated Amount against any other amounts owed by Buyer to Seller under any other agreements between Buyer and Seller or their Affiliates.

**Conditions Precedent:**

Seller may terminate this Transaction Confirmation within 90 days following the execution date if, during such period, Seller's board of directors rejects this Transaction Confirmation.

| Seller: | Buyer: |
|---|---|
| EXCO Operating Company, LP | BG Energy Merchants, LLC |
| By: | By: |
| Name: Stephen F Smith | Name: Matthew Schatzman |
| Title: Vice Chair President | CFO | Title: President |
| Date: 7/9/10 | Date: 6/21/10 |

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF

TGGT HOLDINGS, LLC

DATED AUGUST 14, 2009

# EXHIBIT C

otherwise make any payments to the Company or its creditors or other third parties in respect of such deficiency.

Section 14.6  **Distributions in Kind.**  If any Assets are be distributed in kind, such Assets shall be distributed to the Member(s) as tenants-in-common in the same proportions as such Member(s) would have been entitled to cash distributions if: (a) such Assets had been sold for cash by the Company at the fair market value of such Assets (taking the Gross Asset Value definition herein and Code Section 7701(g) into account) on the date of distribution; (b) any unrealized income, gain, loss and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) that would be realized by the Company from such sale were allocated among the Member(s) as Net Profits or Net Losses in accordance with this Agreement; and (c) the cash proceeds were distributed to such Member(s) in accordance with Section 4.6. The Capital Accounts of such Member(s) shall be increased by the amount of any unrealized income or gain inherent in such property or decreased by the amount of any loss or deduction inherent in such property that would be allocable to them, and shall be reduced by the fair market value of the assets distributed to them under the preceding sentence. Notwithstanding the foregoing, the Members shall have the right to assign their interest to such in-kind distribution to any Person.

## ARTICLE 15
### GOVERNING LAW; DISPUTE RESOLUTION

Section 15.1  **Governing Law.**  THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION.  ALL OF THE PARTIES HERETO CONSENT TO THE EXERCISE OF JURISDICTION IN PERSONAM BY THE COURTS OF THE STATE OF TEXAS FOR ANY DISPUTE.  EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY DISPUTE.

Section 15.2  **Dispute Resolution.**

(a)   Except for matters that are expressly made subject to the dispute resolution procedures set forth in Section 15.3, any Dispute among the Parties shall be resolved through final and binding arbitration.

(b)   The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") in effect at the time the arbitration of the Dispute is initiated (the "AAA Rules").

(c)     The arbitration shall be conducted by 3 arbitrators and conducted in Dallas, Texas.   Within 30 days of any Party providing notice to the other Parties of a Dispute, if there are two Parties or two groups of Parties to a Dispute, each Party or group of Parties to such Dispute shall appoint one arbitrator, and the 2 arbitrators so appointed shall select the third and presiding arbitrator within 30 days following appointment of the second party-appointed arbitrator.   If either Party or group of Parties fails to appoint an arbitrator within the permitted time period, then the missing arbitrator(s) shall be selected by the AAA as appointing authority in accordance with the AAA Rules.   In the event that there are more than two Parties or groups of Parties to an arbitration, the Parties to the arbitration shall endeavor to agree on the appointment of the three (3) arbitrators within thirty (30) days of the written request for arbitration.   In the event the Parties cannot reach agreement on the selection of three (3) arbitrators within the time permitted, all arbitrators not yet appointed shall be appointed by the AAA in accordance with the AAA Rules.   Any arbitrator appointed by the Party-appointed arbitrators or the AAA shall be a member of the Large, Complex Commercial Case Panel of the AAA or a member of the Center of Public Resources Panel of Distinguished Neutrals.   All arbitrators shall be and remain at all times independent and impartial, and, once appointed, no arbitrator shall have any ex parte communications with any of the Parties concerning the arbitration or the underlying Dispute other than communications directly concerning the selection of the presiding arbitrator, when applicable.   All arbitrators shall be qualified by education, training, or experience to resolve the Dispute.   No arbitrator shall have been an employee or consultant to any Party or any of its Affiliates within the five (5) year period preceding the arbitration, or have any financial interest in the Dispute.

(d)     All decisions of the arbitral tribunal shall be made by majority vote.   The award of the arbitral tribunal shall be final and binding, subject only to grounds and procedures for vacating or modifying the award under the Federal Arbitration Act.   Judgment on the award may be entered and enforced by any court of competent jurisdiction hereunder.

(e)     Notwithstanding the agreement to arbitrate Disputes in this Section 15.2, any Party may apply to a court for interim measures pending appointment of the arbitration tribunal, including injunction, attachment, and conservation orders.   The Parties agree that seeking and obtaining such court-ordered interim measures shall not waive the right to arbitration.   Additionally, the arbitrators (or in an emergency the presiding arbitrator acting alone in the event one or more of the other arbitrators is unable to be involved in a timely fashion) may grant interim measures including injunctions, attachments, and conservation orders in appropriate circumstances, which measures may be immediately enforced by court order.   Hearings on requests for interim measures may be held in person, by telephone or video conference, or by other means that permit the Parties to present

evidence and arguments.   The arbitrators may require any Party to provide appropriate security in connection with such measures.

(f)     The arbitral tribunal is authorized to award costs, attorneys' fees, and expert witness fees and to allocate them among the Parties.  The award may include interest, at the Default Interest Rate, from the date of any default, breach, or other accrual of a claim until the arbitral award is paid in full.  The arbitrators may not award indirect, consequential, special or punitive damages.   Unless otherwise directed by the arbitral tribunal, each Party shall pay its own expenses in connection with the arbitration.

(g)     All negotiations, mediation, arbitration, and expert determinations relating to a Dispute (including a settlement resulting from negotiation or mediation, an arbitral award, documents exchanged or produced during a mediation or arbitration proceeding, and memorials, briefs or other documents prepared for the arbitration) are confidential and may not be disclosed by the Parties, their respective Affiliates and each of their respective employees, officers, directors, counsel, consultants, and expert witnesses, except to the extent necessary to enforce any settlement agreement, arbitration award, or expert determination, to enforce other rights of a Party, as required by law or regulation, or for a bona fide business purpose, such as disclosure to accountants, shareholders, or third-party purchasers, provided, however, that breach of this confidentiality provision shall not void any settlement, expert determination, or award.

(h)     Any papers, notices, or process necessary or proper for an arbitration hereunder, or any court action in connection with an arbitration or an award, may be served on a Party in the manner set forth in Section 15.2.

**Section 15.3   Expert Proceedings.**   For any decision referred to an expert under this Agreement, the Parties hereby agree that such decision shall be conducted expeditiously by an expert selected unanimously by the Members.  The expert is not an arbitrator of the dispute and shall not be deemed to be acting in an arbitral capacity.  The expert shall not (without the written consent of the Members) be appointed to act as an arbitrator or as adviser to any Member arbitrated pursuant to Section 15.2, provided that nothing in this sentence shall preclude any Member from using the expert as a witness regarding the proper conduct of the expert procedure.  The Member desiring an expert determination shall give the other Members written notice of the request for such determination.  If the Members are unable to agree upon an expert within ten (10) days after receipt of the written notice of request for an expert determination, then, upon the request of any of the Members, the AAA shall appoint such expert.  The expert, once appointed, shall have no ex parte communications with the Members concerning the expert determination or the underlying dispute.  All communications between any Member and the expert shall be conducted in writing, with copies sent simultaneously to

**JOINT DEVELOPMENT AGREEMENT**

**BY AND AMONG**

**BG US PRODUCTION COMPANY, LLC,**

**EXCO OPERATING COMPANY, LP**

**AND**

**EXCO PRODUCTION COMPANY, LP**

**DATED AUGUST 14, 2009**

# EXHIBIT D

# TABLE OF CONTENTS

ARTICLE 1   INTERPRETATION ................................................................... 1

ARTICLE 2   CERTAIN OBLIGATIONS ....................................................... 2
    Section 2.1   Carry of Eligible Costs ............................................. 2
    Section 2.2   Payment Procedure ................................................... 2
    Section 2.3   Development Costs ................................................... 3

ARTICLE 3   SCOPE; PARTICIPATING INTERESTS; OPERATIONS .................... 3
    Section 3.1   Scope ...................................................................... 3
    Section 3.2   Participating Interests ............................................... 3
    Section 3.3   Operations Subject to Laws, Leases and Operating Agreement ................ 4
    Section 3.4   Operating Agreements ............................................... 4
    Section 3.5   Appointment and Removal of Party Operator .................... 5
    Section 3.6   Joint Development Operator ...................................... 7
    Section 3.7   Liability of Operator ................................................. 9
    Section 3.8   Secondees ................................................................ 10
    Section 3.9   Non-Solicitation of Joint Operator Employees .................... 10
    Section 3.10   Certain Reports ...................................................... 11
    Section 3.11   Insurance .............................................................. 13
    Section 3.12   Reimbursement of Joint Development Operator and Party Operators for Technical Services; Overhead ...................... 14

ARTICLE 4   OPERATING COMMITTEE; DEVELOPMENT WORK PROGRAM; ANNUAL WORK PROGRAM AND BUDGETS ............................. 16
    Section 4.1   Operating Committee ............................................... 16
    Section 4.2   Development Work Program ...................................... 21
    Section 4.3   Initial Annual Work Plan and Budgets .................... 22
    Section 4.4   Subsequent Annual Work Plan and Budgets ................ 22
    Section 4.5   Statements of Estimated Expenditures ...................... 26
    Section 4.6   AFEs ...................................................................... 26
    Section 4.7   Contract Awards ....................................................... 27
    Section 4.8   Area-Wide Operations .............................................. 30
    Section 4.9   Third Party Operators .............................................. 31
    Section 4.10   HSSE .................................................................... 31
    Section 4.11   Conflict of Interest Policy ...................................... 32

ARTICLE 5   DEFAULT ................................................................. 32
    Section 5.1   Default .................................................................... 32
    Section 5.2   Certain Consequences of Default ............................. 33
    Section 5.3   Right to Costs of Enforcement .................... 34
    Section 5.4   Cumulative and Additional Remedies .................... 34
    Section 5.5   Reassignment Obligation ...................................... 34

ARTICLE 6    TRANSFERS ........................................................................................ 35
    Section 6.1    Maintenance of Uniform Interest; Minimum Participating Interest;
                     Transfers by Defaulting Parties ............................................... 35
    Section 6.2    Requirements for Transfer ..................................................... 36
    Section 6.3    Liability of Transferor/Transferee ........................................ 36
    Section 6.4    Encumbrances by Parties ....................................................... 37

ARTICLE 7    CONSENT TO ASSIGNMENT ........................................................ 37
    Section 7.1    Certain Transfers during Initial Three Year Period ............. 37
    Section 7.2    Other Transfers ...................................................................... 38
    Section 7.3    Additional Consent Requirements ........................................ 38
    Section 7.4    Consents for Transfer of Joint Development or Party Operatorship .... 38

ARTICLE 8    PREFERENTIAL RIGHT TO PURCHASE; CHANGES IN CONTROL .......... 38
    Section 8.1    Preferential Right to Purchase .............................................. 38
    Section 8.2    Changes in Control ................................................................ 41

ARTICLE 9    AREA OF MUTUAL INTEREST; CERTAIN RENTALS ................ 43
    Section 9.1    Creation of Area of Mutual Interest ...................................... 43
    Section 9.2    Area of Mutual Interest Procedures ...................................... 43
    Section 9.3    Payment of Certain Rentals ................................................... 46

ARTICLE 10   TAXES ............................................................................................. 47
    Section 10.1   Tax Partnership ...................................................................... 47
    Section 10.2   Tax Information ...................................................................... 48
    Section 10.3   Responsibility for Taxes ........................................................ 48

ARTICLE 11   TERM ............................................................................................... 48

ARTICLE 12   RELATIONSHIP OF THE PARTIES ............................................ 48

ARTICLE 13   GOVERNING LAW; DISPUTE RESOLUTION; EXPERT PROCEEDINGS ... 49
    Section 13.1   Governing Law ....................................................................... 49
    Section 13.2   Dispute Resolution ................................................................ 49
    Section 13.3   Expert Proceedings ................................................................ 51

ARTICLE 14   MISCELLANEOUS ....................................................................... 52
    Section 14.1   Counterparts .......................................................................... 52
    Section 14.2   Notices ................................................................................... 52
    Section 14.3   Expenses ................................................................................ 54
    Section 14.4   Waivers; Rights Cumulative ................................................. 54
    Section 14.5   Entire Agreement; Conflicts .................................................. 54
    Section 14.6   Amendment ............................................................................ 54
    Section 14.7   Parties in Interest ................................................................... 54
    Section 14.8   Successors and Permitted Assigns ........................................ 55
    Section 14.9   Confidentiality ....................................................................... 55
    Section 14.10  Publicity ................................................................................. 56
    Section 14.11  Preparation of Agreement ..................................................... 56

Section 14.12  Conduct of the Parties; Business Principles ............................................ 56
Section 14.13  Severability ............................................................................................. 57
Section 14.14  Non-Compensatory Damages ................................................................. 57
Section 14.15  Excluded Assets ..................................................................................... 57

## APPENDICES AND EXHIBITS

Appendix I         Definitions

Exhibit "A"        East Texas/North Louisiana Area; Excluded Fields
Exhibit "B"        Form of Joint Development Operating Agreement
Exhibit "C"        Form of Secondment Agreement
Exhibit "D"        Development Work Program
Exhibit "E-1"      Calendar Year 2009 Annual Work Program and Budget
Exhibit "E-2"      Draft Calendar Year 2010 Annual Work Program and Budget
Exhibit "F"        Form of Assumption Agreement
Exhibit "G"        Tax Partnership Agreement
Exhibit "H"        Escrow Provisions
Exhibit "I"        Insurance

## JOINT DEVELOPMENT AGREEMENT

THIS JOINT DEVELOPMENT AGREEMENT is made this 14th day of August, 2009 (the "Closing Date") by and among BG US Production Company, LLC, a limited liability company organized and existing under the Laws of Delaware ("BG"), EXCO Production Company, LP, a limited partnership organized and existing under the Laws of Texas ("EPC"), and EXCO Operating Company, LP, a limited partnership organized and existing under the Laws of the State of Delaware ("EOC" and together with EPC, "EXCO"). BG and EXCO shall sometimes be referred to herein together as the "Parties", and individually as a "Party". The Parties shall sometimes be referred to herein together in their capacities as working interest owners in the Subject Oil and Gas Assets as the "Development Parties", and individually as a "Development Party". Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in Appendix I.

### RECITALS

WHEREAS, on the Closing Date, BG and EXCO consummated certain transactions contemplated in the Purchase Agreement, which transactions included the purchase by BG and the sale by EXCO of undivided interests in certain Oil and Gas Assets; and

WHEREAS, the Development Parties desire to develop the Subject Oil and Gas Assets located in the East Texas/North Louisiana Area in a coordinated manner using EXCO Operator as operator; and

WHEREAS, the Parties now desire to set forth their respective rights and obligations with respect to all such arrangements.

NOW THEREFORE, IN CONSIDERATION OF THE MUTUAL AGREEMENTS HEREIN CONTAINED, THE PARTIES HEREBY AGREE AS FOLLOWS:

### ARTICLE 1
### INTERPRETATION

All references in this Agreement to Exhibits, Appendices, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Appendices, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection or other subdivision unless expressly so limited. The words "this Article," "this Section," and "this subsection," and words of similar import, refer only to Article, Section or subsection hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to United States dollars. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the date of this Agreement. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the

singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Appendices and Exhibits referred to herein are attached to and by this reference incorporated herein for all purposes. References to any Law or agreement shall mean such Law or agreement as it may be amended from time to time.

## ARTICLE 2
## CERTAIN OBLIGATIONS

**Section 2.1    Carry of Eligible Costs.**

(a)     From and after the Closing Date and until the Carry Termination Event, and notwithstanding the terms of any Applicable Operating Agreement to the contrary, BG shall pay seventy-five percent (75%) of EXCO's share under each Applicable Operating Agreement of all Eligible Costs incurred in accordance with an approved Annual Work Program and Budget or pursuant to a Sole Risk Development Operation undertaken by EXCO with respect to the Deep Rights (all such Eligible Costs that BG is obligated to pay pursuant to this Section 2.1, "Carried Costs"). As used herein, "Carry Termination Event" means the time at which the aggregate amount of Carried Costs paid by BG equals the Carried Cost Obligation. Joint Development Operator shall maintain an accurate record of the Carried Costs paid by BG from time to time, and shall provide each Development Party with a monthly statement showing the Calendar Month and inception to date payments by BG.

(b)     Until the Carry Termination Event, all Carried Costs shall be paid by BG in the same manner and at the same time it pays its share of billings or requests for advances pursuant to Section 2.2. BG shall be entitled to exercise all rights available to the parties under the Applicable Operating Agreements to contest charges and audit the accounts of the operator thereunder with respect to such payments. Any reimbursements for any Carried Costs paid by BG shall be paid by EXCO or the applicable reimbursing party to BG promptly after the determination thereof (and, to the extent reimbursable by Person other than EXCO and paid to EXCO, receipt by EXCO of such amounts), provided that any amounts so reimbursed to BG shall be deducted from the calculation of the Carried Costs paid by BG for purposes of this Agreement, including the determination of the Carry Termination Event. In the event EXCO receives a credit in respect of Carried Costs paid by BG, at the request of BG, EXCO shall request that such credit be paid directly to BG (and any such credit actually paid to BG shall be deducted from the calculation of Carried Costs paid by BG pursuant to this Agreement).

**Section 2.2    Payment Procedure.**

(a)     In response to each statement or invoice issued by an operator to the Participating Parties in a Development Operation under this Agreement or an Applicable Operating Agreement, each Participating Party shall pay its share of expenditures

for the conduct of such Development Operations in accordance with the escrow provisions set forth in Exhibit "H" attached hereto.

(b)    Each Participating Party shall have the right to audit the Joint Development Operator's and its Affiliates' accounts with respect to Development Operations in which it participates or is a non-consenting party on the same basis as is provided in Exhibit "C" to the Joint Development Operating Agreement. For the avoidance of doubt, this audit right shall extend to accounts maintained by the Joint Development Operator and its Affiliates with respect to the Escrow Deposit Account and the Operating Trust Account (as that term is defined in Exhibit "H") and other accounts maintained by the Joint Development Operator and its Affiliates with respect to Development Operations.

Section 2.3    **Development Costs**.   Except as set forth in Section 2.1 above, each Development Party shall bear and pay its proportionate share of all Development Costs incurred from and after the Closing Date in accordance with, and subject to, the terms and conditions of this Agreement and the Applicable Operating Agreements.

## ARTICLE 3
## SCOPE; PARTICIPATING INTERESTS; OPERATIONS

Section 3.1    **Scope**.   This Agreement shall govern the respective rights and obligations of the Development Parties with respect to the funding, development and operation of the Subject Oil and Gas Assets. This Agreement does not govern: (a) the funding, development or operation of any equipment, fixtures or other assets located downstream of the outlet flange of the relevant custody transfer meter (or, in the case of Hydrocarbon liquids, downstream of the outlet flange in the tanks) located on or in the vicinity of the Leases in the Subject Oil and Gas Assets; or (b) the marketing or sale of oil and gas products from the Subject Oil and Gas Assets, all of which are outside the scope of this Agreement.

Section 3.2    **Participating Interests**.

(a)    As of the Closing Date, the Participating Interests of the Development Parties are as follows:

| Development Party | Participating Interest |
|---|---|
| BG | 50.0000 |
| EXCO | 50.0000 |

(b)    If a Development Party Transfers all or any undivided percentage of its Joint Development Interest pursuant to the provisions of this Agreement, the Participating Interests of the Development Parties shall be revised accordingly.

**Section 3.3**   **Operations Subject to Laws, Leases and Operating Agreement**. All operations conducted pursuant to this Agreement by Joint Development Operator or any Applicable Operating Agreement by any Party Operator shall be conducted in compliance with the terms and conditions of: (a) all applicable Laws; (b) those Leases upon which such operations are conducted; (c) the Applicable Operating Agreements, to the extent applicable to such operations; and (d) once agreed in accordance with Section 4.10, appropriate HSSE guidelines and principles. Joint Development Operator, while conducting operations under this Agreement, and any Party Operator, while conducting operations under any Applicable Operating Agreement, shall conduct such activities as a reasonably prudent operator, in a good and workmanlike manner with due diligence and dispatch, in accordance with good oilfield practice and appropriate technical standards and guidelines issued by the American Petroleum Institute, the American Society of Mechanical Engineers and the American National Standards Institute, among others. Within twelve months of signing this Agreement, the Development Parties shall perform a gap analysis against a set of agreed technical standards for design, construction and operation of the wells and facilities within the East Texas/North Louisiana Area. These standards shall be submitted to the Operating Committee for its approval and shall include appropriate technical standards and guidelines (as mentioned above), including agreed exceptions, and shall adhere to HSSE guidelines and principles agreed upon pursuant to Section 4.10.

**Section 3.4**   **Operating Agreements**.

(a)     All Leases in the East Texas/North Louisiana Area: (i) in which only the Development Parties hold interests as of the Effective Date and which are not subject to a Third Party Operating Agreement; or (ii) in which the Development Parties hereafter acquire interests and which are not subject to a Third Party Operating Agreement at the time of acquisition shall be deemed to be subject to and governed by an operating agreement in the form attached hereto as Exhibit "B" (each a "Joint Development Operating Agreement").

(b)     In addition, the Parties agree to use all commercially reasonable efforts to have the form attached hereto as Exhibit "B" adopted as the operative operating agreement by all working interest owners for any Leases in the East Texas/North Louisiana Area in which the Development Parties and other Persons hold working interests but which are not presently subject to a Third Party Operating Agreement.

(c)     A separate Joint Development Operating Agreement shall be deemed to cover each drilling and production unit now or hereafter designated by the Parties or by order or rule of a Governmental Authority having jurisdiction in the East Texas/North Louisiana Area for which the Development Parties hold the entirety of the working interest for such unit, provided that in the event any Person that is not a Development Party is to acquire a working interest in such unit or this Agreement terminates, the Development Parties shall execute a Joint Development Operating Agreement for such unit prior to such acquisition or termination.

(d)     There shall be no retroactive adjustment of expenses incurred or revenues received with respect to any separate Joint Development Operating Agreement which is deemed to come into existence as a consequence of the designation of a new unit.

(e)     Each Joint Development Operating Agreement in which no third party participates and, as between the Parties only, each Joint Development Operating Agreement in which a third party participates and each Third Party Operating Agreement, shall be subject to the provisions of Exhibit G hereto unless and until the applicability of such provisions to the Subject Oil and Gas Assets subject to such operating agreement terminates in accordance with the terms of Exhibit G.

**Section 3.5     <u>Appointment and Removal of Party Operator</u>**.

(a)     EXCO Operator is hereby designated and agrees to serve as the initial operator under each Joint Development Operating Agreement and to operate the Subject Oil and Gas Assets covered by such Joint Development Operating Agreement in accordance with the terms and conditions thereof, subject (in each case) to the terms of this Agreement.  To the extent EOC or EPC serves as operator under any Third Party Operating Agreement, such Person is hereby designated and agrees to serve as operator under such Third Party Operating Agreement and to operate the Subject Oil and Gas Assets covered by such Third Party Operating Agreement in accordance with the terms and conditions thereof, subject (in each case) to the terms of this Agreement.  The designations set forth in this Section 3.5(a) are personal to the applicable EXCO Operator, as a consequence of the specific skills it holds with respect to shale operations, and operations in the Haynesville shale in particular.  For the avoidance of doubt, a Party Operator shall conduct each Sole Risk Development Operation conducted pursuant to the Joint Development Operating Agreement for which it is operator on behalf of all of the parties participating in such operation, unless otherwise agreed by such participating parties in accordance with the terms of such Joint Development Operating Agreement.

(b)     A Party Operator may be removed as operator under any Joint Development Operating Agreement, or if any Person that is not a Development Party is party to such Joint Development Operating Agreement, then a Party Operator may be required to resign as operator under such Joint Development Operating Agreement, under the following circumstances:

(i)     by the affirmative vote of the Development Parties that are parties to such Joint Development Operating Agreement, other than Party Operator and its Affiliates, holding a majority of the Participating Interest held by such Development Parties:  (A) if there is a Change in Control of such Party Operator; or (B) for good cause, provided that in the case of removal or a required resignation for good cause, such vote shall not be deemed effective until a written notice has been delivered to such Party Operator by another Party that is a party to such Joint Development Operating

Agreement detailing the alleged default and such Party Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice;

(ii) by the affirmative vote of the Development Parties that are parties to such Joint Development Operating Agreement holding a majority of the Participating Interest in the event that Party Operator's and its Affiliates' aggregate Participating Interest falls below twelve and a half percent (12.5%); or

(iii) solely with respect to those After Acquired Units for which EXCO or any Affiliate of EXCO serves as Party Operator under the relevant Joint Development Operating Agreement, upon a change in Control of the ultimate parent company of EXCO.

For purposes hereof, "good cause" shall mean not only gross negligence and willful misconduct, but also the material breach of or inability to meet the standards of operation contained in Section 3.3, or a material failure or inability of a Party Operator to perform its obligations under the relevant Joint Development Operating Agreement. As used herein, "gross negligence" and "willful misconduct" shall include material unlawful acts committed by an operator of which such operator had actual knowledge at the time in question. Notwithstanding anything to the contrary herein, (I) if there is a dispute as to whether a condition resulting in good cause to remove a Party Operator has occurred, or whether such condition has been cured, such Party Operator shall continue to serve and discharge its duties in such capacity until the dispute has been resolved in accordance with Section 13.2, and (II) a change of a corporate name or structure of a Party Operator or Transfer of a Party Operator's interest to another direct or indirect Wholly-Owned Affiliate of the same ultimate parent company shall not be the basis for removal of such Party Operator.

During the term of this Agreement, for avoidance of doubt, as between the Parties, the provisions of this Section 3.5(b) and Section 3.5(c) shall be in lieu of any provisions in any Joint Development Operating Agreement for the removal or resignation of the operator thereunder.

(c) Upon the occurrence of a Material Event with respect to a Party Operator, it shall be deemed to have resigned as operator under each Joint Development Operating Agreement for which it serves as operator, or if any Person that is not a Development Party is party to such Joint Development Operating Agreement, then a Party Operator shall be required to resign as operator under such Joint Development Operating Agreement, without any action by the other Parties, except the selection of a successor pursuant to the terms and conditions of the relevant Joint Development Operating Agreement.

(d) Following any resignation or removal of EXCO Operator as operator under any Applicable Operating Agreement, if BG or one of its Affiliates is still a Party to this Agreement, EXCO shall vote for BG or BG's designee to serve as the successor operator under such Applicable Operating Agreement.

(e)     Each Party Operator shall conduct all operations in accordance with and subject to the terms of Article 4, and Sections 3.3, 3.4, this 3.5, 3.7, 3.10 and 3.11, in addition to any terms set forth in the relevant Applicable Operating Agreements.

**Section 3.6     Joint Development Operator.**

(a)     EOC is hereby designated and agrees to serve as the initial Joint Development Operator in accordance with the terms and conditions of this Agreement.  The designation set forth in this Section 3.6(a) is personal to EOC, as a consequence of the specific skills it holds with respect to shale operations, and operations in the Haynesville shale in particular.

(b)     Joint Development Operator may resign at any time by giving at least ninety (90) days' prior written notice to the other Development Parties.  Joint Development Operator shall be deemed to have resigned without any action by the other Development Parties, except for selection of a successor, under the following circumstances:   (i) Joint Development Operator terminates its legal existence (other than as part of a reorganization that results in the Transfer of all of its rights and obligations in the East Texas/North Louisiana Area to a Wholly-Owned Affiliate of the same ultimate parent company of such Joint Development Operator); (ii) Joint Development Operator no longer possesses the corporate capability to serve as Joint Development Operator (provided that, for the avoidance of doubt, corporate capability is not a measure of Joint Development Operator's knowledge and expertise regarding the performance of drilling operations, but instead concerns Joint Development Operator's ability to function as a business generally); or (iii) any payment default or acceleration of debt (other than an acceleration of debt caused by a Change in Control of Joint Development Operator or any of its Affiliates) by Joint Development Operator or any of its Affiliates shall have occurred and be continuing under (in each case) any material (I) agreement for borrowed money of Joint Development Operator or any of its Affiliates or (II) guarantee by Joint Development Operator or its Affiliates of another Person's payment or performance obligations.

(c)     Joint Development Operator may be removed under the following circumstances:

(i)     by the affirmative vote of the Development Parties other than Joint Development Operator and its Affiliates holding a majority of the Participating Interest held by such Development Parties: (A) if there is a Change in Control of Joint Development Operator; or (B) for good cause, provided that in the case of removal for good cause, such vote shall not be deemed effective until a written notice has been delivered to Joint Development Operator by another Party detailing the alleged default and Joint Development Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice; or

> (ii) by the affirmative vote of the Development Parties holding a majority of the Participating Interest in the event that Joint Development Operator's and its Affiliates' aggregate Participating Interest falls below twelve and a half percent (12.5%).

For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Section 3.3, or material failure or inability to perform its obligations under this Agreement. Notwithstanding anything to the contrary herein, (I) if there is a dispute as to whether a condition resulting in good cause to remove Joint Development Operator has occurred, or whether such condition has been cured, Joint Development Operator shall continue to serve and discharge its duties in such capacity until the dispute has been resolved in accordance with Section 13.2, and (II) a change of a corporate name or structure of Joint Development Operator or Transfer of Joint Development Operator's interest to another direct or indirect Wholly-Owned Affiliate of the same ultimate parent company shall not be the basis for removal of Joint Development Operator.

> (d) Upon the occurrence of a Material Event with respect to Joint Development Operator, it shall be deemed to have resigned without any action by the other Parties, except the selection of a successor pursuant to Section 3.6(e). If a petition for relief under the federal bankruptcy laws is filed by or against Joint Development Operator, and the removal of Joint Development Operator is prevented by the terms of the Bankruptcy Code or actions of the federal bankruptcy court, then, to the extent allowed by Law, the Operating Committee shall serve as Joint Development Operator until Joint Development Operator has elected to reject or assume this Agreement pursuant to the Bankruptcy Code, and an election to reject this Agreement by Joint Development Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Joint Development Operator without any action by the other Parties, except the selection of a successor.

> (e) Following any resignation or removal of EOC as Joint Development Operator, if BG or one of its Affiliates is still a Party to this Agreement, BG or its designated Affiliate shall be entitled to become successor Joint Development Operator. Should BG and its Affiliates elect not to become successor Joint Development Operator, or should none of BG and its Affiliates be a Party to this Agreement, a successor Joint Development Operator shall be selected by the Parties by the affirmative vote of Parties holding collectively at least seventy-five percent (75%) of the Participating Interests eligible to vote. If Joint Development Operator has been removed for cause or is deemed to have resigned or votes only to succeed itself, it and its Affiliates shall not be entitled to vote for the successor Joint Development Operator (but any transferee of all or any part of the Joint Development Operator's Participating Interest shall be entitled to vote for the successor Joint Development Operator). The Joint Development Operator's resignation or removal shall not become effective until 7:00 o'clock am on the first day of the Calendar Month following the expiration of ninety (90) days after the giving of notice of resignation by the Joint Development Operator, the deemed resignation of the Joint Development Operator or action by BG or the

non-operators to remove Joint Development Operator, unless a successor Joint Development Operator has been selected and assumes the duties of Joint Development Operator at an earlier date.

(f)     Subject to the terms and conditions of this Agreement, in addition to those certain other duties and responsibilities expressly set forth herein, Joint Development Operator shall:

(i)     notwithstanding the terms of any Applicable Operating Agreement to the contrary, at the option of any Development Party, pay such Development Party's share of: (A) rentals, shut-in well payments and minimum royalties required to be paid to lessees under the Leases included in the Subject Oil and Gas Assets; and (B) royalties, overriding royalties and other burdens required to be paid to lessees and holders of overriding royalties and other burdens on the Leases included in the Subject Oil and Gas Assets, provided that the Development Party's share of the payments described in clauses (A) and (B) shall be billed to or advanced by, as the case may be, such Development Party in accordance with Section 2.2;

(ii)    at the option of any Development Party, pay such Development Party's share of joint interest billings and cash calls (including, in the case of BG, Carried Costs) from third party operators relating to wells in the East Texas/North Louisiana Area not operated by a Party Operator, provided that the Development Party's share of such payments shall be billed to or advanced by, as the case may be, such Development Party in accordance with Section 2.2; and

(iii)   notwithstanding the terms of any Applicable Operating Agreement to the contrary, at the option of any Development Party, at such Development Party's expense, secure any title curative matters and pooling amendments or agreements required of such Development Party under the Applicable Operating Agreement in connection with Leases or other rights to oil and gas included in the Subject Oil and Gas Assets, provided that the Development Party's expenses for such requested actions shall be billed to or advanced by, as the case may be, such Development Party in accordance with Section 2.2.

**Section 3.7     Liability of Operator.**

(a)     Subject to the rights of a Development Party to remove any Party acting as Joint Development Operator under this Agreement or Party Operator under any Applicable Operating Agreement in accordance with the terms hereof, in no event shall any Party serving as Joint Development Operator or a Party Operator have any liability as Joint Development Operator under this Agreement or Party Operator under any Applicable Operating Agreement for any claim, damage, loss or liability sustained or incurred in connection with any Development Operation or any breach of Section 3.3 or any similar provision regarding the standard of

performance of a Party Operator in performing operations under any Applicable Operating Agreement, EVEN IF SUCH CLAIM, DAMAGE, LOSS OR LIABILITY AROSE IN WHOLE OR IN PART FROM THE ACTIVE, PASSIVE, SOLE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF SUCH PARTY, ANY OF ITS AFFILIATES OR ANY OFFICER, PARTNER, MEMBER, DIRECTOR OR EMPLOYEE OF SUCH PARTY, OTHER THAN IF SUCH CLAIM, DAMAGE, LOSS OR LIABILITY AROSE FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH PARTY, ANY OF ITS AFFILIATES OR ANY OFFICER, PARTNER, MEMBER, DIRECTOR OR EMPLOYEE OF SUCH PARTY (WHICH CLAIM, DAMAGE, LOSS OR LIABILITY IS THE SUBJECT OF SECTION 3.7(B)) and provided further that neither Joint Development Operator nor any Party Operator shall be released from liability for a material breach of any financial, administrative or procedural (such as providing notices and voting) obligation of Joint Development Operator under this Agreement or a Party Operator under any Applicable Operating Agreement; it being understood by each Party that any such claim, damage, loss or liability (other than that caused by the gross negligence or willful misconduct of a Party, its Affiliates or any officer, partner, member, director or employee of a Party or any of its Affiliates, or the material breach of any financial, administrative or procedural (such as providing notices and voting) obligation of Joint Development Operator or a Party Operator), shall be borne severally by the Parties (including such operator) in proportion to their interests in the operations or activities giving rise to such claim, damage, loss or liability.

(b)  Any Party serving as Joint Development Operator or a Party Operator shall bear sole liability on behalf of the Parties for any claim, damage, loss or liability sustained or incurred in connection with Development Operations hereunder or under an Applicable Operating Agreement to the extent such claim, damage, loss or liability arose in whole or in part from the gross negligence or willful misconduct of such Party or any of its Affiliates or any officer, partner, member, director or employee of such Party or Affiliate of such Party.

(c)  Notwithstanding anything to the contrary herein or in any Applicable Operating Agreement, neither Joint Development Operator nor any Party Operator shall be liable for the gross negligence or willful misconduct of a Secondee, nor shall the gross negligence or willful misconduct of such a Secondee be grounds for removal of Joint Development Operator pursuant to Section 3.5(c) or such Party Operator in accordance with Section 3.5(b).

**Section 3.8    Secondees**.  Notwithstanding the terms of any Applicable Operating Agreement to the contrary, BG shall have the right to place Secondees within the organization of EXCO Operator while it is serving as Joint Development Operator, all as set forth in Exhibit "C" attached hereto.

**Section 3.9    Non-Solicitation of Joint Operator Employees**.  No Party may solicit any employee of Joint Development Operator for a period of twelve (12) Calendar Months after

such employee's employment with Joint Development Operator has ended without obtaining the prior written consent of Joint Development Operator, provided that this prohibition shall not apply to offers of employment made by a Party pursuant to a general solicitation of employment to the public or the industry, and no Party shall be prohibited from employing any such person who contacts such Party on his or her own initiative.

**Section 3.10**  **Certain Reports**.

(a)     Joint Development Operator and each Party Operator shall provide the following data and reports, as they are currently produced or compiled, for each Development Operation for which it serves as operator to the Participating Parties for such Development Operation:

(i)     copies of all logs or surveys, including in digitally recorded format if such exists;

(ii)    daily drilling and production reports;

(iii)   copies of all tests and core data and analysis reports;

(iv)    final well recap reports;

(v)     copies of all plugging reports;

(vi)    as requested by Participating Party from time to time and, except as prohibited by restrictions under third party contracts (which restrictions Joint Development Operator or Party Operator, as applicable, shall use its reasonable efforts to have waived), copies of current geological and geophysical maps, seismic sections and shot point location maps;

(vii)   subject to the following sentence, engineering studies, development schedules and annual progress reports on development projects;

(viii)  subject to the following sentence, field and well performance reports, including reservoir studies and reserve estimates;

(ix)    copies of written notices provided by any third Person regarding violations or potential violations of applicable Law;

(x)     copies of all material reports provided to any Governmental Authority;

(xi)    upon written request of a Participating Party, copies of any material correspondence between such operator and any Governmental Authority;

(xii)   copies of all title opinions, including drill site title opinions and division order title opinions;

(xiii)   such other information as may be reasonably requested by a Participating Party; and

(xiv)   such other reports as may be directed by the Operating Committee.

Notwithstanding the foregoing, if any of the foregoing data or reports under clause (vii) or (viii) above is generated, assembled or prepared by a third party that is not an Affiliate of Joint Development Operator or the applicable Party Operator ("Third Party Prepared Information"), then unless the costs of such third party's services with respect to such Third Party Prepared Information are chargeable to the joint account for such Participating Parties, Joint Development Operator or Party Operator (as applicable) shall not be required to furnish such Third Party Prepared Information to any Participating Party, other than any Participating Party that pays Joint Development Operator or the applicable Party Operator its Participating Interest share of the cost of such Third Party Prepared Information.

(b)   Joint Development Operator and each Party Operator shall, in the conduct of Development Operations:

(i)   report to the Participating Parties within 24 hours of the management of such Joint Development Operator or Party Operator (as applicable) receiving notice thereof, details of fatalities, lost time incidents, material environmental incidents and any other material incidents which (in each case) may present a reputational risk to such Participating Parties and also provide copies of any written notices received from Governmental Authorities or third parties with respect to such fatalities and incidents;

(ii)   prepare an HSSE report to be submitted by such operator to the Participating Parties on the fifteenth (15th) day of April, July, October and January of each year in respect of the previous three months, and monthly with respect to item (ii)(c) only, with content to be agreed by the Operating Committee but containing at a minimum:

(A)   progress against the HSSE Plan applicable to such period;

(B)   status of HSSE actions relating to HSSE audits;

(C)   occupational safety indicators (fatalities and lost time incidents and frequency, recordable incidents and frequency and total man hours worked) of such operator (and as agreed to as part of the HSSE Plan in accordance with Section 4.10, its contractors and subcontractors);

(D)   known environmental incidents (e.g. leaks, spills, and cases of violations of environmental Laws and permits); and

(E)   HSSE related claims;

(iii)    Contractually require its contractors, subcontractors and suppliers of services to comply with all applicable Laws and all safety rules of such Joint Development Operator or Party Operator binding on operator personnel, and provide to its contractors and subcontractors copies of the HSSE Principles and HSSE Management System generated pursuant to Section 4.10 that are then in effect and use its commercially reasonable efforts to enforce such Persons' compliance with such principles and system; and

(iv)    with reasonable advance notice, permit the Participating Parties to have access during normal business hours (at their sole risk and expense, notwithstanding anything herein or in any Associated Agreement to the contrary) to operations, design phase activities, books and records, and representatives of such operator for the purpose of conducting HSSE and asset integrity audits (provided that such Participating Parties shall (A) minimize any disruption to the operations and business of such Joint Development Operator or such Party Operator caused by such audits, and (B) adhere to all safety rules of such operator and the HSSE Principles and HSSE Management System then in effect while conducting such audits).

(c)    to the extent that a Development Party is responsible for any portion of the liability associated therewith, Joint Development Operator and each Party Operator shall promptly notify the Development Parties of any third party written claim or suit arising from Development Operations of which such operator becomes aware that exceeds (or is reasonably expected to exceed) one hundred thousand dollars (US$100,000), and, upon request of a Development Party from time to time, shall further provide, in a timely manner, the then current information regarding the progress and status of any such claims or suits.

**Section 3.11**  <u>**Insurance**</u>.

(a)    Joint Development Operator and each Party Operator shall also carry insurance for the benefit of the joint account of the Development Parties as outlined in Exhibit "I" attached hereto and made a part hereof (provided that no Party Operator shall be required to carry insurance for any Development Party that is not a party to the Applicable Operating Agreement for which it is operator). All such policies shall be carried with insurers maintaining a credit rating of at least "A-" by Standard & Poors or A.M. Best or "A3" by Moody's. Joint Development Operator and each Party Operator shall provide copies of such policies to the Development Parties covered by such policies upon request, and shall notify all Development Parties to be covered by such policies if it has been unable to obtain or maintain any of such policies. Except for worker's compensation policies, Joint Development Operator and each Party Operator shall arrange for the Development Parties, according to their respective interests, to be named as additional insureds on the relevant policies, with waivers of subrogation in favor of all parties with respect to their interests under this Agreement or such Applicable Operating Agreement, as applicable. Joint Development Operator and

each Party Operator shall duly file any relevant claims and use commercially reasonable efforts to collect for the account of the relevant Development Parties any proceeds under such policies. Joint Development Operator and each Party Operator shall require all contractors and subcontractors engaged in work for Development Operations to comply with the workers compensation Laws of the state where the Development Operations are being conducted and to maintain such other insurance as Joint Development Operator or such Party Operator may require.

(b) Notwithstanding the foregoing, any Development Party may obtain such insurance as it deems advisable for its own account at its own expense. Such insurance shall, in so far as it relates to Development Operations, contain a waiver of subrogation by the insurers in favor of each of the other Parties. Joint Development Operator and each Party Operator shall reasonably cooperate and assist such insurers in the investigation of insurance claims made by a Development Party in connection with the operations performed hereunder.

(c) Joint Development Operator and each Party Operator shall in respect of insurance obtained by contractors and subcontractors pursuant to Section 3.11(a): (i) if requested by any Development Party, supply such Development Party with evidence of the insurance that has been effected and is being maintained; and (ii) in connection with any Development Operations Contracts entered into on or after the Closing Date (excluding any written or oral confirmations, service orders or purchase orders entered into from or after the Closing Date under contracts existing as of the Closing Date), take all commercially reasonable steps to require that such contractors and subcontractors obtain from their insurers a waiver of subrogation in favor of Joint Development Operator or such Party Operator and each of the Development Parties.

**Section 3.12** **Reimbursement of Joint Development Operator and Party Operators for Technical Services; Overhead**.

(a) From and after the Closing Date and for so long as EOC serves as Joint Development Operator and does not undergo a change in Control of its ultimate parent company, Joint Development Operator shall be entitled to perform Technical Services required in connection with Development Operations conducted by Joint Development Operator or any Party Operator that is an Affiliate of EXCO, and to charge the Development Parties for Technical Services Costs incurred in connection therewith.

(b) All Technical Services Costs chargeable with respect to Development Operations shall be chargeable to the Development Parties on a Calendar Month basis by Joint Development Operator and each Development Party shall pay its Participating Interest share thereof in accordance with Section 2.2. With respect to any Development Operation, if any Technical Services Costs are billed under a Pre-Existing Operating Agreement or a Subsequent Operating Agreement, then such amount received by Joint Development Operator or Party Operator in

connection therewith will be shared by the Development Parties in accordance with their respective Participating Interests (and Joint Development Operator or Party Operator, as applicable, shall credit to each such other Development Party the proportionate share to which such Development Party is entitled with respect to such amount received by such Joint Development Operator or Party Operator).

(c)     All employees and Secondees of Joint Development Operator and its Affiliates providing Technical Services to Development Operations that do not work solely on Development Operations shall record their time, and the time sheets of such employees and Secondees shall identify the time spent providing Technical Services to Development Operations, and only that portion of their time spent providing Technical Services to Development Operations shall be chargeable to the Development Parties.  All such time sheets and related work records shall be subject to audit by the Development Parties.  Notwithstanding the foregoing, from time to time the Development Parties may agree upon an allocation of time for certain employees and Secondees in lieu of requiring such employees and Secondees to record their time.

(d)     To the extent that any Development Operations are subject to a Pre-Existing Operating Agreement and EXCO or an Affiliate of EXCO is the Party Operator thereunder, then each Development Party shall be responsible for and pay its Working Interest share of the overhead rates specified in such Pre-Existing Operating Agreement for such Development Operations conducted thereunder in accordance with Section 2.2.

(e)     Except for Development Operations that are subject to a Pre-Existing Operating Agreement or a Subsequent Operating Agreement, with respect to all Development Operations conducted by EXCO or an Affiliate of EXCO as Party Operator hereunder or under any Joint Development Operating Agreement, each Development Party shall be responsible for and pay its Working Interest share of the overhead rates specified in Schedule 3.12 (subject to Section 3.12(f) below) for such Development Operations in accordance with Section 2.2.

(f)     With respect to Development Operations conducted by EXCO or an Affiliate of EXCO as a Party Operator under a Subsequent Operating Agreement each Development Party shall pay its Working Interest share of the producing well and/or drilling well overhead rates for such Development Operations specified in such Subsequent Operating Agreement (the "Other Overhead Rates") in accordance with Section 2.2; provided that, in the event that the Other Overhead Rates differ from the overhead rates specified in Section 3.12(e) (the "Section 3.12 Overhead Rates"), then:

(i)      to the extent that a Development Party's Working Interest share of such Other Overhead Rates in any Calendar Month paid by such Development Party exceeds such Development Party's Working Interest share of the Section 3.12 Overhead Rates for such Development Party for such Calendar Month (such Development Party's "Actual Operating Agreement

Charges"), then such Party Operator shall credit to such Development Party the difference between its Working Interest share of the Other Overhead Rates paid by such Development Party and its Actual Operating Agreement Charges for such Calendar Month; or

(ii)     to the extent that a Development Party's Working Interest share of such Other Overhead Rates in any Calendar Month paid by such Development Party is less than the Actual Operating Agreement Charges for such Development Party for such Calendar Month, then (upon notice by such Party Operator) such Development Party shall pay such Party Operator the difference between its Actual Operating Agreement Charges and its Working Interest share of such Other Overhead Rates for such Calendar Month in accordance with Section 2.2.

(g)     Each Development Party shall bear its Participating Interest share of the Technical Services Costs and its Working Interest share of overhead rates chargeable to each Development Party pursuant to this Section 3.12; provided that, in the case of Sole Risk Operations, the costs and expenses of such overhead shall be chargeable solely to the Participating Parties with respect to such Sole Risk Development Operations in accordance with their respective Working Interests in such Sole Risk Development Operations.

# ARTICLE 4
## OPERATING COMMITTEE; DEVELOPMENT WORK PROGRAM; ANNUAL WORK PROGRAM AND BUDGETS

**Section 4.1     Operating Committee**.

(a)     To facilitate the creation, approval and amendment of the Development Work Program and Annual Work Program and Budgets, and the approval of certain contracts entered into by Joint Development Operator in the course of performing Development Operations, and provide for the overall direction of Joint Development Operations, there is hereby established an Operating Committee composed of representatives of each Development Party.  Each Development Party shall appoint one (1) representative and one (1) alternate representative to serve on the Operating Committee, and shall appoint its initial representative and alternate representative by notice to the others on or prior to the first to occur of the first meeting of the Operating Committee or the first vote of the Operating Committee pursuant to Section 4.1(n).  All actions of a Development Party taken with respect to the Operating Committee shall be taken through its representative or alternate representative.

(b)     Each Development Party shall have the right to change its representative and alternate at any time by giving notice of such change to the other Parties.

(c)     The Operating Committee shall have the powers and duties expressly ascribed to it in this Agreement.

(d)    The representative of a Development Party, or in his absence his alternate representative, shall be authorized to represent and bind such Development Party with respect to any matter which is within the powers of the Operating Committee and is properly brought before the Operating Committee. Each such representative shall have a vote equal to the Participating Interest of the Development Party that appointed such representative. Each alternate representative shall be entitled to attend all Operating Committee meetings but shall have no vote at such meetings except in the absence of the representative for whom he is the alternate. In addition to the representative and alternate representative, each Development Party may also bring to any Operating Committee meetings such advisors as it may deem appropriate.

(e)    Joint Development Operator may call a meeting of the Operating Committee by giving notice to the Development Parties at least fifteen (15) days in advance of such meeting. Any Development Party may request a meeting of the Operating Committee by giving notice to the other Development Parties and Joint Development Operator, which notice shall include any proposals being proposed by such Development Party for consideration at the meeting (including appropriate supporting information not previously distributed to the Development Parties). Upon receiving such request, Joint Development Operator shall call such meeting for a date not less than fifteen (15) days nor more than twenty (20) days after receipt of the request.

(f)    The Operating Committee may establish such subcommittees as the Operating Committee may deem appropriate. The functions of such subcommittees shall be to serve in an advisory capacity only. Each Development Party shall have the right to appoint a representative to each subcommittee. The Operating Committee is hereby deemed to have established an implementation committee whose purpose shall be to brainstorm, develop and discuss strategies for the efficient development of the Subject Oil and Gas Assets, implementation of such strategies through the Development Work Program and Annual Work Program and Budgets, and potential acquisitions (whether by leasing, purchase, farm-in or otherwise) of other Oil and Gas Assets (provided that, for the avoidance of doubt, no Development Party or Affiliate of a Development Party shall have any obligation to offer another Development Party the opportunity to participate in acquisitions of Oil and Gas Assets except as provided in Article 9).

(g)    Each notice of a meeting of the Operating Committee as provided by Joint Development Operator shall contain: (i) the date, time and location of the meeting; (ii) an agenda of the matters and proposals to be considered and/or voted upon; and (iii) copies of all proposals to be considered at the meeting (including appropriate supporting information not previously distributed to the Development Parties). A Development Party, by notice to the other Development Parties and Joint Development Operator, which notice shall include any additional proposals being proposed by such Development Party to be considered at the meeting (including appropriate supporting information not previously distributed to the Development Parties), given not less than five (5) Business Days prior to a

meeting, may add additional matters to the agenda for a meeting. On the request of a Development Party, and with the unanimous consent of all Development Parties, the Operating Committee may consider at a meeting a proposal not contained in such meeting agenda.

(h)    There shall be at least one (1) but not more than three (3) meetings of the Operating Committee per Calendar Quarter unless all Development Parties agree in writing to the contrary. The restriction on number of meetings contained in this Section shall not restrict the number of proposals that may be submitted without a meeting pursuant to Section 4.1(m). Meetings of each subcommittee shall take place as often as the Operating Committee shall determine. All meetings of the Operating Committee and each subcommittee shall be held in the offices of Joint Development Operator, or elsewhere as the Operating Committee or such subcommittee may mutually decide.

(i)    Except as provided otherwise in this Section 4.1(i) and in Section 5.2, all decisions, approvals and other actions of the Operating Committee on all proposals coming before it that are within its powers to approve or disapprove, shall be decided by the affirmative vote of Development Parties holding collectively at least seventy-five percent (75%) of the Participating Interests of the Development Parties entitled to vote on such proposals, provided that (i) any Development Operation proposed to the Operating Committee that is not approved by the Operating Committee and that may be proposed and conducted as a Sole Risk Development Operation under the terms of the Applicable Operating Agreement may be so proposed and conducted by the Development Parties desiring to participate in such Development Operation and (ii) any Area-Wide Operation proposed to the Operating Committee which is not approved by the Operating Committee may be conducted by those Development Parties desiring to participate in such Development Operation at their sole risk and expense. Notwithstanding the preceding, any proposal to reduce the quantity of work to be conducted under the Development Work Program or any Annual Work Program and Budget (to the extent relating to any Development Operations included in any Development Work Program) with respect to any period prior to the Carry Termination Event shall also require the affirmative vote of EXCO.

(j)    With respect to meetings of the Operating Committee and each subcommittee, Joint Development Operator's duties shall include: (i) timely preparation and distribution of the agenda; (ii) organization and conduct of the meeting; and (iii) preparation of a written record or minutes of each meeting.

(k)    Joint Development Operator shall have the right to appoint the chairman of the Operating Committee and each subcommittee, provided that, for the avoidance of doubt, the chairman shall have no special casting or deciding vote on any matter presented to the Operating Committee. The chairman of the Operating Committee shall appoint a secretary who shall make a record of each proposal voted on and the results of such voting at each Operating Committee meeting. Each Development Party shall sign and be provided a copy of such record at the

end of such meeting, and it shall be considered the final record of the decisions of the Operating Committee.

(l)    The secretary shall provide each Development Party with a copy of the minutes of each Operating Committee meeting within fifteen (15) Business Days after the end of the meeting. Each Development Party shall have fifteen (15) days after receipt of such minutes to give notice to the secretary of any objections to the minutes. A failure to give notice specifying objection to such minutes within said fifteen (15) day period shall be deemed to be approval of such minutes. In any event, the votes recorded under Section 4.1(j) shall take precedence over the minutes described above.

(m)    In lieu of a meeting, any Development Party may submit any proposal that is within the Operating Committee's powers to approve or disapprove to the Operating Committee for a vote by notice. The proposing Development Party or Development Parties shall notify Joint Development Operator with written materials describing the proposal and Joint Development Operator shall provide a copy of such proposal to each Development Party. Any such proposal by a proposing Development Party shall include with such proposal adequate documentation to enable the other Development Parties to make a decision. Each Development Party (including the proposing Development Party) shall communicate its vote on the proposal by notice to Joint Development Operator and the other Development Parties within fifteen (15) days after receipt of the proposal from the Joint Development Operator, unless such proposal, together with any other increases to an approved Annual Work Program and Budget for a Calendar Year, if accepted, would result in aggregate spending pursuant to such Annual Work Program and Budget of more than ten percent (10%) in excess of the original amount of the Annual Work Program and Budget approved pursuant to Section 4.4 (or, in the case of the Annual Work Program and Budget for Calendar Year 2009, attached hereto as Exhibit "E-1") or, once amended to increase the amount of the Annual Work Program and Budget ten percent (10%) above the then existing amount in accordance with Section 4.4(e), the amended amount of the Annual Work Program and Budget, in which case each Development Party (including the proposing Development Party) shall communicate its vote on the proposal by notice to Joint Development Operator and the other Development Parties within sixty (60) days after receipt of the proposal from the Joint Development Operator. Any Development Party failing to communicate its vote in a timely manner shall be deemed to have voted against such proposal. Within five (5) Business Days following the expiration of the relevant time period, Joint Development Operator shall give each Development Party a confirmation notice stating the tabulation and results of the vote on such proposal.

(n)    From time to time, the Operating Committee may approve guidelines, standards or procedures regarding the implementation of Development Operations to be observed in the conduct of Development Operations by Joint Development Operator and each Party Operator.

(o)     All decisions taken by the Operating Committee pursuant to this Section 4.1 shall be conclusive and binding on all Parties.

(p)     All notices and communications required or permitted to be given under Section 3.10 or Article 4 to the Development Parties or a Party Operator or the members of the Operating Committee shall be sufficient in all respects if given in writing and delivered personally, or sent by bonded overnight courier, or mailed by U.S. Express Mail or by certified or registered United States Mail with all postage fully prepaid, or sent by telex or facsimile transmission (provided any such telex or facsimile transmission is confirmed either orally or by written confirmation), or sent by pdf via e-mail, addressed to the appropriate Party at the address for such Party shown below or at such other address as such Party shall have theretofore designated by written notice delivered to the Party giving such notice:

If to EXCO:

> EXCO Operating Company, LP
> EXCO Production Company, LP
> 12377 Merit Drive, Suite 1700
> Dallas, Texas 75251
> Attention Michael R. Chambers
> Telephone: (214) 368-2084
> Fax: (214) 438-1347
> E-mail: mchambers@excoresources.com

> With copies to:

> Attention Harold L. Hickey
> Telephone: (214) 368-2084
> Fax: (214) 368-8754
> E-mail: hhickey@excoresources.com

> Attention Stephen F. Smith
> Telephone: (214) 368-2084
> Fax: (214) 706-3409
> Email: ssmith@excoresources.com

If to BG:

> BG US Production Company, LLC
> 5444 Westheimer, Suite 1200
> Houston, Texas 77056
> Attention: Jon Harris
> Telephone: (713) 599-4000
> Fax: (713) 599-4250
> E-mail: Jon.Harris@bg-group.com

BG US Production Company, LLC
5444 Westheimer, Suite 1200
Houston, Texas 77056
Attention: Bill Way
Telephone: (713) 599-4000
Fax: (713) 599-4250
E-mail: Bill.Way@bg-group.com

Any notice given in accordance herewith shall be deemed to have been given when delivered to the addressee in person, or by courier, or transmitted by facsimile transmission or email during normal business hours, or upon actual receipt by the addressee after such notice has either been delivered to an overnight courier or deposited in the United States Mail, as the case may be. The Parties may change the address, telephone numbers, facsimile numbers and email addresses to which such communications are to be addressed by giving written notice to the other Parties in the manner provided in this Section 4.1(p).

**Section 4.2    Development Work Program**.

(a)    The Operating Committee shall adopt, and modify from time to time, a multi-year work program for Development Operations (the "Development Work Program") as follows:

    (i)    The Operating Committee is hereby deemed to have approved the work program attached hereto as Exhibit "D" for Development Operations to be performed through Calendar Year 2012. Such work program shall constitute the Development Work Program applicable through Calendar Year 2012 except as otherwise revised, amended or modified by the Operating Committee.

    (ii)    On or before August 15 of each Calendar Year, commencing in Calendar Year 2011, Joint Development Operator shall prepare and submit to the Operating Committee a revised Development Work Program setting forth the Development Operations to be carried out during the following two Calendar Years. Such proposed Development Work Program shall automatically include any Development Operations which were approved for such period as part of the prior Development Work Program unless the Operating Committee determines to the contrary. Within sixty (60) days after distribution of the proposed Development Work Program (or such later date as may agreed by the Operating Committee), the Operating Committee shall meet to consider, modify (if necessary) and approve or reject the proposed Development Work Program. If the Operating Committee does not approve any such Development Work Program on or prior to the first day of the following Calendar Year (for purposes of this Section 4.2(a)(ii), the "current Calendar Year"), then the Development Work Program for the then-current Calendar Year shall be the

Development Work Program, if any, approved for the then-current Calendar Year in the preceding Calendar Year.

(b) Except as otherwise agreed in writing by the Operating Committee, the Annual Work Program and Budget for each Calendar Year shall contain not less than those Development Operations to be performed during such Calendar Year as set forth in the Development Work Program.

**Section 4.3** **Initial Annual Work Plan and Budgets**. The Annual Work Program and Budget for the remainder of Calendar Year 2009 is hereby approved by the Operating Committee and is attached hereto as Exhibit "E-1". The first draft of an Annual Work Program and Budget for Calendar Year 2010 attached hereto as Exhibit "E-2" is hereby deemed approved by the Operating Committee, provided that the Operating Committee shall approve such further details as would be required under the terms of Section 4.4 on or before October 15, 2009.

**Section 4.4** **Subsequent Annual Work Plan and Budgets**. For each Calendar Year during the term of this Agreement commencing with Calendar Year 2010, each Annual Work Program and Budget shall be adopted as follows:

(a) On or before August 15 in the Calendar Year immediately preceding the relevant Calendar Year, Joint Development Operator shall prepare and submit to the Operating Committee a proposed Annual Work Program and Budget for such applicable Calendar Year (provided that in the case of the proposed Annual Work Program and Budget for Calendar Year 2010, the draft Annual Work Program and Budget attached hereto as Exhibit "E-2" shall be basis for such proposed Annual Work Program and Budget). Each such proposed Annual Work Program and Budget shall contain at least the following:

(i) all Development Operations that are to be conducted during such Calendar Year pursuant to the Development Work Program, except with the approval of the Operating Committee to the contrary;

(ii) all lease maintenance costs and expenditures required under the terms of existing Leases or existing third party contracts held by Joint Development Operator for the benefit of Joint Development Operations (including each Development Party's share thereof), except with the approval of the Operating Committee to the contrary;

(iii) estimates of all Technical Services Costs associated with Technical Services to be provided by Joint Development Operator;

(iv) itemized estimates of the Development Costs (including each Development Party's share thereof) for Joint Development Operations covered by the proposed Annual Work Program and Budget by budget category and allocated between Shallow Rights and Deep Rights, and Area-Wide Operations, containing sufficient detail (to the extent available) to afford the ready identification of the nature, scope and duration of the activity in question;

(v)    the number of wells to be drilled as part of the Joint Development Operations in each of the Shallow Rights and the Deep Rights during such Calendar Year, the proposed locations of such wells (to the extent reasonably ascertainable at the time such Annual Work Program and Budget is proposed), and the estimated Development Costs (including each Development Party's share thereof) associated therewith;

(vi)    estimates of the schedule pursuant to which the Development Parties' share of Development Costs for Joint Development Operations included in the Annual Work Program and Budget are anticipated to be incurred by the Development Parties; and

(vii)    any other information requested in writing by a Development Party that can reasonably be provided by the Joint Development Operator.

(b)    Itemized expenditures in an Annual Work Program and Budget may extend over more than one Calendar Year because such itemized expenditures represent activities or operations that require commitments in excess of one Calendar Year. Once itemized expenditures are approved, Joint Development Operator shall not be required to resubmit them for approval of the Operating Committee on an annual or other periodic basis, but instead all such items shall be automatically included in future Annual Work Program and Budgets as items which have already been approved.

(c)    Joint Development Operator shall regularly consult with the Operating Committee and the implementation subcommittee during the preparation of each proposed Annual Work Program and Budget.  Following receipt of Joint Development Operator's proposed Annual Work Program and Budget, each Development Party shall furnish to Joint Development Operator and the other Development Parties any comments, suggestions or proposed amendments it may have respecting the proposed Annual Work Program and Budget as soon as may be reasonably practicable, and Joint Development Operator shall consider and discuss such comments, suggestions and proposed amendments with the Operating Committee. Unless otherwise extended by the Operating Committee, within sixty (60) days after distribution of the proposed Annual Work Program and Budget for a Calendar Year, the Operating Committee and Joint Development Operator shall meet to consider, modify (if necessary) and approve or reject the proposed Annual Work Program and Budget.  Subject to Section 4.4(d), approval of an Annual Work Program and Budget shall require the approval of the Operating Committee. Inclusion of an operation in an approved Annual Work Program and Budget or an approved amendment thereof shall, subject to the terms of Section 4.6: (i) bind all Development Parties to participate in such operation, and no Development Party shall have the right to make any nonconsent election under an Applicable Operating Agreement with respect to such operation; and (ii) authorize Joint Development Operator to conduct such operation for the account of all of the Development Parties under the relevant Applicable Operating Agreement (provided that, to the extent any third parties are party to such Applicable

Operating Agreement, Joint Development Operator shall propose such operation to such third parties in accordance with the terms of such Applicable Operating Agreement, though, for the avoidance of doubt, Joint Development Operator need not re-propose such operation to the Development Parties), and each Party Operator to conduct such operation, subject to the budgetary provisions of such Annual Work Program and Budget and Sections 4.4(i) and 4.7, without further authorization from the Operating Committee. Each Development Party agrees to provide such notices, make such elections and take such actions as may reasonably be required under any Applicable Operating Agreement to implement this provision.   For the avoidance of doubt, no Development Party shall be obligated to participate in acquisitions of Leases included in an Annual Work Program and Budget, but instead shall have the right but not the obligation to participate in such acquisitions pursuant to Article 9.

(d)     In the event that an Annual Work Program and Budget is not approved on or prior to the first day of the Calendar Year to which such Annual Work Program and Budget pertains (for purposes of this Section 4.4(d), the "relevant Calendar Year"), the Operating Committee shall be deemed to have approved an Annual Work Program and Budget for such relevant Calendar Year that includes the following:  (i) the Development Operations scheduled to be performed during the relevant Calendar Year as set forth in the Development Work Program, if any, and associated Development Costs reasonably required to implement such Development Operations; (ii) Operating Expenses equal to the product of the amount of Operating Expenses approved in the preceding Calendar Year's Annual Work Program and Budget and the Operating Expense Multiplier for the relevant Calendar Year; (iii) Technical Services Costs equal to the amount of Technical Services Costs approved in the preceding Calendar Year's Annual Work Program and Budget; (iv) those multi-year expenditures previously approved by the Development Parties pursuant to Section 4.4(b) that are attributable to the relevant Calendar Year; (v) existing payment commitments to third parties under Leases and contracts binding with respect to the Subject Oil and Gas Assets; and (vi) taxes payable with respect to the Subject Oil and Gas Assets by any operator under the terms of any Applicable Operating Agreement.

(e)     Any Development Party may propose to amend the Development Work Program or an Annual Work Program and Budget by notice to the Operating Committee and Joint Development Operator.  Approval of any such amendment shall require the approval of the Operating Committee.  Notwithstanding any provision of Section 4.1 to the contrary, each Development Party shall have sixty (60) days to consider any proposed amendment that would increase the estimated costs of the Development Work Program for any Calendar Year or any Annual Work Program and Budget by more than ten percent (10%).  To the extent that such amendment is approved by the Operating Committee, the Development Work Program and relevant Annual Work Program and Budget shall, subject to any required approvals under any Applicable Operating Agreement, be deemed amended accordingly, provided that any such amendment shall not invalidate any commitment or expenditure already made by an operator under an Applicable

Operating Agreement in accordance with any previous authorization given pursuant hereto.

(f)     Notwithstanding anything to the contrary in this Section 4.4, any Development Party may propose Development Operations that are not included in the Development Work Program or a then-current approved Annual Work Program and Budget (a "Non-Budgeted Operation"). Any such Non-Budgeted Operation proposed by a Development Party in which all Development Parties agree to participate shall automatically be added to the Development Work Program and the applicable approved Annual Work Program and Budget(s) and shall cease to be a Non-Budgeted Operation. Any such Non-Budgeted Operation in which less than all of the Development Parties elect to participate (i) that may be undertaken as a Sole Risk Development Operation under the terms of the relevant Applicable Operating Agreement or (ii) that is an Area-Wide Operation may be proposed and conducted as a Sole Risk Development Operation. Notwithstanding the preceding, until December 31, 2012, no Non-Budgeted Operation may be performed as a Sole Risk Development Operation for the benefit of a Development Party if the sum of the estimated costs of conducting such Non-Budgeted Operation for the account of such Development Party, together with costs incurred or to be incurred by such Development Party with respect to other Sole Risk Development Operations performed or to be performed in such Calendar Year, together with all Joint Development Operations performed or to be performed in such Calendar Year, exceeds one hundred twenty percent (120%) of the total amount of the approved Annual Work Program and Budget for such Calendar Year.

(g)     Any Development Operation proposed by a third party pursuant to an Applicable Operating Agreement shall be subject to the terms and conditions of such Applicable Operating Agreement. Any such Development Operation proposed by a third party in which all Development Parties elect to participate shall automatically be added to the Development Work Program and the applicable approved Annual Work Program and Budget(s). Any such Development Operation in which less than all of the Development Parties elect to participate that may be undertaken as a Sole Risk Development Operation under the terms of the relevant Applicable Operating Agreement may be so proposed and conducted.

(h)     Approval by the Operating Committee of an Annual Work Program and Budget shall constitute the Operating Committee's deemed approval for any Party Operator to expend up to ten percent (10%) in excess of the authorized amount applicable to its operations within each Annual Work Program and Budget category, not to exceed in the aggregate ten percent (10%) of the aggregate amount applicable to its operations in such Annual Work Program and Budget, less, in each case, any amounts included as line items for contingencies and overruns with respect to such operations in such category or Annual Work Program and Budget. Each Party Operator shall promptly notify the Operating Committee of any expenditure made by it in the exercise of its rights pursuant to this Section 4.4(h). The ten percent (10%) deemed approval levels set forth in

this Section 4.4(h) shall be calculated with respect to the original amount of an Annual Work Program and Budget or, once amended, the amended amount of the Annual Work Program and Budget, provided that no expenditures incurred pursuant to Section 4.4(i) shall be deemed to be included in an approved Annual Work Program and Budget for purposes of calculating the ten percent (10%) deemed approvals pursuant to this Section 4.4(h), nor shall any such expenditures be considered to be amounts expended in excess of the authorized amount of any Annual Work Program and Budget for purposes of calculating the ten percent (10%) deemed approval levels.

(i)     Notwithstanding anything to the contrary in this Agreement, any Party Operator is expressly authorized to make expenditures and incur liabilities without prior authorization or approval when necessary or advisable, in such Party Operator's good faith judgment, to deal with emergencies, including well blowouts, fires, oil spills, or any other similar event, which may endanger property, lives, or the environment.  Each Party Operator shall as soon as practicable report to the Development Parties the nature of any such emergency which arises, the measures it intends to take in respect of such emergency and the estimated related expenditures.

(j)     To the extent reasonably within the control of any Party Operator or the other Development Party or Development Parties conducting any Joint Development Operation, the Joint Development Operation shall be conducted at the time prescribed in the applicable Annual Work Program and Budget.

(k)     For the avoidance of doubt, any reference in this Agreement to an approved Annual Work Program and Budget shall include an Annual Work Program and Budget that is deemed to have been approved by the Operating Committee, and shall incorporate all approved amendments thereto and all modifications to Annual Work Program and Budgets described herein that require no action on the part of the Parties.

**Section 4.5     Statements of Estimated Expenditures**. Not later than twenty (20) days prior to the commencement of each Calendar Quarter during the term of this Agreement, Joint Development Operator shall provide the Development Parties a statement of the estimated Development Costs to be incurred in such Calendar Quarter pursuant to this Agreement, including Development Costs associated with Joint Development Operations.  Such statement shall be for informational purposes only, and, except as otherwise provided in Section 4.6, no approval of the Operating Committee shall be required for any of the Development Costs identified therein to the extent such Development Costs are included in an approved Annual Work Program and Budget, or are covered by Section 4.4(h).

**Section 4.6     AFEs**.

(a)     Prior to:  (i) spudding any well as a Joint Development Operation, (ii) making any material expenditures or incurring any material commitments for work on any Wellbore Operation to be conducted as a Joint Development Operation that is

estimated to cost in excess of five hundred thousand dollars (US$500,000), or (iii) making any material expenditures or incurring any material commitments for work on any Area-Wide Operation to be conducted as a Joint Development Operation that is estimated to cost in excess of one million dollars (US$1,000,000), the Party Operator or Joint Development Operator, as the case may be, shall submit for the approval of the Operating Committee an AFE. Where the necessary information is available, such AFE may be submitted and approved for designated wells and Wellbore Operations as part of the proposed Annual Work Program and Budget for a Calendar Year, in which case no separate subsequent AFE shall be required.

(b)     Each Development Party shall communicate an Operating Committee vote to approve or reject the AFE within fifteen (15) days following receipt of the AFE (or forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in the event of a Wellbore Operation when a drilling rig is on location).   Any Development Party failing to communicate its vote within the applicable time period shall be deemed to have voted against the AFE.

(c)     If the Operating Committee approves an AFE for the operation within the applicable period, the Party Operator or Joint Development Operator shall be authorized to conduct the operation under the terms of this Agreement.   If the Operating Committee fails to approve an AFE for the operation within the applicable time period, the operation shall be deemed rejected.   The Party Operator or Joint Development Operator shall promptly notify the Parties if the operation has been rejected, and, subject to Section 4.4(f), any Development Party may thereafter conduct the operation as a Sole Risk Development Operation under the terms of the Applicable Operating Agreement.

(d)     For purposes of any Applicable Operating Agreement that contains a casing point election, approval of an AFE that includes the costs associated with completing a well shall be deemed to be an election to participate in the completion of such well pursuant to the relevant provisions of such Applicable Operating Agreement.

(e)     When an operation is approved for greater amounts than those provided for in the applicable line items of the approved Annual Work Program and Budget, the Annual Work Program and Budget shall be deemed to be revised accordingly.

**Section 4.7   Contract Awards**.   Notwithstanding the terms of any Applicable Operating Agreement to the contrary:

(a)     Subject to Sections 4.7(b), (c) and (d), Joint Development Operator and each Party Operator shall award each Development Operations Contract to the best qualified contractor considering cost, ability, availability and HSSE performance considerations (in each case, in Joint Development Operator's or Party Operator's reasonable opinion), to perform the contract without the obligation to tender and without informing or seeking the approval of the Operating Committee.   The procedures set forth in this Section 4.7 shall not apply to any contracts that have

been awarded, or in respect of which invitations to tender have been issued, on or before the Closing Date, provided that the procedures set forth in this Section 4.7 shall apply to confirmations, service orders or purchase orders (whether written or oral) entered into on and after the Closing Date pursuant to existing master service agreements that were effective prior to the Closing Date.

(b)   Prior to Joint Development Operator or any Party Operator entering into a Development Operations Contract with a Development Party or an Affiliate of a Development Party for which one or more other Development Parties participating in such Development Operation that are not Affiliates of such Development Operations Contract counterparty will be responsible for all or a portion of the costs and expenses payable thereunder ("Unaffiliated Participating Parties"), Joint Development Operator or such Party Operator shall obtain the affirmative vote of the Operating Committee members appointed by Unaffiliated Participating Parties holding collectively at least seventy-five percent (75%) of the Participating Interests held by the Unaffiliated Participating Parties.

(c)   (i)   From and after January 1, 2010, prior to entering into a Development Operations Contract that can reasonably be expected to result in aggregate payments to the counterparty of more than one million dollars (US$1,000,000) during any twelve (12) consecutive Calendar Month period, commencing as of January 1 in any Calendar Year, except as provided in Section 4.7(c)(ii), Joint Development Operator and any Party Operator shall obtain proposals for such services from at least two (2) service providers.   For the avoidance of doubt, a contract that automatically renews (is evergreen) on a month-to-month or other periodic basis that would meet the $1,000,000 threshold if it remained in effect for an entire twelve (12) consecutive Calendar Month period commencing as of January 1 in any Calendar Year shall be considered subject to the requirements of the preceding sentence.

(ii)   If the Joint Development Operator or any Party Operator desires to award a Development Operations Contract that would otherwise be subject to Section 4.7(c)(i) without tender of proposals from more than one service provider, whether because only one competent service provider can provide the contracted-for-service or otherwise, the Joint Development Operator or such Party Operator may do so with the prior approval of the Operating Committee.   Joint Development Operator and any Party Operator shall present a copy of the proposed Development Operations Contract to the Operating Committee.   Each Development Party shall notify the Joint Development Operator or such Party Operator, and the rest of the Operator Committee, of its approval or rejection of such Development Operations Contract within fifteen (15) Business Days of its receipt of such Development Operations Contract.   Failure of a Development Party to respond within such period shall be deemed an approval of the award of such Development Operations Contract.   Joint Development Operator and a Party Operator may only enter into a

proposed Development Operations Contract that would otherwise be subject to Section 4.7(c)(i) without tender of proposals from more than one service provider if the Operating Committee approves such Development Operations Contract.

(iii)    To the extent that Joint Development Operator or any Party Operator enters into a Development Operations Contract for which Joint Development Operator or any Party Operator is not required to obtain proposals from at least two (2) service providers pursuant to Section 4.7(c)(i) and such Development Operations Contract can reasonably be expected to result in aggregate payment to the counterparty of more than one hundred thousand dollars (US$100,000), Joint Development Operator or such Party Operator shall keep a written record in its files that are subject to the audit provisions of Section 2.2 of this Agreement and Exhibit "C" of the relevant Applicable Operating Agreement explaining why multiple bids were not obtained for such services

(iv)    In connection with the foregoing, Joint Development Operator and each Party Operator shall keep a written record in its files that are subject to the audit provisions of Section 2.2 of this Agreement and Exhibit "C" of each Joint Development Operating Agreement that (i) in the event that the Development Operations Contract is awarded pursuant to Section 4.7(c)(i), includes the proposals obtained from the prospective service providers; or (ii) in the event that the Development Operations Contract is awarded pursuant to Section 4.7(c)(ii), includes the notice to the Operating Committee and Operating Committee responses.

(d)    From and after the Closing Date, prior to entering into a Development Operations Contract not specifically and expressly approved as part of an approved Annual Work Program and Budget that can reasonably be expected to result in aggregate payments to the counterparty of more than five million dollars (US$5,000,000) during any twelve (12) consecutive Calendar Month period, Joint Development Operator and any Party Operator shall present a copy of the proposed Development Operations Contract to each Development Party, together with the tender list and tender evaluation criteria used to secure such proposed Development Operations Contract. Each Development Party shall notify the Joint Development Operator or such Party Operator and the Operating Committee, of its approval or rejection of such Development Operations Contract within fifteen (15) Business Days of its receipt of such materials. Failure of a Development Party to respond within such period shall be deemed an approval of such Development Operations Contract. Joint Development Operator and a Party Operator may only enter into such proposed Development Operations Contract to the extent that the Operating Committee approves such Development Operations Contract.

(e)    Upon the reasonable written request of a Party, Joint Development Operator or a Party Operator shall provide such Party a copy of any written contract or contracts

of a material nature that are utilized in connection with Joint Development Operations or Sole Risk Development Operations in which such Party is participating, as well as other information that can reasonably be provided by such operator regarding the use and performance of any such contract or contracts, except to the extent Joint Development Operator or such Party Operator may be prohibited from making any such disclosure under the terms and conditions of such contract and is unable through commercially reasonable efforts to obtain consent for such disclosure.

(f)     With respect to written contracts that are reasonably expected to be effective for a period of one (1) or more Calendar Years and that are entered into from and after the Closing Date, Joint Development Operator and each Party Operator shall include, in the case of Development Operations Contracts subject to Section 4.7(b), each of items (i) through (v) (inclusive) below, and shall use commercially reasonable efforts to include, in the case of Development Operations Contracts subject to Section 4.7(c) or (d), each of items (i) through (iv) (inclusive) below:

    (i)     A right to assign such Development Operations Contract to a successor operator.

    (ii)    A right for the operator to enforce the Development Operations Contract on behalf of all beneficiaries and to recover the full amount of damages suffered by all beneficiaries on their behalf.

    (iii)   A statement that the Participating Parties are third party beneficiaries of the Development Operations Contract.

    (iv)    A right for any Participating Party to hold, review and use any data and information, including seismic, geological, geophysical and other technical data and information that is the subject of such Development Operations Contract.

    (v)     A right for any Participating Party to enforce the contract as a third party beneficiary without a requirement to join the operator.

**Section 4.8     Area-Wide Operations.**

(a)     Joint Development Operator shall conduct Area-Wide Operations on behalf of the Development Parties pursuant to the applicable approved Annual Work Program and Budget.

(b)     All costs and liabilities incurred in Area-Wide Operations shall be borne and paid, and all assets acquired in such operations owned, by the Participating Parties in proportion to their Participating Interests.

(c)     Each Development Party shall pay its share of estimated expenditures for Area-Wide Operations in which it participates, and such amounts shall be billed to or

advanced by, as the case may be, such Development Party in accordance with Section 2.2.

**Section 4.9** **Third Party Operators**.  For the avoidance of doubt, the Parties agree that (a) the Development Work Program, Annual Work Program and Budget and other terms of Sections 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.8, 4.9 and 4.10 shall, though binding as between the Parties, not be binding upon any operator or non-operator that is not a Party and (b) the terms of Section 4.7 shall not apply to any operations conducted by an operator that is not a Party.

**Section 4.10** **HSSE**.

(a)     Within thirty (30) days following the Closing Date, the Development Parties shall use good faith efforts to develop HSSE principles to be observed in the conduct of Development Operations (the "HSSE Principles") which at a minimum include: (i) the goals of preventing injuries and providing a healthy, safe and secure working environment; (ii) protection of the environment; (iii) the responsibility to seek continuous improvement in HSSE performance; and (iv) the principle that level of risk is the primary criterion for facilities design.

(b)     Within one hundred twenty (120) days following the Closing Date, the Development Parties shall use good faith efforts to develop an HSSE plan to be observed in the conduct of Development Operations (the "HSSE Plan") relating to the conduct of activities under this Agreement which is consistent with the HSSE Principles and the relevant technical standards and codes of practice issued by American professional bodies, including the American Petroleum Institute, the American Society of Mechanical Engineers, the American National Standards Institute, and all applicable Laws.

(c)     Within two (2) years following the Closing Date, Joint Development Operator and each Party Operator shall have used good faith efforts to develop and implement an HSSE management system to be observed in the conduct of Development Operations (an "HSSE Management System") which addresses the HSSE risks specific to its duties under this Agreement, and any Applicable Operating Agreement, and the management of controls to eliminate, reduce or mitigate HSSE risks.

(d)     From time to time, the Operating Committee may amend the HSSE Principles, HSSE Plan, and the HSSE Management System, as the case may be, subject to the voting thresholds and procedures set forth herein.

**Section 4.11    Conflict of Interest Policy.**  Within sixty (60) days following the Closing Date, the Operating Committee shall use good faith efforts to develop a policy for the Development Parties regarding required disclosure of conflicts of interest that any Development Party or Affiliate of a Development Party, or any officer, director or key employee of any Development Party or Affiliate of a Development Party, may have with the interests of any of the Development Parties in connection with the conduct of Development Operations.

**ARTICLE 5**
**DEFAULT**

**Section 5.1    Default.**

(a)    Any Development Party that fails to pay when due any amounts owed and undisputed under the terms of this Agreement or any Associated Agreement (including any amount included in an approved Annual Work Program and Budget) and such failure is not cured within fifteen (15) days of such Development Party's receipt of a Default Notice shall be in default under this Agreement, and shall be referred to herein as a "Defaulting Party".   Joint Development Operator shall (or any Affected Party may) give notice of such default (a "Default Notice") to the Defaulting Party and each of the other non-Defaulting Parties.

(b)    For purposes of this Article 5, "Default Period" means the period beginning fifteen (15) days from the date of a Development Party's receipt of a Default Notice if such Development Party remains in default under Section 5.1(a), and ending when all of the Defaulting Party's defaults have been remedied in full.

(c)    All amounts in default and not paid when due under this Agreement shall bear interest at the Default Interest Rate from the due date to the date of payment.

(d)    For the avoidance of doubt (i) EXCO shall not be in default with respect to the payment of its Participating Interest share of Development Costs to the extent that BG is responsible for such Development Costs as required by Section 2.1 and BG fails to pay its Carried Costs when due, and (ii) in the event BG fails to pay its Carried Costs when due and BG has not exercised its rights under Section 5.1(e) with respect to such Carried Costs (if applicable), then BG shall be in default under this Agreement upon its receipt of a Default Notice and its failure to so cure such default as provided in Section 5.1(a).  Except as set forth in Section 5.1(e), no default by EXCO under this Agreement shall affect BG's obligation to pay the Carried Costs when due as required by Section 2.1.

(e)    Notwithstanding anything to the contrary herein, at any time upon which EXCO is a Defaulting Party hereunder and prior to the Carry Termination Event, BG shall have the right but not the obligation to set off its obligation to pay Carried Costs against the Total Amount in Default of EXCO upon notice to EXCO and, upon such set off, such obligation to pay such Carried Costs (to the extent of the amount so set off) shall be deemed satisfied.

**Section 5.2**     **Certain Consequences of Default**.

(a)     Notwithstanding any other provision in this Agreement or any Associated Agreement to the contrary, during the Default Period, the Defaulting Party shall be subject to all rights and remedies available to the Affected Parties under the relevant Applicable Operating Agreements, and in addition, shall have no right to:

  (i)     make or elect to participate in any proposal under this Agreement or any Applicable Operating Agreement;

  (ii)     vote on any matter with respect to which approval is required under the express terms of this Agreement or any Associated Agreement (excluding any amendment or waiver of the terms of any such agreement);

  (iii)     call any Operating Committee or subcommittee meeting;

  (iv)     vote on any matter coming before the Operating Committee or any subcommittee (except for any amendment to the Development Work Program pursuant to Section 4.1);

  (v)     access any data or information relating to any operation conducted under this Agreement or any Associated Agreement (except to the extent that the Defaulting Party is Joint Development Operator or is a Party Operator, in which case such Defaulting Party shall be entitled to such data and information as may be necessary to perform its responsibilities in such capacity);

  (vi)     Transfer all or any part of its interests in its Joint Development Interest or any other Subject Oil and Gas Asset, or Encumber all or any part of its interests in its Subject Oil and Gas Assets except in a case of (a) a Transfer of a Joint Development Interest to a Person or Encumbrance in favor of a Person who simultaneously with such Transfer or Encumbrance satisfies in full the Total Amount in Default, or (b) a Credit Facility Encumbrance granted pursuant to a borrowing for which all or a portion of the proceeds thereof are used to pay the entire amount of the Total Amount in Default;

  (vii)     withhold consent to any Transfer of all or an undivided portion of the Joint Development Interest or a Material Interest of a non-defaulting Development Party pursuant to Article 7, or exercise its preferential purchase right provided for in Section 8.1 in the event of such a Transfer by a non-defaulting Development Party or in Section 8.2 in the event of a Change in Control of a non-defaulting Development Party; or

  (viii)     elect to acquire any portion of an Acquired Interest pursuant to Article 9.

(b)     In addition to the other remedies available to the Affected Parties under this Agreement and any other rights available to each Affected Party to recover its

share of the Total Amount in Default from and after the later to occur of the thirtieth (30th) day of the Default Period or the time upon which the Defaulting Party's Escrow Account Balance is equal to zero (0), a Defaulting Party shall have no right to receive its Entitlement from the Leases included in the Subject Oil and Gas Assets and the Affected Parties shall have the right to collect such Entitlement.

(c)    Furthermore, during the Default Period, the Defaulting Party shall be deemed to have approved, and shall join with the non-defaulting Development Party in taking, any actions approved by the non-defaulting Development Parties during the Default Period which cannot be conducted as Sole Risk Development Operations under the terms of any Applicable Operating Agreement.

(d)    Any Default Notice shall include a statement of the amount of money that the Defaulting Party has failed to pay.

(e)    Upon the commencement of the Default Period, except with respect to any Carried Costs, Joint Development Operator, or if Joint Development Operator or any Affiliate of Joint Development Operator is the Defaulting Party, any Affected Party or Affected Parties, shall send the non-defaulting Development Parties a statement of the sum of money that the Defaulting Party failed to pay, and the non-defaulting Development Parties shall pay such amount within fifteen (15) days following receipt of the statement.  If any non-defaulting Development Party fails to timely satisfy such obligations, such non-defaulting Development Party shall thereupon be a Defaulting Party subject to the provisions of this Article 5.  If all non-defaulting Development Parties fail to timely satisfy such obligations, the Development Parties shall be deemed to have unanimously determined not to make such expenditure and the Defaulting Party shall no longer be deemed to be in default with respect to such expenditure.

**Section 5.3**    **Right to Costs of Enforcement**.  Each Affected Party shall be entitled to recover from the Defaulting Party all reasonable attorneys' fees and other reasonable costs sustained in the collection of amounts owed by the Defaulting Party.

**Section 5.4**    **Cumulative and Additional Remedies**.  The rights and remedies granted to an Affected Party in this Article 5 shall be cumulative, not exclusive, and shall be in addition to any other rights and remedies that may be available to the Affected Party, at law, in equity or otherwise.  Each right and remedy available to an Affected Party may be exercised from time to time and so often and in such order as may be considered expedient by an Affected Party in its sole discretion.

**Section 5.5**    **Reassignment Obligation**.

(a)    If BG becomes a Defaulting Party with respect to any Carried Costs, (a "Carried Cost Default"), then in addition to a Default Notice with respect thereto, EXCO will give notice of such Carried Cost Default (a "Carried Cost Default Notice") to BG.  If BG fails to pay such owed and undisputed Carried Costs within fifteen

(15) days of BG's receipt of a Carried Cost Default Notice, then EXCO (at the option of EXCO exercisable at any time prior to the cure of such Carried Cost Default, which option shall be exercised by notice to BG) may require BG to reassign to EXCO, effective as of the date of BG's failure to pay such Carried Costs when due, with special warranty of title against, and free and clear of, all claims by, through or under BG or its Affiliates, but not otherwise, an undivided one-half (½) of the Unpaid Carried Costs Percentage as of such time of all of BG's and its Affiliates' interests in the Deep Rights assigned by EXCO to BG pursuant to the Purchase Agreement and related Subject Oil and Gas Assets, including wells (including all wells drilled on such Deep Rights in which BG and/or its Affiliates have participated).  For the avoidance of doubt, no Deep Rights acquired by BG pursuant to Article 9 shall be subject to the reassignment obligation.  If EXCO elects to exercise its reassignment rights pursuant to this Section 5.5, BG shall be deemed to no longer be in default of its obligations to pay Carried Costs in accordance with the terms of Sections 2.1 and 2.2 of this Agreement, and such obligation to pay Carried Costs shall be deemed to be fully satisfied and this Agreement shall terminate.  EXCO shall be entitled to exercise any and all rights and remedies that may be available to EXCO to enforce its rights under this Section 5.5, whether set forth in this Agreement, the Applicable Operating Agreement, at Law, in equity (including specific performance of this Agreement) or otherwise.

(b)     Notwithstanding anything to the contrary in this Section 5.5, for the avoidance of doubt, unless and until EXCO exercises its rights to require BG to reassign a portion of the Deep Rights under and in accordance with Section 5.5(a), BG shall have record title to the interests in the Deep Rights Transferred to BG pursuant to the Purchase Agreement and the conveyances executed in connection therewith and, except in the event of the exercise by EXCO of its rights under Section 5.2(b) or in the event that EXCO exercises its right to require BG to reassign a portion of the Deep Rights under and in accordance with Section 5.5(a) effective as of the date of BG's failure to pay such Carried Costs when due, BG shall be entitled to all production from or attributable to such interests.

**ARTICLE 6**
**TRANSFERS**

**Section 6.1**    **Maintenance of Uniform Interest; Minimum Participating Interest; Transfers by Defaulting Parties**.

(a)     For the purpose of maintaining uniformity of ownership in the East Texas/North Louisiana Area as among the Development Parties, from and after the Closing Date, no Development Party shall Transfer any portion of its Joint Development Interest unless such Transfer covers the entirety of such Development Party's Joint Development Interest, or an undivided percentage of such Development Party's Joint Development Interest.  Any Transfer of a Joint Development Interest shall also transfer a proportionate share of the Transferring Development Party's interest in this Agreement and all of the Associated Agreements other than the

Secondment Agreement.  For the avoidance of doubt, nothing in this Section 6.1(a) shall prevent a Development Party from Transferring a Material Interest or an Other Interest in accordance with the terms and conditions of this Agreement.

(b)     Except in the case of a Development Party transferring all of its Joint Development Interest, no Transfer of its Joint Development Interest shall be made by a Development Party which results in the transferor or transferee holding a Participating Interest of less than ten percent (10%).

(c)     No Defaulting Party may Transfer all or any part of its Joint Development Interest or any other Subject Oil and Gas Asset unless and until the Total Amount in Default is paid by such Defaulting Party or its transferee or any other Person on behalf of such Defaulting Party.

**Section 6.2     Requirements for Transfer.**

(a)     Any Transfer of all or any portion of a Joint Development Interest or any other interest of a Development Party in the Subject Oil and Gas Assets or Encumbrance of all or any portion of a Subject Oil and Gas Asset must expressly be made subject to this Agreement and the Associated Agreements.  No Credit Facility Encumbrance shall be subject to the terms and conditions of this Agreement or any Associated Agreement, except that Credit Facility Encumbrances granted at or after the Closing Date (other than Credit Facility Encumbrances granted pursuant to the Existing EXCO Credit Facility) shall be subject to Section 3.5 (excluding Section 3.5(e)) and Article 8 of this Agreement and all Joint Development Operating Agreements.

(b)     A transferee of any Transfer of a Joint Development Interest shall have no rights in this Agreement or the Associated Agreements unless and until it provides the non-transferring Development Parties, and Joint Development Operator executed counterparts of the instrument or instruments providing for such Transfer; by execution and delivery of an instrument in substantially the form attached hereto as Exhibit "F" (the "Assumption Agreement") expressly undertakes to be bound by the terms of this Agreement and the Associated Agreements.

**Section 6.3     Liability of Transferor/Transferee.**  With respect to any Transfer of a Joint Development Interest, a transferring Development Party shall, notwithstanding such Transfer, be liable to the other Development Parties and Joint Development Operator for its obligation to fund its Participating Interest share (as of the time of the Transfer) of the Development Operations included in approved Annual Work Program and Budgets (including multi-year expenditures included in more than one Annual Work Program and Budget) and Sole Risk Development Operations in which such Development Party is participating, and for all other obligations, in each case, accrued under this Agreement or any Associated Agreement on or prior to such Transfer, but shall be released from any other obligations thereafter accruing under this Agreement or such Associated Agreement with respect to the Joint Development Interest being Transferred, except in the case where the Transfer at issue is made to an Affiliate or where the lender(s) with respect to a Credit Facility Foreclosure foreclose(s) on all or any part

of a Development Party's Joint Development Interest, in which cases the transferring Development Party or Development Party subject to the foreclosure, as applicable, shall remain primarily liable for all such obligations. For purposes of this Section 6.3, costs of plugging and abandoning wells and decommissioning facilities in which the transferring Development Party has participated (or has paid a share of the costs under the preceding sentence) shall be considered to accrue at the time when applicable operator cash calls such amounts or the Development Parties are required to provide security for such amounts under the terms of this Agreement or the Associated Agreements, whichever is earlier.

### Section 6.4   Encumbrances by Parties.

(a) Nothing contained in this Article 6 or in Articles 7 or 8 shall prevent a Development Party from Encumbering all or any undivided share of its Joint Development Interest or any other interest in the Subject Oil and Gas Interests to a third party after the Closing Date, provided that:

   (i) such Development Party shall remain liable for all obligations relating to such Joint Development Interest except as provided in Section 6.3; and

   (ii) other than with respect to a Credit Facility Encumbrance, such Encumbrance shall be expressly subordinated to the rights of the other Parties under this Agreement, including any mortgage or security interest provided for herein or in the Associated Agreements, which subordination shall be expressly for the benefit of the other Parties.

(b) The liens and security interests created for the benefit of the Development Parties under this Agreement and any Applicable Operating Agreement (other than the Development Parties' security interest in the Escrow Deposit Account) are and will be, in all respects, subordinate to the liens and security interests created pursuant to a Credit Facility Encumbrance regardless of the time of execution of the instruments creating such liens and/or security interests and/or the filing of such liens and security interests in the applicable county or parish or other governmental office. Each Development Party agrees to execute any instruments requested by any Credit Facility Encumbrance lender reasonably necessary to reflect the subordination of any liens or security interests created for the benefit of the Development Parties under this Agreement or any Associated Agreement (other than the Development Parties' security interests in the Escrow Deposit Account) to the liens and security interests created pursuant to such Credit Facility Encumbrance.

## ARTICLE 7
## CONSENT TO ASSIGNMENT

**Section 7.1   Certain Transfers during Initial Three Year Period**. From and after the Closing Date and until the third anniversary of the Closing Date (such period, the "Initial Three Year Period"), no Development Party shall be permitted to Transfer all or any part of its Joint Development Interest or other Material Interest or undergo a Change in Control without the

prior written consent of each other Development Party, which consent may be withheld for any reason in the sole discretion of such other Development Party, provided that no such consent shall be required for any Transfer of all or any part of a Development Party's Joint Development Interest or other Material Interest to an Affiliate of such Development Party, provided that any subsequent Transfer of a Material Interest by such Affiliate of such Development Party to a Person that is not an Affiliate of such Development Party during the Initial Three Year Period shall require the prior written consent of the other Development Parties, which consent may be withheld for any reason in the sole discretion of such other Development Parties. Further, during the Initial Three Year Period, no Affiliate of a Development Party that has been Transferred a Material Interest may undergo a Change in Control without the prior written consent of each other Development Party, which consent may be withheld for any reason in the sole discretion of such other Development Party.

**Section 7.2**   **Other Transfers**.  A Development Party shall be permitted to Transfer all or any part of its Joint Development Interest after the Initial Three Year Period, provided that a transferee must have the financial ability to perform its future payment obligations hereunder and under the Associated Agreements and the technical ability to participate in the planning of future operations.

**Section 7.3**   **Additional Consent Requirements**.   For the avoidance of doubt, any Transfer of a Joint Development Interest or a Material Interest shall also be subject to any restrictions on Transfer set forth in the Associated Agreements in addition to those set forth in this Agreement, provided that to the extent any such Associated Agreement contains a right to withhold consent to Transfer or a preferential purchase right in favor of another Development Party, as between the transferring Development Party and the other Development Parties that are parties to such Associated Agreement, any such consent right or preferential purchase right in such Associated Agreement shall not apply.

**Section 7.4**   **Consents for Transfer of Joint Development or Party Operatorship**. Neither Joint Development Operator nor any Party Operator may transfer all or any part of its rights or obligations as Joint Development Operator hereunder or as Party Operator under any Applicable Operating Agreement without the prior written consent of each Development Party, which consent may be withheld for any reason in the sole discretion of such Development Party.

**ARTICLE 8**
**PREFERENTIAL RIGHT TO PURCHASE; CHANGES IN CONTROL**

**Section 8.1**   **Preferential Right to Purchase**.  Any Transfer of all or a portion of a Development Party's Joint Development Interest or a Material Interest, other than a Transfer thereof to a Wholly-Owned Affiliate shall be subject to the following procedure.

(a)   Once the final terms and conditions of such Transfer have been fully negotiated and are binding upon the parties thereto, the transferring Development Party shall disclose all such final terms and conditions as are relevant to the acquisition of the Joint Development Interest or Material Interest, as applicable (and, if applicable, the determination of the Cash Value of the Joint Development Interest or Material Interest, as applicable) in a notice to the non-transferring Development Parties,

which notice shall be accompanied by a copy of all instruments or relevant portions of instruments establishing such terms and conditions. Each non-transferring Development Party shall have the right to acquire the Joint Development Interest or any Material Interest, as applicable, subject to such proposed Transfer from the transferring Development Party on the terms and conditions described in Sections 8.1(c) and 8.1(d), as applicable, if, within sixty (60) days of the transferring Development Party's notice, the non-transferring Development Party delivers to the transferring Development Party a counter-notification that it accepts such terms and conditions without reservations or conditions (subject to the other provisions of this Section 8.1, where applicable). If no non-transferring Development Party delivers such counter-notification within such time, such Transfer to the proposed transferee may proceed without further notice, subject to the other provisions of this Agreement, under terms and conditions no more favorable to the transferee than those set forth in the notice to the non-transferring Development Parties, provided that such Transfer shall be concluded within one hundred twenty (120) days from the date of the notice. If such Transfer fails to be concluded within such period and the parties thereto desire thereafter to proceed with such proposed Transfer, the transferring Development Party shall be required to re-offer the Joint Development Interest or Material Interest, as applicable, subject to the Transfer to the non-transferring Development Parties in accordance with the terms and conditions of this Section 8.1. No Development Party shall have a right under this Section 8.1 to acquire any asset other than a Joint Development Interest or Material Interest, as applicable, nor shall a Development Party be required to acquire any asset other than a Joint Development Interest or Material Interest, as applicable, regardless of whether other properties are included in the Transfer at issue.

(b) If more than one non-transferring Development Party counter-notifies that it intends to acquire the transferring Development Party's Joint Development Interest or Material Interest, as applicable, that is subject to the proposed Transfer, then each such Development Party shall acquire a proportion of the Joint Development Interest or Material Interest, as applicable, to be transferred equal to the ratio of its own Participating Interest to the total Participating Interests of all counter-notifying Development Parties, unless the counter-notifying Development Parties otherwise agree.

(c) In the event of a Cash Transfer that does not involve other properties as part of a wider transaction, each non-transferring Development Party shall have a right to acquire the Joint Development Interest or Material Interest, as applicable, subject to the proposed Transfer on the same final terms and conditions as were negotiated with the proposed transferee.

(d) In the event of a Transfer of all or a portion of a Joint Development Interest or Material Interest, as applicable, that is not a Cash Transfer or involves other properties included in a wider transaction (package deal), the transferring Development Party shall include in its notification to the non-transferring Development Parties a statement of the proposed Cash Value of the Joint

Development Interest or Material Interest, as applicable, subject to the proposed Transfer, and each non-transferring Development Party shall have a right to acquire such Joint Development Interest or Material Interest, as applicable, on the same final terms and conditions as were negotiated with the proposed transferee except that it shall pay the Cash Value in immediately available funds at the closing of the Transfer in lieu of the consideration payable in the third party offer, and the terms and conditions of the applicable instruments shall be modified as necessary to reflect the acquisition of a Joint Development Interest or Material Interest, as applicable, for cash. In the case of a package sale, the non-transferring Development Parties may not acquire the Joint Development Interest or Material Interest, as applicable, subject to the proposed package sale unless and until the completion of the wider transaction (as modified by the exclusion of properties subject to preemptive rights or excluded for other reasons) with the package sale transferee. If for any reason the package sale terminates without completion, the non-transferring Development Parties' rights to acquire the Joint Development Interest or Material Interest, as applicable, subject to the proposed package sale shall also terminate.

(e)     For purposes of Section 8.1(d), the Cash Value proposed by the transferring Development Party in its notice shall be conclusively deemed correct unless any non-transferring Development Party gives notice to the transferring Development Party within thirty (30) days of receipt of the transferring Development Party's notice stating that it does not agree with the statement of the Cash Value, stating the Cash Value it believes is correct, and providing any supporting information that it believes is helpful. In such event, the Development Parties shall have fifteen (15) days in which to attempt to negotiate an agreement on the applicable Cash Value. If no agreement has been reached by the end of such fifteen (15) day period, any affected Development Party shall be entitled to refer the matter to an independent expert as provided in Section 13.3 for determination of the Cash Value, provided that the transferring Development Party may elect to terminate the proposed Transfer, and any non-transferring Development Party may elect to revoke its notice of intention to purchase, in either case by notice to the other Development Parties at any time prior to the time that the independent expert is retained pursuant to such provision. The Cash Value to be submitted to the independent expert by the transferring Development Party shall be the Cash Value provided by such Development Party in the notice provided to the non-transferring Development Parties pursuant to Section 8.1(d), and the Cash Value to be submitted to the independent expert by each non-transferring Development Party shall be the Cash Value provided by such Development Party in the notice provided to the transferring Development Party pursuant to this Section 8.1(e).

**Section 8.2**    **Changes in Control**.

(a)    Any Change in Control of a Development Party shall be subject to the terms and conditions of this Section 8.2. For purposes of this Section 8.2, the term "Acquired Development Party" shall refer to the Development Party that is subject to a Change in Control, "Other Development Parties" shall refer to all other Development Parties not subject to the Change in Control, and "Acquiror" shall refer to the third party proposing to acquire Control of the Acquired Development Party in the Change in Control.

(b)    Once the final terms and conditions of a Change in Control have been fully negotiated and are binding upon the parties thereto, the Acquired Development Party shall disclose all such final terms and conditions as are relevant to the acquisition of such Acquired Development Party's Joint Development Interest and other interests in the Subject Oil and Gas Assets and the determination of the Cash Value of that Joint Development Interest and other interests in a notice to the Other Development Parties, which notice shall be accompanied by a copy of all instruments or relevant portions of instruments establishing such terms and conditions. Each Other Development Party shall have the right to acquire the Acquired Development Party's Joint Development Interest and other interests in the Subject Oil and Gas Assets on the terms and conditions described in Section 8.2(d) if, within sixty (60) days of the Acquired Development Party's notice, the Other Development Party delivers to the Acquired Development Party a counter-notification that it accepts such terms and conditions without reservations or conditions (subject to the other provisions of this Section 8.2, where applicable). If no Other Development Party delivers such counter-notification, the Change in Control may proceed without further notice, subject to the other provisions of this Article 8, under terms and conditions no more favorable to the Acquiror than those set forth in the notice to the Other Development Parties, provided that the Change in Control shall be concluded within one hundred twenty (120) days from the date of the notice. If the Change in Control fails to be concluded within such period and the direct or indirect owners, as the case may be, of the Acquired Development Party desire thereafter to proceed with such proposed Change in Control, the Acquired Development Party shall be required to re-offer the Joint Development Interest and other interests in the Subject Oil and Gas Assets subject to the Change in Control to the Other Development Parties in accordance with the terms and conditions of this Section 8.2. No Other Development Party shall have a right under this Section 8.2 to acquire any asset other than a Joint Development Interest, nor shall any Other Development Party be required to acquire any asset other than a Joint Development Interest and other interests in the Subject Oil and Gas Assets, regardless of whether other properties are subject to the Change in Control.

(c)    If more than one Other Development Party counter-notifies that it intends to acquire the Acquired Development Party's Joint Development Interest and other interests in the Subject Oil and Gas Assets that is subject to the proposed Change in Control, then each such Other Development Party shall acquire a proportion of

the Joint Development Interest subject to the Change in Control equal to the ratio of its own Participating Interest to the total Participating Interests of all counter-notifying Other Development Parties, unless the counter-notifying Other Development Parties otherwise agree.

(d)     The Acquired Development Party shall include in its notification to the Other Development Parties a statement of the proposed Cash Value of the Joint Development Interest subject to the proposed Change in Control, and each Other Development Party shall have a right to acquire such Joint Development Interest and other interests in the Subject Oil and Gas Assets for the Cash Value, on the final terms and conditions negotiated with the Acquiror that are relevant to the acquisition of a Joint Development Interest and other interests in the Subject Oil and Gas Assets for cash. No Other Development Party may acquire the Acquired Development Party's Joint Development Interest and other interests in the Subject Oil and Gas Assets pursuant to this Section 8.2 unless and until completion of the Change in Control. If for any reason the Change in Control agreement terminates without completion, the Other Development Parties' rights to acquire the Joint Development Interest and other interests in the Subject Oil and Gas Assets subject to the proposed Change in Control shall also terminate.

(e)     For purposes of Section 8.2(d), the Cash Value proposed by the Acquired Development Party in its notice shall be conclusively deemed correct unless any Other Development Party gives notice to the Acquired Development Party within thirty (30) days of receipt of the Acquired Development Party's notice stating that it does not agree with the Acquired Development Party's statement of the Cash Value, stating the Cash Value it believes is correct, and providing any supporting information that it believes is helpful. In such event, the Development Parties shall have fifteen (15) days in which to attempt to negotiate an agreement on the applicable Cash Value. If no agreement has been reached by the end of such fifteen (15) day period, any affected Development Party shall be entitled to refer the matter to an independent expert as provided in Section 13.3 for determination of the Cash Value, provided that the Acquired Development Party may elect to terminate the proposed Change in Control, and any Other Development Party may elect to revoke its notice of intention to purchase, in either case by notice to the other Development Parties at any time prior to the time that the independent expert is retained pursuant to such provision. The Cash Value to be submitted to the independent expert by the Acquired Development Party shall be the Cash Value provided by such Acquired Development Party in the notice provided to the non-transferring Development Parties pursuant to Section 8.2(d), and the Cash Value to be submitted to the independent expert by each Other Development Party shall be the Cash Value provided by such Other Development Party in the notice provided to the acquired Development Party pursuant to this Section 8.2(e).

(f)     Within thirty (30) days of receiving notice of a proposed Change in Control of EXCO, BG shall have the right but not the obligation to require EOC to resign as Joint Development Operator and to require EXCO Operator to resign as operator under each Applicable Operating Agreement in which it serves in such capacity,

in each case, simultaneous with the consummation of such Change in Control. Such right shall be exercisable by BG by notice to EXCO.  Upon any such election by BG, simultaneous with the consummation of the Change in Control, BG or BG's designee shall automatically be deemed to be Joint Development Operator and the successor operator under each Joint Development Operating Agreement, and EXCO or its successor in interest shall vote for BG or BG's designee to serve as the successor operator under each Applicable Operating Agreement where a successor operator is to be elected as a result of EXCO Operator's resignation.  If for any reason the Change in Control agreement terminates without completion, BG's right to require EOC and EXCO Operator to resign as Joint Development Operator and operator, respectively, subject to the proposed Change in Control shall also terminate.

## ARTICLE 9
## AREA OF MUTUAL INTEREST; CERTAIN RENTALS

**Section 9.1**     **Creation of Area of Mutual Interest**.  The Development Parties agree that the East Texas/North Louisiana Area shall be an area of mutual interest.

**Section 9.2**     **Area of Mutual Interest Procedures**.

(a)     If, during the period commencing on June 29, 2009 and ending on the five (5) year anniversary of the Closing Date, a Development Party or any Affiliate thereof (such Development Party, whether it or its Affiliate is the acquiror, an "Acquiring Development Party") directly or indirectly acquires any interest from a non-Affiliate (a "Selling Party") in any Oil and Gas Asset (such Oil and Gas Asset, the "Acquired Interest"), whether by lease, sublease, purchase, farmout, acquisition of shares or other equity interests in an entity directly or indirectly owning the Acquired Interest or otherwise, the Acquiring Development Party shall provide written notice (an "Offer Notice") to the other Development Parties (each, a "Non-Acquiring Development Party"), provided that no Acquiring Development Party shall be required to deliver any Offer Notices relating to the acquisition by such Acquiring Development Party or any of its Affiliates of any Acquired Interests acquired on or after June 29, 2009 but prior to the Closing Date until five (5) Business Days after the Closing Date.  Subject to the rights of any third parties under any relevant Applicable Operating Agreement, each Non-Acquiring Development Party shall have the right (but not the obligation) to acquire its undivided Participating Interest share in the Acquired Interest (the "Offered Interest") upon the same terms and conditions on which the Acquiring Development Party or its Affiliate acquired the Acquired Interest, subject to assuming its Participating Interest share of all duties and obligations with respect to the Acquired Interest and paying the Acquiring Development Party the Non-Acquiring Development Party's Participating Interest share of any consideration paid by the Acquiring Development Party or its Affiliate (and, in the case of Acquired Interests including Leases, any lease broker costs incurred in acquiring such Leases).  Notwithstanding anything to the contrary in the preceding sentence, in the event that one or more Non-Acquiring Development Parties elect

not to acquire their Offered Interests, each Non-Acquiring Development Party's Offered Interest shall be that portion of the Acquired Interest that such Non-Acquired Development Party's Participating Interest bears to the aggregate Participating Interests of the Acquiring Development Party and the Non-Acquiring Parties electing to participate in the acquisition of the Acquired Interest. An Acquiring Development Party shall use commercially reasonable efforts to assign a share of its or its Affiliate's rights and obligations under the acquisition documents to the Non-Acquiring Development Parties, provided that the Acquiring Development Party shall not be required pay cash or otherwise surrender value or incur any liability to the Selling Party to obtain such a right.

(b)     Each Non-Acquiring Development Party shall have a period of sixty (60) days after receipt of the Offer Notice to notify the Acquiring Development Party in writing whether it elects to acquire its Offered Interest. Failure to give timely notice of such election shall be deemed an election not to acquire its Offered Interest. If a Non-Acquiring Development Party timely elects to acquire its Offered Interest, then the Acquiring Development Party and such Non-Acquiring Development Party shall enter into agreements for the Transfer of the Non-Acquiring Development Party's Participating Interest share of such rights and obligations on substantially the same terms as provided in the agreements between the Selling Party and the Acquiring Development Party or its Affiliate (with such changes as may be necessitated by the differences in parties, the transfer of only a Participating Interest share, the inclusion of lease broker costs to the extent required by Section 9.2(a), and, if applicable, the apportionment of rights from a package deal or the payment of Cash Value in lieu of other consideration), provided that the Acquiring Development Party shall in no event have liability to the Non-Acquiring Development Party for representations, warranties or indemnities with respect to the Acquired Interest in excess of the Non-Acquiring Party's Participating Interest share of amounts that the Acquiring Development Party or its Affiliate actually recovers under the third party acquisition agreement and related documents for the same matters. The Parties shall execute and deliver the applicable documents and take such other actions as shall be reasonably required to accomplish the transfer promptly after the Non-Acquiring Development Party's exercise of its option.

(c)     If the Acquired Interest arises out of a farmout agreement or similar agreement requiring the drilling of a well or the performance of other similar obligations, the election by a Non-Acquiring Development Party to acquire its Offered Interest shall also constitute an election by such Non-Acquiring Development Party to join the Acquiring Development Party in all operations and obligations required to earn such Offered Interest under such an agreement and to bear its proportion of the cost thereof (including, if applicable, any Carried Costs relating thereto and such operations shall automatically be added to the Development Work Program and the relevant Annual Work Program and Budget). However, nothing in this Section 9.2(c) shall be construed to prevent any Development Party from electing not to join in a completion attempt of an earning or obligation well drilled under the terms of a farmout agreement or similar agreement if such Development Party

is not obligated to do so under the terms of such farmout agreement or similar agreement.

(d)    In the event an Acquired Interest is not acquired pursuant to a Cash Transfer or is acquired with other properties included in a wider transaction (package deal), the Acquiring Development Party shall include in its notification to the Non-Acquiring Development Parties a statement of the Cash Value of the Acquired Interest (excluding the drilling of wells or performance of other obligations included as part of the consideration), and each Non-Acquiring Development Party shall have a right to acquire its Offered Interest on the same final terms and conditions as were negotiated with the proposed transferor except that it shall pay the Cash Value in immediately available funds to the Acquiring Development Party at the time of its acquisition of the Offered Interest in lieu of the consideration (excluding the drilling of wells or performance of other obligations included as part of the consideration) payable in the third party offer, and the terms and conditions of the applicable instruments shall be modified to reflect the acquisition of the Offered Interest for cash. In the case of a package sale, the Non-Acquiring Development Parties may not acquire an interest in the Acquired Interest subject to the proposed package sale unless and until the completion of the wider transaction (as modified by the exclusion of properties subject to preemptive rights or excluded for other reasons) with the package sale transferor. If for any reason the package sale terminates without completion, the Non-Acquiring Development Parties' rights to acquire the Acquired Interest subject to the proposed package sale shall also terminate.

(e)    For purposes of Section 9.2(d), the Cash Value proposed by the Acquiring Development Party in its notice shall be conclusively deemed correct unless any Non-Acquiring Development Party gives notice to the Acquiring Development Party within thirty (30) days of its receipt of the Offer Notice stating that it does not agree with the Acquiring Development Party's statement of the Cash Value, stating the Cash Value (excluding the drilling of wells or performance of other obligations included as part of the consideration) it believes is correct, and providing any supporting information that it believes is helpful. In such event, the Development Parties shall have fifteen (15) days in which to attempt to negotiate an agreement on the applicable Cash Value. If no agreement has been reached by the end of such fifteen (15) day period, any affected Development Party shall be entitled to refer the matter to an independent expert as provided in Section 13.3 for determination of the Cash Value, provided that the Acquiring Development Party may elect to terminate the proposed acquisition of the Acquired Interest, and any Non-Acquiring Development Party may elect to revoke its notice of intention to purchase, in either case by notice to the other Development Parties at any time prior to the time that the independent expert is retained pursuant to such provision. The Cash Value to be submitted to the independent expert by the Acquiring Development Party shall be the Cash Value provided by such Acquiring Development Party in the notice provided to the Non-Acquiring Development Parties pursuant to Section 9.1(d), and the Cash Value to be submitted to the independent expert by each Non-Acquiring Development Party

shall be the Cash Value provided by such Non-Acquiring Development Party in the notice provided to the Acquiring Development Party pursuant to this Section 9.1(e).

(f)     If a Non-Acquiring Development Party elects not to acquire or fails to make a timely election to acquire the Offered Interest, such Non-Acquiring Development Party shall have no further rights whatsoever with regard to the Acquired Interest and such Acquired Interest shall be excluded for all purposes from this Agreement and the Associated Agreements and the provisions thereof, except that, in the case that EXCO is a Non-Acquiring Development Party that elects not to acquire or fails to make a timely election to acquire the Offered Interest, BG shall nonetheless have the right but not the obligation to require EXCO to operate such Acquired Interest on its behalf pursuant to a Joint Development Operating Agreement.

(g)     Notwithstanding anything to the contrary herein, this Article 9 shall not be applicable to:  (i) Transfers among a Development Party and its Affiliates; (ii) acquisitions of interests in any entity or entities directly or indirectly owning an Acquired Asset if the direct or indirect interest in the Acquired Assets makes up less than twenty-five percent (25%) of the total Cash Value of the interest acquired or to be acquired, or (iii) any Excluded Assets.

(h)     For the avoidance of doubt, the Additional Interests shall be Acquired Interests for purposes of this Agreement in accordance with the Purchase Agreement, and EXCO shall offer the Additional Interests to BG on the Closing Date in accordance with the terms of this Section 9.2.

(i)     The Development Parties shall use commercially reasonable efforts to cause a Development Party, and not a third party, to serve as operator of any Acquired Interest.

(j)     Each Development Party agrees to cause its Affiliates to comply with this Article 9.

**Section 9.3     Payment of Certain Rentals**.  If, at any time within the period that is thirty (30) days prior to the expiration of any Lease included in the Subject Assets, no approved Annual Work Program and Budget contemplates commencement of drilling operations or payment of delay rentals as may be necessary to maintain such Lease in existence, a Development Party with an interest in such Lease shall have the right to pay such delay rental in order to maintain such Lease in existence (any Development Party paying such delay rental, a "Maintaining Development Party"), and within ten (10) days of the payment of any such delay rental, shall provide notice of such payment (a "Delay Rental Notice") to the other Parties.  Each other Development Party with an interest in such Lease shall have the right (but not the obligation) to reimburse the Maintaining Development Party that portion of such delay rental that its Participating Interest bears to the aggregate Participating Interests of those Development Parties with interests in such Lease (or, if there are Releasing Development Parties, that portion of such delay rental that its Participating Interest bears to the aggregate Participating Interests of

the Non-Releasing Development Parties) by notice to the other Parties and reimbursement of the Maintaining Development Party within ten (10) days of its receipt of the Delay Rental Notice. Failure of a Development Party to so reimburse the Maintaining Development Party (any such Development Party, a "Releasing Development Party") shall result in such Releasing Development Party being deemed to have Transferred its interest in the applicable Lease to Maintaining Development Party and the Development Parties paying a portion of such delay rental (all such Development Parties, the "Non-Releasing Development Parties") in the proportions that such Non-Releasing Development Parties' Participating Interests in such Lease bear to the aggregate Participating Interests in such Lease of such Non-Releasing Development Parties, effective as of the first day of the Calendar Month in which such delay rental is paid. A Releasing Development Party shall, without delay following any request from any Non-Releasing Development Party, do any act required to be done by applicable Law or any applicable contract in order to render the Transfer of an affected Lease legally valid, including obtaining all necessary consents and approvals, and shall execute any document and take such other actions as may be necessary in order to effect a prompt and valid transfer. The Releasing Development Party shall be obligated to promptly remove any Encumbrances which may exist on the affected Lease. In the event required consents and approvals are not timely obtained, the Releasing Development Party shall hold the Transferred Lease in trust for the Non-Releasing Development Parties.

## ARTICLE 10
## TAXES

**Section 10.1   Tax Partnership**. The Development Parties intend and expect that the transactions contemplated by the Purchase Agreement, this Agreement and the Associated Agreements, taken together, will be treated, for purposes of federal income taxation and for purposes of certain state income tax laws that incorporate or follow federal income tax principles, as resulting in (a) the creation of a partnership (the "Tax Partnership") in which BG and EXCO are treated as partners, with the Tax Partnership being treated for tax purposes as holding the Subject Oil and Gas Assets and engaging in all activities of the Development Parties with respect to the Subject Oil and Gas Assets, (b) a contribution by EXCO of all of the Subject Oil and Gas Assets to the Tax Partnership; (c) a contribution of the Adjusted Closing Cash Consideration (as defined in the Purchase Agreement) and a commitment to fund the Carried Costs allocable to it under this Agreement to the Tax Partnership by BG in exchange for a fifty percent (50%) interest therein, (d) a distribution to EXCO of the Adjusted Closing Cash Consideration (i) as a reimbursement of EXCO's preformation expenditures with respect to the Subject Oil and Gas Assets within the meaning of Treasury Regulations Section 1.707-4(d) to the extent applicable and (ii) in a transaction subject to treatment under Section 707(a) of the Internal Revenue Code of 1986, as amended, and its implementing Treasury Regulations as in part a sale, and in part a contribution, of the Subject Oil and Gas Assets to the Tax Partnership to the extent that Treasure Regulations Section 1.707-4(d) is inapplicable, and (e) the realization by the Tax Partnership of all items of income or gain and the incurrence by the Tax Partnership of all items of costs or expenses attributable to the ownership, operation or disposition of the Subject Oil and Gas Assets, notwithstanding that such items are realized, paid or incurred by the Parties individually. The governing terms and conditions of the Tax Partnership are set forth in Exhibit "G" hereto.

Section 10.2   **Tax Information**.  Joint Development Operator and each Party Operator shall provide each Development Party, in a timely manner and at each Development Party's sole expense, with information with respect to Development Operations as such Development Party may reasonably request for preparation of its tax returns or responding to any audit or tax proceeding with respect to Asset Taxes.

Section 10.3   **Responsibility for Taxes**.  Each Party shall be responsible for reporting and discharging its own tax measured by the income of the Party and the satisfaction of such Party's share of all contract obligations under this Agreement and the Associated Agreements. Each Party shall protect, defend, and indemnify each other Party from and against any and all losses, costs, and liabilities arising from the indemnifying Party's failure or refusal to report and discharge such taxes or satisfy such obligations.

**ARTICLE 11**
**TERM**

This Agreement shall terminate on January 1, 2020, unless earlier terminated pursuant to Section 5.5 or by the written agreement of all of the Parties; provided that (a) except as provided in Section 5.5 (in the event that this Agreement is terminated pursuant to such Section), the termination of this Agreement or any provision thereof shall not relieve any Party from any expense, liability or other obligation or remedy therefor which has accrued or attached prior to the date of such termination, (b) except in connection with a termination of this Agreement pursuant to Section 5.5, as among BG and EXCO and any other Person who becomes a Development Party hereunder prior to the termination of this Agreement (but not as to any successor or assign or such Person following the termination of this Agreement), the provisions of each of (A) Sections 3.3, 3.10(b) and 4.10, and (B) Articles 8, 10, 12, 13 and 14 shall survive such termination and remain in full force and effect with respect to each of those Leases in which more than one of such Persons jointly holds an interest until only one such Person holds an interest in such Lease (unless earlier terminated by the written agreement of all of the Parties), and (c) the provisions of each of (x) Section 3.4 (other than Section 3.4(b)), (y) Exhibit G and (z) Section B of Schedule 3.12 shall survive such termination and remain in full force and effect with respect to each of those Leases in which more than one of such Persons jointly holds an interest until only one such Person holds an interest in such Lease (unless earlier terminated by the written agreement of all of the Parties).

**ARTICLE 12**
**RELATIONSHIP OF THE PARTIES**

The rights, duties, obligations and liabilities of the Parties under this Agreement shall be individual, not joint or collective.  It is not the intention of the Parties to create, nor shall this Agreement be deemed or construed to create, a mining or other partnership (other than the Tax Partnership created pursuant to Section 10.1), joint venture or association or a trust.  This Agreement shall not be deemed or construed to authorize any Party to act as an agent, servant or employee for any other Party for any purpose whatsoever except as explicitly set forth in this Agreement.  In their relations with each other under this Agreement, the Parties shall not be considered fiduciaries except as expressly provided in the last sentence of Section 9.3.

## ARTICLE 13
## GOVERNING LAW; DISPUTE RESOLUTION; EXPERT PROCEEDINGS

**Section 13.1   Governing Law.**   THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION.   ALL OF THE PARTIES HERETO CONSENT TO THE EXERCISE OF JURISDICTION IN PERSONAM BY THE COURTS OF THE STATE OF TEXAS FOR ANY DISPUTE.   EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY DISPUTE.

**Section 13.2   Dispute Resolution.**

(a)   Except for matters that are expressly made subject to the dispute resolution procedures set forth in Section 13.3, any Dispute among the Parties shall be resolved through final and binding arbitration.

(b)   The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") in effect at the time the arbitration of the Dispute is initiated (the "AAA Rules").

(c)   The arbitration shall be conducted by 3 arbitrators and conducted in Dallas, Texas.   Within 30 days of any Party providing notice to the other Parties of a Dispute, if there are two Parties or two groups of Parties to a Dispute, each Party or group of Parties to such Dispute shall appoint one arbitrator, and the 2 arbitrators so appointed shall select the third and presiding arbitrator within 30 days following appointment of the second party-appointed arbitrator.   If either Party or group of Parties fails to appoint an arbitrator within the permitted time period, then the missing arbitrator(s) shall be selected by the AAA as appointing authority in accordance with the AAA Rules.   In the event that there are more than two Parties or groups of Parties to an arbitration, the Parties to the arbitration shall endeavor to agree on the appointment of the three arbitrators within thirty (30) days of the written request for arbitration.   In the event the Parties cannot reach agreement on the selection of three arbitrators within the time permitted, all arbitrators not yet appointed shall be appointed by the AAA in accordance with the AAA Rules.   Any arbitrator appointed by the Party-appointed arbitrators or the AAA shall be a member of the Large, Complex Commercial Case Panel of the AAA or a member of the Center of Public Resources Panel of Distinguished Neutrals.   All arbitrators shall be and remain at all times independent and impartial, and, once appointed, no arbitrator shall have any ex parte communications with any of the Parties concerning the arbitration or the underlying Dispute other than communications directly concerning the selection of the presiding arbitrator, when applicable.   All arbitrators shall be qualified by education, training, or experience to resolve the Dispute.   No arbitrator shall have been an employee or consultant to any Party or any of its Affiliates within the five

(5) year period preceding the arbitration, or have any financial interest in the Dispute.

(d)    All decisions of the arbitral tribunal shall be made by majority vote. The award of the arbitral tribunal shall be final and binding, subject only to grounds and procedures for vacating or modifying the award under the Federal Arbitration Act. Judgment on the award may be entered and enforced by any court of competent jurisdiction hereunder.

(e)    Notwithstanding the agreement to arbitrate Disputes in this Section 13.2, any Party may apply to a court for interim measures pending appointment of the arbitration tribunal, including injunction, attachment, and conservation orders. The Parties agree that seeking and obtaining such court-ordered interim measures shall not waive the right to arbitration. Additionally, the arbitrators (or in an emergency the presiding arbitrator acting alone in the event one or more of the other arbitrators is unable to be involved in a timely fashion) may grant interim measures including injunctions, attachments, and conservation orders in appropriate circumstances, which measures may be immediately enforced by court order. Hearings on requests for interim measures may be held in person, by telephone or video conference, or by other means that permit the Parties to present evidence and arguments. The arbitrators may require any Party to provide appropriate security in connection with such measures.

(f)    The arbitral tribunal is authorized to award costs, attorneys' fees, and expert witness fees and to allocate them among the Parties. The award may include interest, at the Default Interest Rate, from the date of any default, breach, or other accrual of a claim until the arbitral award is paid in full. The arbitrators may not award indirect, consequential, special or punitive damages. Unless otherwise directed by the arbitral tribunal, each Party shall pay its own expenses in connection with the arbitration.

(g)    All negotiations, mediation, arbitration, and expert determinations relating to a Dispute (including a settlement resulting from negotiation or mediation, an arbitral award, documents exchanged or produced during a mediation or arbitration proceeding, and memorials, briefs or other documents prepared for the arbitration) are confidential and may not be disclosed by the Parties, their respective Affiliates and each of their respective employees, officers, directors, counsel, consultants, and expert witnesses, except to the extent necessary to enforce any settlement agreement, arbitration award, or expert determination, to enforce other rights of a Party, as required by law or regulation, or for a bona fide business purpose, such as disclosure to accountants, shareholders, or third-party purchasers, provided, however, that breach of this confidentiality provision shall not void any settlement, expert determination, or award.

(h)    Any papers, notices, or process necessary or proper for an arbitration hereunder, or any court action in connection with an arbitration or an award, may be served on a Party in the manner set forth in Section 14.2.

**Section 13.3   Expert Proceedings**.  For any decision referred to an expert under this Agreement, the Parties hereby agree that such decision shall be conducted expeditiously by an expert selected unanimously by the Development Parties.  The expert is not an arbitrator of the dispute and shall not be deemed to be acting in an arbitral capacity.  The expert shall not (without the written consent of the Development Parties) be appointed to act as an arbitrator or as adviser to any Development Party arbitrated pursuant to Section 13.2, provided that nothing in this sentence shall preclude any Development Party from using the expert as a witness regarding the proper conduct of the expert procedure.  The Development Party desiring an expert determination shall give the other Development Party written notice of the request for such determination.  If the Development Parties are unable to agree upon an expert within ten (10) days after receipt of the notice of request for an expert determination, then, upon the request of any of the Development Parties, the AAA shall appoint such expert.  The expert, once appointed, shall have no ex parte communications with the Development Parties concerning the expert determination or the underlying dispute.  All communications between any Development Party and the expert shall be conducted in writing, with copies sent simultaneously to the other Development Party in the same manner, or at a meeting to which all Development Parties have been invited and of which such Development Parties have been provided at least five (5) Business Days notice.  Within thirty (30) days after the expert's acceptance of its appointment, the Development Parties shall provide the expert with a report containing their proposal for the resolution of the matter and the reasons therefor, accompanied by all relevant supporting information and data.  Within sixty (60) days of receipt of the above-described materials and after receipt of additional information or data as may be required by the expert, the expert shall select the proposal which it finds more consistent with the terms of this Agreement.  The expert may not propose alternate positions or award damages, interest or penalties to any Party with respect to any matter.  The expert's decision shall be final and binding on the Development Parties.  Any Party that fails or refuses to honor the decision of an expert shall be in default under this Agreement.

# ARTICLE 14
## MISCELLANEOUS

**Section 14.1   Counterparts**.  This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement.  Any signature hereto delivered by a Party by facsimile transmission shall be deemed an original signature hereto.

**Section 14.2   Notices**.  All notices and communications required or permitted to be given hereunder, excluding any notices under Section 3.10 and Article 4 hereof (which notices shall be governed by the provisions of Section 4.1(p) hereof), shall be sufficient in all respects if given in writing and delivered personally, or sent by bonded overnight courier, or mailed by U.S. Express Mail or by certified or registered United States Mail with all postage fully prepaid, or sent by telex or facsimile transmission (provided any such telex or facsimile transmission is confirmed either orally or by written confirmation), addressed to the appropriate Party at the address for such Party shown below or at such other address as such Party shall have theretofore designated by written notice delivered to the Party giving such notice:

If to EXCO:

        EXCO Operating Company, LP
        EXCO Production Company, LP
        12377 Merit Drive, Suite 1700
        Dallas, Texas  75251
        Attention:  Rick Hodges, Vice President of Land
        Telephone:  (214) 368-2084
        Fax:  (214) 706-3424

With a copy to:

        EXCO Operating Company, LP
        EXCO Production Company, LP
        12377 Merit Drive, Suite 1700
        Dallas, Texas  75251
        Attention:  William L. Boeing, Vice President,
                 General Counsel, and Secretary
        Telephone:  (214) 368-2084
        Fax:  (214) 706-3409

With a copy to:

        Vinson & Elkins L.L.P.
        2500 First City Tower
        1001 Fannin Street
        Houston, Texas  77002-6760
        Attention:  Robin S. Fredrickson
        Telephone:  (713) 758-2450
        Fax:  (713) 615-5850

If to BG:

        BG US Production Company, LLC
        5444 Westheimer, Suite 1200
        Houston, Texas 77056
        Attention:  Jon Harris
        Telephone:  (713) 599-4000
        Fax:  (713) 599-4250

with copies to:

BG US Production Company, LLC
5444 Westheimer, Suite 1200
Houston, Texas 77056
Attention:  Bill Way
Telephone:  (713) 599-4000
Fax:  (713) 599-4250

and

BG US Production Company, LLC
5444 Westheimer, Suite 1200
Houston, Texas 77056
Attention:  Chris Migura, Principal Counsel
Telephone:  (713) 599-4000
Fax:  (713) 599-4250

Any notice given in accordance herewith shall be deemed to have been given when delivered to the addressee in person, or by courier, or transmitted by facsimile transmission during normal business hours, or upon actual receipt by the addressee after such notice has either been delivered to an overnight courier or deposited in the United States Mail, as the case may be.  The Parties may change the address, telephone numbers, and facsimile numbers to which such communications are to be addressed by giving written notice to the other Parties in the manner provided in this Section 14.2.

Section 14.3   **Expenses**.  Except as otherwise specifically provided, all fees, costs and expenses incurred by the Parties in negotiating this Agreement shall be paid by the Party incurring the same, including legal and accounting fees, costs and expenses.

Section 14.4   **Waivers; Rights Cumulative**.  Any of the terms, covenants, or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party waiving compliance.  No course of dealing on the part of any Development Party, or their respective officers, employees, agents, or representatives, nor any failure by a Development Party to exercise any of its rights under this Agreement shall operate as a waiver thereof or affect in any way the right of such Party at a later time to enforce the performance of such provision.  No waiver by any Party of any condition, or any breach of any term or covenant contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term or covenant.  The rights of the Development Parties under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

Section 14.5   **Entire Agreement; Conflicts**.  THIS AGREEMENT, THE EXHIBITS HERETO, THE PURCHASE AGREEMENT AND THE ASSOCIATED AGREEMENTS COLLECTIVELY CONSTITUTE THE ENTIRE AGREEMENT AMONG THE DEVELOPMENT PARTIES PERTAINING TO THE SUBJECT MATTER HEREOF AND

SUPERSEDE ALL PRIOR AGREEMENTS, UNDERSTANDINGS, NEGOTIATIONS, AND DISCUSSIONS, WHETHER ORAL OR WRITTEN, OF THE PARTIES PERTAINING TO THE SUBJECT MATTER OF THIS AGREEMENT.   THERE ARE NO WARRANTIES, REPRESENTATIONS, OR OTHER AGREEMENTS AMONG THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, AND NO DEVELOPMENT PARTY SHALL BE BOUND BY OR LIABLE FOR ANY ALLEGED REPRESENTATION, PROMISE, INDUCEMENT, OR STATEMENTS OF INTENTION NOT SO SET FORTH.   IN THE EVENT OF A CONFLICT BETWEEN:  (A) THE TERMS AND PROVISIONS OF THIS AGREEMENT AND THE TERMS AND PROVISIONS OF ANY EXHIBIT HERETO; OR (B) THE TERMS AND PROVISIONS OF THIS AGREEMENT AND THE TERMS AND PROVISIONS OF ANY ASSOCIATED AGREEMENT, THE TERMS AND PROVISIONS OF THIS AGREEMENT SHALL GOVERN AND CONTROL, PROVIDED, HOWEVER, THAT THE INCLUSION IN ANY OF THE EXHIBITS HERETO OR ANY ASSOCIATED AGREEMENT OF TERMS AND PROVISIONS NOT ADDRESSED IN THIS AGREEMENT SHALL NOT BE DEEMED A CONFLICT, AND ALL SUCH ADDITIONAL PROVISIONS SHALL BE GIVEN FULL FORCE AND EFFECT, SUBJECT TO THE PROVISIONS OF THIS SECTION 14.5.

Section 14.6    **Amendment**.  This Agreement may be amended only by an instrument in writing executed by all of the Parties and expressly identified as an amendment or modification.

Section 14.7    **Parties in Interest**.  Nothing in this Agreement shall entitle any Person other than the Parties to any claim, cause of action, remedy or right of any kind.

Section 14.8    **Successors and Permitted Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.

Section 14.9    **Confidentiality**.

(a)    The Parties agree that all information related to Development Operations in which any Development Party is participating shall be considered confidential, shall be kept confidential and shall not be disclosed during the term of this Agreement to any Person that is not a Party, except:

(i)    to an Affiliate of a Party;

(ii)    to the extent such information is required to be furnished in compliance with applicable Law, or pursuant to any legal proceedings or because of any order of any Governmental Authority binding upon a Party;

(iii)    to prospective or actual attorneys engaged by any Party where disclosure of such information is essential to such attorney's work for such Party;

(iv)    to prospective or actual contractors and consultants engaged by any Party where disclosure of such information is essential to such contractor's or consultant's work for such Party;

(v)    to a bona fide prospective transferee of a Party's Joint Development Interest, a Material Interest or an Other Interest to the extent appropriate in order to allow the assessment of such Joint Development Interest, Material Interest or Other Interest (including a Person with whom a Party and/or its Affiliates are conducting bona fide negotiations directed toward a merger, consolidation or the sale of a majority of its or an Affiliate's shares);

(vi)    to a bank or other financial institution to the extent appropriate to a Party arranging for funding;

(vii)    to the extent such information must be disclosed pursuant to any rules or requirements of any stock exchange having jurisdiction over such Party or its Affiliates; provided that if any Party desires to disclose information in an annual or periodic report to its or its Affiliates' shareholders and to the public and such disclosure is not required pursuant to any rules or requirements of any stock exchange, then such Party shall comply with Section 14.10;

(viii)    to its respective employees for the purpose of conducting Development Operations, subject to each Party taking customary precautions to ensure such information is kept confidential; and

(ix)    any information which, through no fault of a Party, becomes a part of the public domain.

(b)    Disclosure as pursuant to Sections 14.9(a)(iv), (v) and (vi) shall not be made unless prior to such disclosure the disclosing Party has obtained a written undertaking from the recipient to keep the information strictly confidential for the term of this Agreement and to use the information for the sole purpose described in Sections 14.9(a)(iv), (v) and (vi), whichever is applicable, with respect to the disclosing Party.

**Section 14.10  Publicity**.

(a)    Without reasonable prior notice to the other Parties, no Party will issue, or permit any agent or Affiliate of it to issue, any press releases or otherwise make, or cause any agent or Affiliate of it to make, any public statements with respect to this Agreement, the Associated Agreements or the activities contemplated hereby or thereby, except where such release or statement is deemed in good faith by the releasing Party to be required by Law or under the rules and regulations of a recognized stock exchange on which shares of such Party or any of its Affiliates are listed, and in any case, prior to making any such press release or public statement, the releasing Party shall provide a copy of the press release or public statement to the other Parties.

(b)    Notwithstanding anything to the contrary in Section 14.9 or Section 14.10(a), any Party or Affiliate of a Party may disclose information regarding Development Operations in investor presentations, industry conference presentations or similar

disclosures, provided that not less than twenty four (24) hours prior to so disclosing any such information, the releasing Party shall provide a copy of the presentation or other disclosure document containing such information to the other Parties.

(c)     Notwithstanding anything to the contrary in Section 14.9 or Section 14.10(a), in the event of any emergency endangering property, lives or the environment, Joint Development Operator may issue such press releases or public announcements as it deems necessary in light of the circumstances and shall promptly provide each Party with a copy of any such press release or announcement.

**Section 14.11  Preparation of Agreement**.  Both EXCO and BG and their respective counsel participated in the preparation of this Agreement.  In the event of any ambiguity in this Agreement, no presumption shall arise based on the identity of the draftsman of this Agreement.

**Section 14.12  Conduct of the Parties; Business Principles**.

(a)     Each Party warrants that it and its Affiliates have not made, offered, or authorized and agrees that it will not make, offer, or authorize with respect to the matters which are the subject of this Agreement, any payment, gift, promise or other advantage, whether directly or through any other Person, to or for the use or benefit of any public official (being any person holding a legislative, administrative or judicial office, including any person employed by or acting on behalf of a public agency, a public enterprise or public international organization) or any political party or political party official or candidate for office, where such payment, gift, promise or advantage would violate any applicable Law.

(b)     Prior to the Closing Date, each Development Party provided the others with a copy of its business principles governing its general conduct of operations and business dealings, and each Development Party acknowledges receipt and awareness of the other Development Party's business principles.  Within one hundred twenty (120) days from the Closing Date, the Development Parties agree to use reasonable efforts to meet and agree a common set of general principles governing the conduct of operations under this Agreement.

**Section 14.13  Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

**Section 14.14  Non-Compensatory Damages**.  None of the Parties shall be entitled to recover from any other Party, or such Parties respective Affiliates, any indirect, consequential,

punitive or exemplary damages or damages for lost profits of any kind arising under or in connection with this Agreement, the Associated Agreements or the transactions contemplated hereby or thereby, except to the extent any such Party suffers such damages (including costs of defense and reasonable attorney's fees incurred in connection with defending of such damages) to a third party, which damages (including costs of defense and reasonable attorney's fees incurred in connection with defending against such damages) shall not be excluded by this provision as to recovery hereunder.  Subject to the preceding sentence, each Development Party, on behalf of itself and each of its Affiliates, waive any right to recover punitive, special, exemplary and consequential damages, including damages for lost profits, arising in connection with or with respect to this Agreement, the Associated Agreements or the transactions contemplated hereby and thereby.

Section 14.15 **Excluded Assets**.  For the avoidance of doubt, no Excluded Asset shall be subject to the terms of this Agreement or any Joint Development Operating Agreement.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives on and as of the Closing Date.

BG US PRODUCTION COMPANY, LLC

By: _____
Name:  Elizabeth Spomer
Title:  Vice President


EXCO OPERATING COMPANY, LP

By:      EXCO PARTNERS OLP GP, LLC, its general partner

By: _____
Name:  R.L. Hodges
Title:  Vice President


EXCO PRODUCTION COMPANY, LP

By:      VAUGHN DE, LLC, its general partner

By: _____
Name:  R.L. Hodges
Title:  Vice President

[SIGNATURE PAGE TO JOINT DEVELOPMENT AGREEMENT]

ATTACHED TO AND MADE PART OF THE JOINT DEVELOPMENT AGREEMENT BY AND AMONG BG US PRODUCTION COMPANY, LLC, EXCO OPERATING COMPANY, LP AND EXCO PRODUCTION COMPANY, LP

# APPENDIX I
## DEFINITIONS

"AAA" has the meaning set forth in Section 11.2.

"AAA Rules" has the meaning set forth in Section 11.2.

"Acquired Development Party" has the meaning set forth in Section 8.2(a).

"Acquired Interest" has the meaning set forth in Section 9.2(a).

"Acquiring Development Party" has the meaning set forth in Section 8.2(a).

"Acquiror" has the meaning set forth in Section 8.2(a).

"Actual Operating Agreement Charges" has the meaning set forth in Section 3.12(e)(i).

"Additional Interests" has the meaning set forth in the Purchase Agreement.

"AFE" means an authorization for expenditure.

"Affected Party" means any non-defaulting Party who either operates or owns an interest in the Subject Oil and Gas Assets affected by a default by another Party and which is not itself in default (either under the terms of this Agreement or any Associated Agreement) at the time in question.

"Affiliate" means, with respect to any Party, a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Party.

"After Acquired Units" means those Subject Oil and Gas Assets acquired after the Closing Date that are not within the boundaries of any drilling, proration or production unit existing as of the Closing Date or hereinafter formed by the Parties or by order or rule of a Governmental Authority having jurisdiction that contains acreage covered by any Lease in which EXCO owns an interest as of the Closing Date.

"Agreement" means this Joint Development Agreement.

"Annual Work Program and Budget" means, for any Calendar Year, the work program and budget for Joint Development Operations during such Calendar Year.

"Applicable Operating Agreements" means, collectively, the Joint Development Operating Agreements and all Third Party Operating Agreements, and "Applicable Operating Agreement" means any of them.

"Area-Wide Operation" means a seismic or other geophysical data acquisition operation, or other similar operation, including geophysical surveys, microseismic monitoring and core sampling

and analysis conducted by the Development Parties in accordance with this Agreement with respect to the East Texas/North Louisiana Area and covering areas subject to more than one Applicable Operating Agreement, or areas subject presently to no Applicable Operating Agreement.

"Asset Taxes" means ad valorem, property, excise, severance, production or similar taxes (including any interest, fine, penalty or additions to tax imposed by Governmental Authorities in connection with such taxes) based upon operation or ownership of the Subject Oil and Gas Assets or the production of hydrocarbons therefrom, but excluding, for the avoidance of doubt, income, capital gains and franchise taxes.

"Associated Agreements" means, collectively, the Applicable Operating Agreements, the Secondment Agreement and any other agreements entered into by all Development Parties and any third parties in furtherance of the conduct of Joint Development Operations, and "Associated Agreement" means any of them.

"Assumption Agreement" has the meaning set forth in Section 6.2(b).

"Bankruptcy Code" means Title 11 of the United States Code.

"BG" has the meaning set forth in the Preamble.

"Business Day" means a day (other than a Saturday or Sunday) on which commercial banks in Texas are generally open for business, provided that if Business Days are used to calculate periods in which a Party must make a payment hereunder, "Business Day" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Texas and London are generally open for business.

"Calendar Month" means any of the months of the Gregorian calendar.

"Calendar Quarter" means a period of three (3) consecutive Calendar Months commencing on the first day of January, the first day of April, the first day of July and the first day of October in any Calendar Year.

"Calendar Year" means a period of twelve (12) consecutive Calendar Months commencing on the first day of January and ending on the following 31st day of December, according to the Gregorian calendar.

"Carried Costs" has the meaning set forth in Section 2.1.

"Carried Costs Balance" means, as of any time, the difference between the Carried Costs Obligation and the aggregate Carried Costs paid by BG as of such time.

"Carried Costs" has the meaning set forth in Section 2.1.

"Carried Cost Obligation" means four hundred million dollars (US$400,000,000), as such amount may be decreased from time to time pursuant to Article XI and/or Article XII of the Purchase Agreement.

"Carried Cost Default" has the meaning set forth in Section 5.5(a).

"Carried Cost Default Notice" has the meaning set forth in Section 5.5(a).

"Carry Termination Event" has the meaning set forth in Section 2.1.

"Cash Transfer" means any Transfer of any Joint Development Interest where the sole consideration (other than the assumption of obligations relating to the transferred Joint Development Interest) takes the form of cash, cash equivalents, promissory notes or retained interests (such as production payments) in the Joint Development Interest being transferred.

"Cash Value" means the market value (expressed in U.S. dollars) of all or a portion of a Joint Development Interest subject to the proposed Transfer or Change in Control, based upon the amount that a willing buyer would pay a willing seller in an arm's length transaction.

"Change in Control" means any direct or indirect change in Control of a Development Party (whether through merger, sale of shares or other equity interests, or otherwise), through a single transaction or series of related transactions, from one or more transferors to one or more transferees; provided, however, that for purposes hereof, a "Change in Control" shall not include a change in Control of a Party (a) resulting from a management-lead buyout of the public share ownership of such Party and conversion of such Party to a privately-held company, (b) resulting in ongoing control by a Wholly-Owned Affiliate that is wholly-owned by the ultimate parent company of such Party, or (c) created by a change in Control of the ultimate parent company of such Party. For the avoidance of doubt, as of the Closing Date, the ultimate parent company of BG is BG Group plc, a public limited company organized and existing under the Laws of England and Wales, and the ultimate parent company of EXCO is EXCO Resources, Inc., a corporation organized and existing under the Laws of Texas.

"Closing Date" has the meaning set forth in the Preamble.

"Control" and its derivatives with respect to any Person means the possession, directly or indirectly, of the power to exercise or determine the voting of more than fifty percent (50%) of the voting rights in a corporation, and, in the case of any other type of entity, the right to exercise or determine the voting of more than fifty percent (50%) of the equity interests having voting rights, or otherwise to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Credit Facility Encumbrance" means Encumbrances created pursuant to any material borrowing arrangement entered into by any Development Party and/or its Affiliates with a third party that is not an Affiliate of such Development Party or its Affiliates, as such arrangement may be amended, modified, supplemented or replaced from time to time. For the avoidance of doubt, as of the Closing Date, the only Credit Facility Encumbrances burdening the Subject Oil and Gas Assets are those Encumbrances created pursuant to the Existing EXCO Credit Facility (provided that such Encumbrances only burden EXCO's interests in the Subject Oil and Gas Assets).

"Credit Facility Foreclosure" means any foreclosure upon the interests of a Development Party and its Affiliates in the Subject Oil and Gas Assets pursuant to a Credit Facility Encumbrance of such Development Party and any related security agreements.

"Deep Rights" means those subsurface depths within the East Texas/North Louisiana Area that are below the base of (but excluding) the Cotton Valley formation at a measured depth of 9,650', as identified by the Jonesville North A-17 well, API No. 42203343000000, recognizing that actual depth will vary across the East Texas/North Louisiana Area.

"Default Interest Rate" means the three month London Inter-Bank Offer Rate (as published in the "Money Rates" table of the *Wall Street Journal*, eastern edition) plus an additional five percentage points (5%) applicable on the first Business Day prior to the due date of payment and thereafter on the first Business Day of each succeeding Calendar Month (or, if such rate is contrary to any applicable usury Law, the maximum rate permitted by such applicable Law).

"Default Notice" has the meaning set forth in Section 5.1(a).

"Default Period" has the meaning set forth in Section 5.1(b).

"Defaulting Party" has the meaning set forth in Section 5.1(a).

"Development Costs" means costs and expenses incurred in the conduct of Development Operations.

"Development Operation" means any operation conducted pursuant to any Applicable Operating Agreement or an Area-Wide Operation conducted pursuant to this Agreement.

"Development Operations Contract" means any contract (or confirm relating to any such contract) to which Joint Development Operator or any Party Operator is a party for which services thereunder are to be used primarily for the conduct of Development Operations.

"Development Party" and "Development Parties" have the meanings set forth in the Preamble, and following any Transfer in accordance with this Agreement, the successor or assign of such Transferring Party.

"Development Work Program" has the meaning set forth in Section 4.2.

"Dispute" means any dispute, controversy, or claim (of any and every kind or type, whether based on contract, tort, statute, regulation, or otherwise) arising out of, relating to, or connected with this Agreement or Associated Agreement, or the transactions contemplated hereby or thereby, including but not limited to any dispute, controversy or claim concerning the existence, validity, interpretation, performance, breach, or termination of this Agreement or any Associated Agreement or the relationship of the Parties arising out of this Agreement or the Associated Agreements or the transactions contemplated hereby or thereby; provided that the term "Dispute" shall not include any disagreement among the Operating Committee with respect to decisions to be made by the Operating Committee.

"East Texas/North Louisiana Area" means the lands (and subsurface) included in those Texas counties and Louisiana parishes identified in Exhibit "A" attached hereto, provided that the East Texas/North Louisiana Area shall not include (a) those areas included within the description of the excluded fields on Exhibit "A" attached hereto or (b) any Lease or other property that is an Excluded Asset.

Appendix I-4

"Eligible Costs" means all costs and expenses incurred in accordance with an Applicable Operating Agreement in conducting (i) Joint Development Operations with respect to the Deep Rights for the drilling, testing, completing, deepening, recompleting, sidetracking, reworking and plugging back of wells, the plugging and abandoning of dry holes or wells no longer capable of producing in paying quantities, and the equipping of wells for production, and (ii) Sole Risk Development Operations with respect to the Deep Rights conducted by EXCO pursuant to Section 4.6 for drilling and/or completing any well or conducting any Wellbore Operation, the plugging and abandoning of any dry hole resulting from such operation or any such well no longer capable of production in paying quantities, and the equipping of such wells for production, in each case including costs of mobilizing and demobilizing drilling and workover rigs to and from the wellsite if not charged to another operation, and overhead charged under the Applicable Operating Agreement with respect to the costs specifically described above, provided that "Eligible Costs" shall not include liabilities, losses, claims and damages associated with such activities or otherwise, and related costs of investigation, litigation, arbitration, administrative proceedings, judgment, award and settlement (including court and arbitration costs and reasonable attorneys' fees), to the extent attributable to actual or claimed personal injury, illness or death, property damage (other than damage to structures, fences, irrigation systems and other fixtures, crops, livestock and other personal property in the ordinary course of business), environmental damage or contamination, other torts, breach of contract, violation of Law (or private rights of action under any Law), casualty or condemnation.

"Encumbrance" means a mortgage, lien, pledge, charge, or other encumbrance. "Encumber" and other derivatives shall be construed accordingly.

"Entitlement" means that quantity of oil and gas from the Subject Oil and Gas Assets for which a Development Party has the right to take delivery pursuant to the terms of any Applicable Operating Agreement, any other applicable agreement or applicable Law.

"EOC" has the meaning set forth in the Preamble.

"EPC" has the meaning set forth in the Preamble.

"Escrow Account Balance" has the meaning set forth in Exhibit H.

"Escrow Deposit Account" has the meaning set forth in Exhibit H.

"Excluded Asset" has the meaning set forth in the Purchase Agreement.

"EXCO" has the meaning set forth in the Preamble.

"EXCO Operator" means:  (a) EOC, with respect to those Leases in the East Texas/North Louisiana Area in which EOC has an interest as of the Effective Date and is the operator thereof and that are governed by an Applicable Operating Agreement; (b) EPC, with respect to those Leases in the East Texas/North Louisiana Area in which EPC has an interest as of the Effective Date and is the operator thereof and that are governed by an Applicable Operating Agreement; and (c) EOC, with respect to those Leases in the East Texas/North Louisiana Area in which at least EOC or EPC and at least one other non-Affiliate Development Party acquires an interest

from and after the Effective Date and that become subject to an Applicable Operating Agreement.

"Existing EXCO Credit Facility" means the arrangements contemplated in that certain Amended and Restated Credit Agreement dated March 30, 2007 between EXCO Partners Operating Company, LP (now EOC) and JPMorgan Chase Bank, N.A. and other lenders, as the same may be amended, modified or supplemented from time to time.

"Governmental Authority" shall mean any federal, state, local, municipal, tribal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitle to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power; and any court or governmental tribunal, including any tribal authority having or asserting jurisdiction.

"HSSE" shall mean Health, Safety, Security and Environmental.

"HSSE Management System" has the meaning set forth in Section 4.10(c).

"HSSE Plan" has the meaning set forth in Section 4.10(b).

"HSSE Principles" has the meaning set forth in Section 4.10(a).

"Initial Three Year Period" has the meaning set forth in Section 7.1(a).

"Joint Development Interest" means, with respect to a Development Party, all of such Development Party's leasehold, working or mineral fee interest and obligations with respect to Subject Oil and Gas Assets within the East Texas/North Louisiana Area.

"Joint Development Operations" means Development Operations in which all Development Parties participate.

"Joint Development Operating Agreement" has the meaning set forth in Section 3.4.

"Joint Development Operator" means the operator appointed pursuant to Section 3.6.

"Laws" means any constitution, decree, resolution, law, statute, act, ordinance, rule, directive, order, treaty, code or regulation and any injunction or final non-appealable judgment or any interpretation of the foregoing, as enacted, issued or promulgated by any Governmental Authority.

"Lease" means any oil and gas lease, oil, gas and mineral lease or sublease, royalty, overriding royalty, production payment, net profits interest, mineral fee interest, carried interest, mineral servitude or other right to oil and gas in place.

"Maintaining Development Party" has the meaning set forth in Section 9.3.

"Material Event" means shall mean with respect to Joint Development Operator, that Joint Development Operator or any direct or indirect parent of Operator:  (a) is dissolved (other than

pursuant to an internal reorganization in the ordinary course of business which does not result in a change in Control of such entity); (b) becomes insolvent or is unable to pay its debts or fails to pay or admits in writing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (e) has a resolution passed for its winding up, official management pursuant to an applicable statutory remedy or liquidation (other than pursuant to an internal reorganization in the ordinary course of business which does not result in a change in Control of such entity); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or a substantial portion of its assets; (g) has a secured party take possession of all or a substantial portion of its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or a substantial portion of its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) through (g).

"Material Interest" means, with respect to any Development Party, any overriding royalty interest, production payment, net profits interest or similar interest that is carved out of such Development Party's interests in the Subject Oil and Gas Assets, the Transfer of which interest would convey a material portion of the value of the Development Party's interest in the Subject Oil and Gas Assets.

"Non-Acquiring Development Party" has the meaning set forth in Section 9.2(a).

"Non-Budgeted Operation" has the meaning set forth in Section 4.4(f)

"Non-Releasing Development Party" has the meaning set forth in Section 9.3.

"Offered Interest" has the meaning set forth in Section 9.2(a).

"Offer Notice" has the meaning set forth in Section 9.2(a).

"Oil and Gas Assets" means all of the following, to the extent located within the East Texas/North Louisiana Area:

    (a)    oil, gas and/or mineral leases, subleases, operating agreements granted by the Louisiana State Mineral Board, fee interests, fee mineral interests, mineral servitudes, royalties, overriding royalties, production payments, net profits interests, carried interests, reversionary interests and other interests in oil, gas and/or minerals in place (collectively, "Oil and Gas Interests"), the leasehold estates created by Oil and Gas Interests, lands covered by Oil and Gas Interests

("Lands"), and interests in any pooled acreage, communitized acreage or units arising on account of Oil and Gas Interests or Lands pooled, communitized or unitized into such units ("Units");

(b) oil and gas wells and injection wells that have not been permanently abandoned located on Oil and Gas Interests, Lands or Units ("Wells"), and all Hydrocarbons produced therefrom or allocated thereto (Oil and Gas Interests, Lands, Units and Wells being collectively referred to hereinafter as "Properties");

(c) equipment, machinery, fixtures, and other real, immovable, personal, movable and mixed property primarily used or held for use in connection with Properties, including saltwater disposal wells, well equipment, casing, rods, tanks, boilers, buildings, tubing, pumps, motors, fixtures, machinery, compression equipment, flow lines, and separation facilities, structures, materials, and other items used or held for use in the operation thereof and located upstream of the outlet flange of the relevant custody transfer meter (or, in the case of Hydrocarbon liquids, upstream of the outlet flange in the tanks);

(d) surface fee interests, surface leases, easements, rights-of-way, permits, licenses, servitudes, and other surface rights;

(e) water withdrawal and disposal and other permits, licenses, orders, approvals, variances, waivers, franchises, rights and other authorizations issued by any Governmental Authority;

(f) contracts primarily relating to any of the other items identified in this definition;

(g) imbalances at wellheads;

(h) files, records, maps, information, and data, whether written or electronically stored, relating to any of the other items identified in this definition, including: (i) land and title records (including abstracts of title, title opinions, and title curative documents); (ii) contract files; (iii) correspondence; (iv) operations, environmental, production, and accounting records and (v) production, facility and well records and data (including logs and cores);

(i) geophysical and other seismic and related technical data and information;

(j) liens and security interests securing payment for the sale or other disposition of Hydrocarbons produced from or allocated to Properties, including the security interests granted under Texas Uniform Commercial Code § 9.343; and

(k) rights, claims and causes of action to the extent, and only to the extent, that such rights, claims or causes of action are associated with other items identified in this definition.

"Operating Committee" means the committee created pursuant to Section 4.1.

"Operating Expense Multiplier" means, in the case of any Calendar Year (for purposes of this definition, the "relevant Calendar Year"), the amount obtained by dividing: (i) the number of active wells included in Joint Development Operations as of the end of the preceding Calendar Year, plus the number of wells anticipated to be drilled as Joint Development Operations in the relevant Calendar Year, minus the number of wells anticipated to be plugged and abandoned pursuant to Joint Development Operations in the first half of the relevant Calendar Year; by (ii) the number of active wells included in Joint Development Operations as of the end of the preceding Calendar Year.

"Operating Expenses" means costs and expenses reasonably necessary to continue operating, maintaining and producing wells and related surface equipment included in the Subject Oil and Gas Assets in a manner consistent with past practices, industry standards and applicable Law.

"Other Development Parties" has the meaning set forth in Section 8.2(a).

"Other Interest" means, with respect to any Development Party, any overriding royalty interest, production payment, net profits interest or similar interest that is carved out of such Development Party's interests in the Subject Oil and Gas Assets, the Transfer of which interest would not convey a material portion of the value of the Development Party's interest in the Subject Oil and Gas Assets.

"Other Overhead Rates" has the meaning set forth in Section 3.12(f).

"Participating Interest" means each Development Party's undivided share of the aggregate rights and obligations of the Development Parties (other than with respect to Sole Risk Development Operations) under the terms of this Agreement and under the terms of each Applicable Operating Agreement.

"Participating Party" means with respect to any Development Operation, a Development Party that is participating in such Development Operation, and with respect to any Development Operations Contract, a Development Party that is responsible, whether directly or indirectly, for any amounts payable under such Development Operations Contract.

"Party" and "Parties" have the meanings set forth in the Preamble.

"Party Operator" means any Party or any of its Affiliates or, in the case where BG exercises its rights pursuant to Section 3.5(d) or Section 3.6(e), BG's designee, serving in the role of operator under any Applicable Operating Agreement. In the case of BG's designee, BG shall cause such designee to abide by the provisions of this Agreement applicable to a Party Operator in all respects.

"Person" means any individual, corporation, company, partnership, limited partnership, limited liability company, trust, estate, Governmental Authority or any other entity.

"Pre-Existing Operating Agreement" means a Third Party Operating Agreement where EXCO or an Affiliate of EXCO is the Party Operator thereunder and that is (a) in place prior to the Closing Date, or (b) is in place prior to the acquisition of the Oil and Gas Assets covered thereby by EXCO or any other Development Party.

"Purchase Agreement" means that certain Purchase and Sale Agreement by and between EXCO and BG, dated June 29, 2009, as amended.

"Releasing Development Party" has the meaning set forth in Section 9.3.

"Rental Notice" has the meaning set forth in Section 9.3.

"Secondee" means any employee of a Party seconded into the organization of Joint Development Operator or any of its Affiliates.

"Secondment Agreement" means the Secondment Agreement entered into by BG and EXCO as of the Closing Date in the form of Exhibit C attached hereto.

"Section 3.12 Rates" has the meaning set forth in Section 3.12(f).

"Shallow Rights" means those subsurface depths within the East Texas/North Louisiana Area that are at and above the base of (and including) the Cotton Valley formation at a measured depth of 9,650', as identified by the Jonesville North A-17 well, API No. 42203343000000, recognizing that actual depth will vary across the East Texas/North Louisiana Area.

"Sole Risk Development Operations" means Development Operations in which not all Development Parties participate.

"Subject Oil and Gas Assets" means all right, title and interest of the Development Parties within the East Texas/North Louisiana Area in and to the Oil and Gas Assets in which both Development Parties hold an interest, whether held on, or acquired at or after the Closing Date.

"Subsequent Operating Agreement" means an operating agreement entered into after the Closing Date among one or more third parties that are not Affiliates of the Development Parties and the Development Parties and under which EXCO or any Affiliate of EXCO will serve as operator.

"Tax Partnership" has the meaning set forth in Section 10.1.

"Technical Services" means services providing specific engineering, geoscience, land, or other exploration, development and/or producing professional skills, such as those performed by engineers, geologists, geophysicists, landmen, and technicians, required to handle specific operating conditions and problems for the benefit of Development Operations; provided, however, Technical Services shall not include general corporate overhead costs or those functions specifically identified as overhead in the Exhibit "C" to the Joint Development Operating Agreement.  Technical Services may be provided by the Joint Development Operator or its Affiliates.

"Technical Services Costs" means salaries and wages of employees and Secondees of Joint Development Operator and its Affiliates providing Technical Services, together with those additional amounts chargeable under Articles II.2.B., C., D., E., F., G., and H. of Exhibit "C" to the Joint Development Operating Agreement with respect such employees and Secondees as direct labor costs.

"Third Party Operating Agreements" means those operating agreements, other than the Joint Development Operating Agreement, to which Persons other than the Development Parties and Joint Development Operator are parties and which burden the Subject Oil and Gas Assets within the East Texas/North Louisiana Area.

"Third Party Prepared Information" has the meaning set forth in Section 3.10(a).

"Total Amount in Default" means, as of any time, the following amounts:  (a) the amounts that the Defaulting Party has failed to pay under the terms of this Agreement and the Associated Agreements as of such time; and (b) any interest at the Default Interest Rate accrued on the amount under (a) from the date this amount is due by the Defaulting Party until paid in full by the Defaulting Party and on the amount under (b) from the time this amount is incurred by the Affected Party until paid in full by the Defaulting Party.

"Transfer" means any sale, assignment, or other disposition by a Development Party of all or any part of its Joint Development Interest or any other interest in the Subject Oil and Gas Interests excluding (a) any disposition resulting from a direct or indirect Change in Control of a Party, or a change in Control created by a change in Control of the ultimate parent of such Party, (b) any disposition resulting from a Credit Facility Foreclosure, and (c) any Encumbrance.

"Treasury Regulations" shall mean the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute, proposed or final Treasury Regulations.

"Unaffiliated Participating Party" has the meaning set forth in Section 4.7(b).

"Unpaid Carried Costs Percentage" means, as of any time, the product of 100% times the amount obtained by dividing the Carried Costs Balance as of such time by the Carried Costs Obligation.

"Wellbore Operation" means, as such terms are defined or used in the Applicable Operating Agreement, the sidetracking, deepening, plugging back or recompleting of a wellbore.

"Wholly-Owned Affiliate" means, with respect to any Party, an Affiliate of such Party that is wholly owned, directly or indirectly by the ultimate parent of such Party.

"Working Interest" means with respect to any Development Party and any Development Operation in which such Development Party is participating, such Development Party's working interest (to the 8/8ths) in such Development Operation.

Appendix I-11



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

| Sales to: | | Invoice, Rev No.: | ENABLE HOLLY 2 |
|---|---|---|---|
| Shell Energy NA Coral | | Invoice Date: | December 8, 2017 |
| Gas Accounting | | Due Date: | December 26, 2017 |
| 909 Fannin - Plaza Level 1 | | Prod. Month: | November , 2017 |
| Houston, TX 77010 | | | |
| ATTN: | | | |
| Phone: | | | |
| Fax: | | | |
| Email: | Venkatraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com | | |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg.) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| Enable Midstream Partners, LP TIK | | Shell Enable OP Swing | 11/1 | 11/30 | Nom | 147,000.00 | $2.869503 | $421,816.94 |
| | | | | | Invoice Totals: | 147,000.00 | | $421,816.94 |

**REMIT PAYMENT TO:**
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing, LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 26th of each month.

12/8/2017                    7:01:17 AM            **EXHIBIT E**

**INVOICE DETAILS**

Prod. Month: November, 2017

Invoice, Rev No.: ENABLE HOLLY 2

Facility: Enable Midstream Partners, LP    Description: Shell Enable OP Swing
TIK

Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|-----|-----|-------|-----|-----|-------|-----|-----|-------|-----|-----|-------|
| 1 | 5,400.00 | $2.6700 | 9 | 5,000.00 | $3.0550 | 17 | 5,000.00 | $2.9500 | 25 | 4,800.00 | $2.8100 |
| 2 | 5,400.00 | $2.5750 | 10 | 5,000.00 | $3.0900 | 18 | 4,000.00 | $2.9300 | 26 | 4,800.00 | $2.8100 |
| 3 | 5,400.00 | $2.6350 | 11 | 5,000.00 | $3.0400 | 19 | 4,000.00 | $2.9300 | 27 | 4,800.00 | $2.8100 |
| 4 | 5,400.00 | $2.6750 | 12 | 5,000.00 | $3.0400 | 20 | 4,000.00 | $2.9300 | 28 | 4,800.00 | $2.7200 |
| 5 | 5,400.00 | $2.6750 | 13 | 5,000.00 | $3.0400 | 21 | 4,000.00 | $2.9500 | 29 | 4,800.00 | $2.8250 |
| 6 | 5,400.00 | $2.6750 | 14 | 5,000.00 | $3.0200 | 22 | 4,800.00 | $2.9400 | 30 | 4,800.00 | $2.9650 |
| 7 | 5,400.00 | $2.6250 | 15 | 5,000.00 | $2.9750 | 23 | 4,800.00 | $2.8100 | 31 | | |
| 8 | 5,000.00 | $2.9550 | 16 | 5,000.00 | $2.9900 | 24 | 4,800.00 | $2.8100 | | | |

|  |  |
|--|--|
| 147,000.00 | $2.869503 |
| | **=============** |
| | $421,816.94 |
| | **=============** |
| Invoice Transaction Total: | $421,816.94 |



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

| Sales to: | | | Invoice, Rev No.: | HOLLY 8 |
|---|---|---|---|---|
| Shell Energy NA Coral | | | Invoice Date: | December 8, 2017 |
| Gas Accounting | | | Due Date: | December 25, 2017 |
| 909 Fannin - Plaza Level 1 | | | Prod. Month: | November , 2017 |
| Houston, TX 77010 | | | | |

ATTN:

Phone:

Fax:

Email: Venkatraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com

| Facility | Meter | Description | Start | End | Rate | Volume | Price (Avg) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| Azure Midstream Holdings LLC | Holly-GS/Acadian/Tiger meters | Shell Holly JV | 11/1 | 11/30 | Nom | 2,250,000.00 | $2.304270 | $6,184,607.50 |
| | | | 11/1 | 11/30 | Cont | 0.00 | $0.000000 | $0.00 |
| | | Demand | | | | | -$11.7000 | -$1,170,000.00 |
| Azure Midstream Holdings LLC | Holly-GS/Acadian/Tiger meters | Shell Holly JV Swing | 11/1 | 11/30 | Nom | 616,000.00 | $2.548945 | $1,570,150.12 |
| | | | | | | | | |
| | | **Invoice Totals:** | | | | **2,866,000.00** | | **$6,584,757.62** |
| | | | | | | ***************** | | ***************** |

REMIT PAYMENT TO:
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

12/8/2017                    7:13:30 AM

**INVOICE DETAILS**

Prod. Month: November, 2017                               Invoice, Rev No.: HOLLY 8

Facility: Azure Midstream Holdings LLC   Description: Shell Holly JV                Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 75,000.00 | $2.3043 | 9 | 75,000.00 | $2.3043 | 17 | 75,000.00 | $2.3043 | 25 | 75,000.00 | $2.3043 |
| 2 | 75,000.00 | $2.3043 | 10 | 75,000.00 | $2.3043 | 18 | 75,000.00 | $2.3043 | 26 | 75,000.00 | $2.3043 |
| 3 | 75,000.00 | $2.3043 | 11 | 75,000.00 | $2.3043 | 19 | 75,000.00 | $2.3043 | 27 | 75,000.00 | $2.3043 |
| 4 | 75,000.00 | $2.3043 | 12 | 75,000.00 | $2.3043 | 20 | 75,000.00 | $2.3043 | 28 | 75,000.00 | $2.3043 |
| 5 | 75,000.00 | $2.3043 | 13 | 75,000.00 | $2.3043 | 21 | 75,000.00 | $2.3043 | 29 | 75,000.00 | $2.3043 |
| 6 | 75,000.00 | $2.3043 | 14 | 75,000.00 | $2.3043 | 22 | 75,000.00 | $2.3043 | 30 | 75,000.00 | $2.3043 |
| 7 | 75,000.00 | $2.3043 | 15 | 75,000.00 | $2.3043 | 23 | 75,000.00 | $2.3043 | 31 | | |
| 8 | 75,000.00 | $2.3043 | 16 | 75,000.00 | $2.3043 | 24 | 75,000.00 | $2.3043 | | | |

2,250,000.00   $2.304270
=============
$5,184,607.50

Facility:                               Description:                               Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0.00 | $4.6190 | 9 | 0.00 | $4.6190 | 17 | 0.00 | $4.6190 | 25 | 0.00 | $4.6190 |
| 2 | 0.00 | $4.6190 | 10 | 0.00 | $4.6190 | 18 | 0.00 | $4.6190 | 26 | 0.00 | $4.6190 |
| 3 | 0.00 | $4.6190 | 11 | 0.00 | $4.6190 | 19 | 0.00 | $4.6190 | 27 | 0.00 | $4.6190 |
| 4 | 0.00 | $4.6190 | 12 | 0.00 | $4.6190 | 20 | 0.00 | $4.6190 | 28 | 0.00 | $4.6190 |
| 5 | 0.00 | $4.6190 | 13 | 0.00 | $4.6190 | 21 | 0.00 | $4.6190 | 29 | 0.00 | $4.6190 |
| 6 | 0.00 | $4.6190 | 14 | 0.00 | $4.6190 | 22 | 0.00 | $4.6190 | 30 | 0.00 | $4.6190 |
| 7 | 0.00 | $4.6190 | 15 | 0.00 | $4.6190 | 23 | 0.00 | $4.6190 | 31 | | |
| 8 | 0.00 | $4.6190 | 16 | 0.00 | $4.6190 | 24 | 0.00 | $4.6190 | | | |

0.00   $0.000000
=============
$0.00

Facility: Azure Midstream Holdings LLC   Description: Shell Holly JV Swing                Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 17,000.00 | $2.3366 | 9 | 17,000.00 | $2.7328 | 17 | 27,000.00 | $2.6280 | 25 | 26,000.00 | $2.4869 |
| 2 | 17,000.00 | $2.2695 | 10 | 17,000.00 | $2.7888 | 18 | 25,000.00 | $2.6024 | 26 | 26,000.00 | $2.4869 |
| 3 | 17,000.00 | $2.3130 | 11 | 18,000.00 | $2.7105 | 19 | 25,000.00 | $2.6024 | 27 | 26,000.00 | $2.4869 |
| 4 | 17,000.00 | $2.3415 | 12 | 18,000.00 | $2.7105 | 20 | 25,000.00 | $2.6024 | 28 | 20,000.00 | $2.3912 |
| 5 | 17,000.00 | $2.3415 | 13 | 18,000.00 | $2.7105 | 21 | 30,000.00 | $2.6123 | 29 | 15,000.00 | $2.5005 |
| 6 | 17,000.00 | $2.3415 | 14 | 18,000.00 | $2.6819 | 22 | 26,000.00 | $2.6036 | 30 | 7,000.00 | $2.6347 |
| 7 | 17,000.00 | $2.6024 | 15 | 20,000.00 | $2.6334 | 23 | 26,000.00 | $2.4869 | 31 | | |
| 8 | 17,000.00 | $2.6483 | 16 | 24,000.00 | $2.6583 | 24 | 26,000.00 | $2.4869 | | | |

618,000.00   $2.548945
=============
$1,570,150.12
=============

Invoice Transaction Total:        $6,754,757.62

12/8/2017                               7:13:30 AM



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

**INVOICE FOR NATURAL GAS**

| | |
|---|---|
| Sales to: | Invoice, Rev No.: | MANSFIELD 12 |
| Shell Energy NA Coral | Invoice Date: | December 8, 2017 |
| Gas Accounting | Due Date: | December 25, 2017 |
| 909 Fannin - Plaza Level 1 | Prod. Month: | November , 2017 |
| Houston, TX 77010 | | |
| ATTN: | | |
| Phone: | | |
| Fax: | | |
| Email: | Venkatraman.Kanden@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercadez.Livingston@shell.com | |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg.) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| LA Midstream Gas Services | Mansfield | Shell Mansfield Tiger PA Base | 11/1 | 11/30 | Nom | 1,320,000.00 | $2.598700 | $3,430,284.00 |
| LA Midstream Gas Services- TIK | Mansfield | Shell Mansfield TIK Tiger PA Swing | 11/1 | 11/30 | Nom | 69,100.00 | $2.871623 | $198,429.15 |
| LA Midstream Gas Services | Mansfield | Shell Mansfield Tiger PA Swing | 11/1 | 11/30 | Nom | 804,000.00 | $2.877599 | $2,313,589.60 |
| | | | | | Invoice Totals: | 2,193,100.00 | | $5,942,302.75 |

**REMIT PAYMENT TO:**
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

12/8/2017                                    7:20:41 AM

**INVOICE DETAILS**

Prod. Month: November, 2017

Invoice, Rev No.: MANSFIELD 12

Facility: LA Midstream Gas Services   Description: Shell Mansfield Tiger PA Base   Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 44,000.00 | $2.5987 | 9 | 44,000.00 | $2.5987 | 17 | 44,000.00 | $2.5987 | 25 | 44,000.00 | $2.5987 |
| 2 | 44,000.00 | $2.5987 | 10 | 44,000.00 | $2.5987 | 18 | 44,000.00 | $2.5987 | 26 | 44,000.00 | $2.5987 |
| 3 | 44,000.00 | $2.5987 | 11 | 44,000.00 | $2.5987 | 19 | 44,000.00 | $2.5987 | 27 | 44,000.00 | $2.5987 |
| 4 | 44,000.00 | $2.5987 | 12 | 44,000.00 | $2.5987 | 20 | 44,000.00 | $2.5987 | 28 | 44,000.00 | $2.5987 |
| 5 | 44,000.00 | $2.5987 | 13 | 44,000.00 | $2.5987 | 21 | 44,000.00 | $2.5987 | 29 | 44,000.00 | $2.5987 |
| 6 | 44,000.00 | $2.5987 | 14 | 44,000.00 | $2.5987 | 22 | 44,000.00 | $2.5987 | 30 | 44,000.00 | $2.5987 |
| 7 | 44,000.00 | $2.5987 | 15 | 44,000.00 | $2.5987 | 23 | 44,000.00 | $2.5987 | 31 | | |
| 8 | 44,000.00 | $2.5987 | 16 | 44,000.00 | $2.5987 | 24 | 44,000.00 | $2.5987 | | | |

1,320,000.00   $2.598700

$3,430,284.00

Facility: LA Midstream Gas Services- TIK   Description: Shell Mansfield TIK Tiger PA Swing   Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2,500.00 | $2.6637 | 9 | 2,100.00 | $3.0637 | 17 | 2,500.00 | $2.9537 | 25 | 2,200.00 | $2.8237 |
| 2 | 2,500.00 | $2.5787 | 10 | 2,100.00 | $3.1087 | 18 | 2,500.00 | $2.9337 | 26 | 2,200.00 | $2.8237 |
| 3 | 2,500.00 | $2.6267 | 11 | 2,100.00 | $3.0487 | 19 | 2,500.00 | $2.9337 | 27 | 2,200.00 | $2.8237 |
| 4 | 2,500.00 | $2.6637 | 12 | 2,100.00 | $3.0487 | 20 | 2,500.00 | $2.9337 | 28 | 2,200.00 | $2.7037 |
| 5 | 2,500.00 | $2.6637 | 13 | 2,100.00 | $3.0487 | 21 | 2,500.00 | $2.9437 | 29 | 2,200.00 | $2.8087 |
| 6 | 2,500.00 | $2.6637 | 14 | 2,100.00 | $3.0237 | 22 | 2,200.00 | $2.9437 | 30 | 2,200.00 | $2.9587 |
| 7 | 2,500.00 | $2.9287 | 15 | 2,100.00 | $2.9737 | 23 | 2,200.00 | $2.8237 | 31 | | |
| 8 | 2,500.00 | $2.9887 | 16 | 2,100.00 | $2.9987 | 24 | 2,200.00 | $2.8237 | | | |

69,100.00   $2.871823

$198,429.15

Facility: LA Midstream Gas Services   Description: Shell Mansfield Tiger PA Swing   Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 28,000.00 | $2.6637 | 9 | 29,000.00 | $3.0637 | 17 | 24,000.00 | $2.9537 | 25 | 26,000.00 | $2.8237 |
| 2 | 28,000.00 | $2.5787 | 10 | 29,000.00 | $3.1087 | 18 | 24,000.00 | $2.9337 | 26 | 26,000.00 | $2.8237 |
| 3 | 28,000.00 | $2.6267 | 11 | 29,000.00 | $3.0487 | 19 | 24,000.00 | $2.9337 | 27 | 26,000.00 | $2.8237 |
| 4 | 28,000.00 | $2.6637 | 12 | 29,000.00 | $3.0487 | 20 | 24,000.00 | $2.9337 | 28 | 26,000.00 | $2.7037 |
| 5 | 28,000.00 | $2.6637 | 13 | 29,000.00 | $3.0487 | 21 | 24,000.00 | $2.9437 | 29 | 26,000.00 | $2.8087 |
| 6 | 28,000.00 | $2.6637 | 14 | 27,000.00 | $3.0237 | 22 | 26,000.00 | $2.9437 | 30 | 26,000.00 | $2.9587 |
| 7 | 28,000.00 | $2.9287 | 15 | 27,000.00 | $2.9737 | 23 | 26,000.00 | $2.8237 | 31 | | |
| 8 | 28,000.00 | $2.9887 | 16 | 27,000.00 | $2.9987 | 24 | 26,000.00 | $2.8237 | | | |

804,000.00   $2.877599

$2,313,589.60

Invoice Transaction Total:   $5,942,302.75

12/8/2017                    7:20:41 AM



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

**INVOICE FOR NATURAL GAS**

| Sales to: | | | Invoice, Rev No.: | SHELBY 16 |
|---|---|---|---|---|
| Shell Energy NA Coral | | | Invoice Date: | December 8, 2017 |
| Gas Accounting | | | Due Date: | December 25, 2017 |
| 909 Fannin - Plaza Level 1 | | | Prod. Month: | November , 2017 |
| Houston, TX 77010 | | | | |
| ATTN: | | | | |
| Phone: | | | | |
| Fax: | | | | |
| Email: | Venkatraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com | | | |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg.) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| NGPL | | Shell Shelby Swing | 11/1 | 11/30 | Nom | 346,000.00 | $2.838454 | $982,105.08 |
| NGPL | | Shell Shelby Base | 11/1 | 11/30 | Nom | 690,000.00 | $2.600000 | $1,794,000.00 |
| | | | | Invoice Totals: | | 1,036,000.00 | | $2,776,105.08 |

**REMIT PAYMENT TO:**
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing, LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

12/12/2017                    1:11;38 PM

**INVOICE DETAILS**

Prod. Month: November, 2017                                   Invoice, Rev No.: SHELBY 16

Facility: NGPL                    Description: Shell Shelby Swing                    Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11,000.00 | $2.6500 | 9 | 10,000.00 | $3.0300 | 17 | 11,000.00 | $2.9100 | 25 | 12,000.00 | $2.7650 |
| 2 | 11,000.00 | $2.6800 | 10 | 10,000.00 | $3.0500 | 18 | 13,000.00 | $2.9100 | 26 | 12,000.00 | $2.7650 |
| 3 | 11,000.00 | $2.6400 | 11 | 10,000.00 | $2.9750 | 19 | 13,000.00 | $2.9100 | 27 | 12,000.00 | $2.7650 |
| 4 | 11,000.00 | $2.7200 | 12 | 10,000.00 | $2.9750 | 20 | 13,000.00 | $2.9100 | 28 | 12,000.00 | $2.6450 |
| 5 | 11,000.00 | $2.7200 | 13 | 10,000.00 | $2.9750 | 21 | 13,000.00 | $2.8600 | 29 | 12,000.00 | $2.7550 |
| 6 | 11,000.00 | $2.7200 | 14 | 10,000.00 | $2.9650 | 22 | 13,000.00 | $2.9100 | 30 | 17,000.00 | $2.8600 |
| 7 | 11,000.00 | $2.9300 | 15 | 11,000.00 | $2.8800 | 23 | 12,000.00 | $2.7650 | 31 | | |
| 8 | 10,000.00 | $2.9550 | 16 | 11,000.00 | $2.9450 | 24 | 12,000.00 | $2.7650 | | | |

346,000.00   $2.838454

═══════════

$982,105.08

Facility: NGPL                    Description: Shell Shelby Base                    Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 23,000.00 | $2.6000 | 9 | 23,000.00 | $2.6000 | 17 | 23,000.00 | $2.6000 | 25 | 23,000.00 | $2.6000 |
| 2 | 23,000.00 | $2.6000 | 10 | 23,000.00 | $2.6000 | 18 | 23,000.00 | $2.6000 | 26 | 23,000.00 | $2.6000 |
| 3 | 23,000.00 | $2.6000 | 11 | 23,000.00 | $2.6000 | 19 | 23,000.00 | $2.6000 | 27 | 23,000.00 | $2.6000 |
| 4 | 23,000.00 | $2.6000 | 12 | 23,000.00 | $2.6000 | 20 | 23,000.00 | $2.6000 | 28 | 23,000.00 | $2.6000 |
| 5 | 23,000.00 | $2.6000 | 13 | 23,000.00 | $2.6000 | 21 | 23,000.00 | $2.6000 | 29 | 23,000.00 | $2.6000 |
| 6 | 23,000.00 | $2.6000 | 14 | 23,000.00 | $2.6000 | 22 | 23,000.00 | $2.6000 | 30 | 23,000.00 | $2.6000 |
| 7 | 23,000.00 | $2.6000 | 15 | 23,000.00 | $2.6000 | 23 | 23,000.00 | $2.6000 | 31 | | |
| 8 | 23,000.00 | $2.6000 | 16 | 23,000.00 | $2.6000 | 24 | 23,000.00 | $2.6000 | | | |

690,000.00   $2.600000

═══════════

$1,794,000.00

═══════════

Invoice Transaction Total:                    $2,776,105.08



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

| | |
|---|---|
| Sales to: | |
| Shell Energy NA Coral | |
| Gas Accounting | |
| 909 Fannin - Plaza Level 1 | |
| Houston, TX 77010 | |
| ATTN: | |
| Phone: | |
| Fax: | |
| Email: | Venkatraman.Kandan@shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com |

| | |
|---|---|
| Invoice, Rev No.: | WILDCAT 21, 3017468 |
| Invoice Date: | December 8, 2017 |
| Due Date: | December 25, 2017 |
| Prod. Month: | November , 2017 |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg). | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| Wildcat Midstream Caddo LLC | | Shell Wildcat Tiger PA Base | 11/1 | 11/30 | Nom | 450,000.00 | $2.598700 | $1,169,415.00 |
| Wildcat Midstream Caddo LLC | | Shell Wildcat Tiger PA Swing | 11/1 | 11/30 | Nom | 85,500.00 | $2.879865 | $246,211.36 |
| | | | | | **Invoice Totals:** | 535,500.00 | | $1,415,626.36 |

REMIT PAYMENT TO:
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

**INVOICE DETAILS**

Prod. Month: November, 2017                                    Invoice, Rev No.: WILDCAT 21; 3017486

Facility: Wildcat Midstream Caddo LLC   Description: Shell Wildcat Tiger PA Base                    Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15,000.00 | $2.5987 | 9 | 15,000.00 | $2.5987 | 17 | 15,000.00 | $2.5987 | 25 | 15,000.00 | $2.5987 |
| 2 | 15,000.00 | $2.5987 | 10 | 15,000.00 | $2.5987 | 18 | 15,000.00 | $2.5987 | 26 | 15,000.00 | $2.5987 |
| 3 | 15,000.00 | $2.5987 | 11 | 15,000.00 | $2.5987 | 19 | 15,000.00 | $2.5987 | 27 | 15,000.00 | $2.5987 |
| 4 | 15,000.00 | $2.5987 | 12 | 15,000.00 | $2.5987 | 20 | 15,000.00 | $2.5987 | 28 | 15,000.00 | $2.5987 |
| 5 | 15,000.00 | $2.5987 | 13 | 15,000.00 | $2.5987 | 21 | 15,000.00 | $2.5987 | 29 | 15,000.00 | $2.5987 |
| 6 | 15,000.00 | $2.5987 | 14 | 15,000.00 | $2.5987 | 22 | 15,000.00 | $2.5987 | 30 | 15,000.00 | $2.5987 |
| 7 | 15,000.00 | $2.5987 | 15 | 15,000.00 | $2.5987 | 23 | 15,000.00 | $2.5987 | 31 | | |
| 8 | 15,000.00 | $2.5987 | 16 | 15,000.00 | $2.5987 | 24 | 15,000.00 | $2.5987 | | | |

450,000.00   $2.598700

$1,169,415.00

Facility: Wildcat Midstream Caddo LLC   Description: Shell Wildcat Tiger PA Swing                    Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3,000.00 | $2.6637 | 9 | 3,000.00 | $3.0637 | 17 | 3,000.00 | $2.9537 | 25 | 2,500.00 | $2.8237 |
| 2 | 3,000.00 | $2.5767 | 10 | 3,000.00 | $3.1087 | 18 | 3,000.00 | $2.9337 | 26 | 2,500.00 | $2.8237 |
| 3 | 3,000.00 | $2.6287 | 11 | 3,000.00 | $3.0487 | 19 | 3,000.00 | $2.9337 | 27 | 2,500.00 | $2.8237 |
| 4 | 3,000.00 | $2.6637 | 12 | 3,000.00 | $3.0467 | 20 | 3,000.00 | $2.9337 | 28 | 2,500.00 | $2.7037 |
| 5 | 3,000.00 | $2.6637 | 13 | 3,000.00 | $3.0487 | 21 | 3,000.00 | $2.9437 | 29 | 2,500.00 | $2.6087 |
| 6 | 3,000.00 | $2.6637 | 14 | 3,000.00 | $3.0237 | 22 | 2,500.00 | $2.9437 | 30 | 2,500.00 | $2.9587 |
| 7 | 3,000.00 | $2.9287 | 15 | 3,000.00 | $2.9737 | 23 | 2,500.00 | $2.8237 | 31 | | |
| 8 | 3,000.00 | $2.9987 | 16 | 3,000.00 | $2.9987 | 24 | 2,500.00 | $2.8237 | | | |

85,500.00   $2.879865

$246,211.36

Invoice Transaction Total:                    $1,415,626.36



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

INVOICE FOR NATURAL GAS

| | |
|---|---|
| Sales to: | |
| Shell Energy NA Coral | |
| Gas Accounting | |
| 909 Fannin - Plaza Level 1 | |
| Houston, TX 77010 | |
| ATTN: | |
| Phone: | |
| Fax: | |
| Email: | Venkatraman,Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA,customersupport@shell.com; Mercedez.Livingston@shell.com; Artendra,A.McClure@shell.com |

| | |
|---|---|
| Invoice, Rev No.: | SPRINGRIDGE,59, REVISED 3017547 |
| Invoice Date: | December 19, 2017 |
| Due Date: | December 25, 2017 |
| Prod. Month: | November , 2017 |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg.) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| Magnolia Midstream Gas Services TIK | | Shell Springridge TIK Tiger PA Swing | 11/1 | 11/30 | Nom | 80,260,00 | $2,901722 | $232,863,19 |
| Magnolia Midstream Gas Services | | Shell JV Springridge Swing | 11/1 | 11/30 | Nom | 29,788,00 | $2,539574 | $75,643,75 |
| Magnolia Midstream Gas Services | | Shell Springridge Tiger PA Swing | 11/1 | 11/30 | Nom | 29,788,00 | $2,869751 | $85,478,40 |
| | | | | | **Invoice Totals:** | 139,822,00 | | $393,985.34 |

**REMIT PAYMENT TO:**
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. #-      3356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates, Please confirm volumes
and dollars, Payment is due on the 25th of each month,

**INVOICE DETAILS**

Prod. Month: November, 2017

Invoice, Rev No.: SPRINGRIDGE,59, REVISED 3017547

Facility: Magnolia Midstream Gas Services TIK
Description: Shell Springridge TIK Tiger PA Swing
Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|-----|-----|-------|-----|-----|-------|-----|-----|-------|-----|-----|-------|
| 1 | 1,400.00 | $2.6637 | 9 | 3,100.00 | $3.0637 | 17 | 3,100.00 | $2.9537 | 25 | 3,300.00 | $2.8237 |
| 2 | 1,400.00 | $2.5787 | 10 | 3,100.00 | $3.1087 | 18 | 3,300.00 | $2.9337 | 26 | 3,300.00 | $2.8237 |
| 3 | 1,400.00 | $2.6287 | 11 | 3,100.00 | $3.0487 | 19 | 3,300.00 | $2.9337 | 27 | 3,300.00 | $2.8237 |
| 4 | 1,400.00 | $2.6637 | 12 | 3,100.00 | $3.0487 | 20 | 3,300.00 | $2.9337 | 28 | 3,300.00 | $2.7037 |
| 5 | 1,400.00 | $2.6637 | 13 | 3,100.00 | $3.0487 | 21 | 3,300.00 | $2.9437 | 29 | 3,300.00 | $2.8087 |
| 6 | 1,400.00 | $2.6637 | 14 | 3,100.00 | $3.0237 | 22 | 3,300.00 | $2.9437 | 30 | 3,300.00 | $2.9587 |
| 7 | 525.00 | $2.9287 | 15 | 3,100.00 | $2.9737 | 23 | 3,300.00 | $2.8237 | 31 | | |
| 8 | 525.00 | $2.9887 | 16 | 3,100.00 | $2.9987 | 24 | 3,300.00 | $2.8237 | | | |
| | | | | | | | | | | 80,250.00 | $2.901722 |
| | | | | | | | | | | | $232,863.19 |

Facility: Magnolia Midstream Gas Services
Description: Shell JV Springridge Swing
Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|-----|-----|-------|-----|-----|-------|-----|-----|-------|-----|-----|-------|
| 1 | 1,000.00 | $2.3366 | 9 | 850.00 | $2.7326 | 17 | 850.00 | $2.6280 | 25 | 1,100.00 | $2.4869 |
| 2 | 1,000.00 | $2.2695 | 10 | 850.00 | $2.7686 | 18 | 1,100.00 | $2.6024 | 26 | 1,100.00 | $2.4869 |
| 3 | 1,000.00 | $2.3130 | 11 | 850.00 | $2.7105 | 19 | 1,100.00 | $2.6024 | 27 | 1,100.00 | $2.4869 |
| 4 | 1,000.00 | $2.3415 | 12 | 850.00 | $2.7105 | 20 | 1,100.00 | $2.6024 | 28 | 1,100.00 | $2.3912 |
| 5 | 1,000.00 | $2.3415 | 13 | 850.00 | $2.7105 | 21 | 1,100.00 | $2.6123 | 29 | 1,100.00 | $2.5005 |
| 6 | 1,000.00 | $2.3415 | 14 | 850.00 | $2.6819 | 22 | 1,100.00 | $2.6036 | 30 | 1,100.00 | $2.6347 |
| 7 | 918.00 | $2.6024 | 15 | 850.00 | $2.6334 | 23 | 1,100.00 | $2.4869 | 31 | | |
| 8 | 918.00 | $2.6483 | 16 | 850.00 | $2.6583 | 24 | 1,100.00 | $2.4869 | | | |
| | | | | | | | | | | 29,786.00 | $2.539574 |
| | | | | | | | | | | | $75,643.75 |

Facility: Magnolia Midstream Gas Services
Description: Shell Springridge Tiger PA Swing
Prod. Month: November, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|-----|-----|-------|-----|-----|-------|-----|-----|-------|-----|-----|-------|
| 1 | 1,000.00 | $2.6637 | 9 | 850.00 | $3.0637 | 17 | 850.00 | $2.9537 | 25 | 1,100.00 | $2.8237 |
| 2 | 1,000.00 | $2.5787 | 10 | 850.00 | $3.1087 | 18 | 1,100.00 | $2.9337 | 26 | 1,100.00 | $2.8237 |
| 3 | 1,000.00 | $2.6287 | 11 | 850.00 | $3.0487 | 19 | 1,100.00 | $2.9337 | 27 | 1,100.00 | $2.8237 |
| 4 | 1,000.00 | $2.6637 | 12 | 850.00 | $3.0487 | 20 | 1,100.00 | $2.9337 | 28 | 1,100.00 | $2.7037 |
| 5 | 1,000.00 | $2.6637 | 13 | 850.00 | $3.0487 | 21 | 1,100.00 | $2.9437 | 29 | 1,100.00 | $2.8087 |
| 6 | 1,000.00 | $2.6637 | 14 | 850.00 | $3.0237 | 22 | 1,100.00 | $2.9437 | 30 | 1,100.00 | $2.9587 |
| 7 | 918.00 | $2.9287 | 15 | 850.00 | $2.9737 | 23 | 1,100.00 | $2.8237 | 31 | | |
| 8 | 918.00 | $2.9887 | 16 | 850.00 | $2.9987 | 24 | 1,100.00 | $2.8237 | | | |
| | | | | | | | | | | 29,786.00 | $2.869751 |
| | | | | | | | | | | | $85,478.40 |

Invoice Transaction Total:   $393,985.34

| | |
|---|---|
| **From:** | Evelyn.Kinney@shell.com |
| **Sent:** | Friday, December 22, 2017 10:05 AM |
| **To:** | Eric.W.Reese@shell.com |
| **Cc:** | Backoffice-Raider; Lori Harris |
| **Subject:** | EXT: RE: Exco Resources / Raider Marketing - Halt Payments |

LOL OMG... ok they have a group in Back office, and I mostly talk to Lori Harris 😊

backoffice-raider@raidermarketing.com

lharris@EXCOResources.com

---

**From:** Reese, Eric W SENA-FST/LCG
**Sent:** Friday, December 22, 2017 10:03 AM
**To:** Kinney, Evelyn Y SENA-STX/A/381 <Evelyn.Kinney@shell.com>
**Subject:** RE: Exco Resources / Raider Marketing - Halt Payments

Sorry the Exco people

**From:** Kinney, Evelyn Y SENA-STX/A/381
**Sent:** Friday, December 22, 2017 9:51 AM
**To:** Reese, Eric W SENA-FST/LCG <Eric.W.Reese@shell.com>
**Subject:** RE: Exco Resources / Raider Marketing - Halt Payments

GX TR GAS PHASE II GXTRGASPHASEII@shell.com

There were cc. on email 😊 there are the ones that process the payments... is a group email

**From:** Reese, Eric W SENA-FST/LCG
**Sent:** Friday, December 22, 2017 9:50 AM
**To:** Kinney, Evelyn Y SENA-STX/A/381 <Evelyn.Kinney@shell.com>
**Subject:** RE: Exco Resources / Raider Marketing - Halt Payments

Can you send me the contact info for the people who you send the invoices to?

**From:** Kinney, Evelyn Y SENA-STX/A/381
**Sent:** Thursday, December 14, 2017 4:05 PM
**To:** Reese, Eric W SENA-FST/LCG <Eric.W.Reese@shell.com>
**Cc:** Hadnot, Bridgette A SENA-STX/A/381 <Bridgette.Hadnot@shell.com>; Tipp, Eric A SENA-FST/LCG <eric.tipp@shell.com>
**Subject:** RE: Exco Resources / Raider Marketing - Halt Payments

Eric,

1

**EXHIBIT F**

Thank you for the notice, I have stop finalization on all RAIDER's invoices for this month and will contact Chennai as there were instructions sent few days ago to set payment on 12/26/17 for some EXCO RESOURCES Amounts that were in agreement.

Attached are all unsettled invoices for November and I also included some PPA's that are being worked on. Bellow summary for this moth.

I will continue to work on discrepancies but won't process for payment.

| POINT | SHEL NA | | | | | RAIDER | |
|---|---|---|---|---|---|---|---|
| | Quantity | Unit | Avg Price | Amount Due | | Quantity | |
| MANSFIELD | (2,193,100) | mmbtu | $ 2.7095 | ($5,942,302.97) | | (2,193,100) | $ |
| SHELBY | (1,036,000) | mmbtu | $ 2.6795 | $ (2,776,105.00) | | (1,036,000) | $ |
| WILDCAT | (525,500) | mmbtu | $ 2.6825 | (1,409,626.25) | | (525,500) | $ |
| HOLLY | (2,835,000) | mmbtu | $ 1.3765 | ($3,901,801.49 86) | | (2,835,000) | |
| HOLLY ENABLE | (147,400) | mmbtu | $ 2.8697 | $ (422,999.00) | | (147,400) | $ |
| SPRINGRIDGE | (189,822) | mmbtu | $ 2.8178 | $ (693,985.24) | | (189,591) | $ |
| | | | | | | | |
| TOTAL RAIDER | (6,917,822) | | | ($16,535,783.37) | | (6,917,591) | ( |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| POINT | SHEL NA | | | | | EXCO RESOURCES | |
| | Quantity | Unit | Avg Price | Amount Due | | Quantity | |
| | | | | | | | |
| TRANSCO | (63,260) | mmbtu | $19.3154 | $ (1,221,891.87) | | (63,260) | $ |
| DOMINION | (243,640) | mmbtu | $2.3929 | $ (583,009.37) | | (243,640) | $ |
| | | | | | | | |
| TOTAL EXCO RESOURCES | (306,900) | | $ 5.8811 | $ (1,804,901.24) | | (306,900) | $ |

Thanks!!!


Regards,

Evelyn Kinney
Customer Support
**Shell Energy North America (US)** 🐚
Office: +1 713 230 4900 | Toll-Free: +1 866 818 5501 | Fax: +1 281 582 5716
Email: evelyn.kinney@shell.com
Alternate Email: customersupport@shell.com
1000 Main Street | Houston, TX 77002


**From:** Reese, Eric W SENA-FST/LCG
**Sent:** Thursday, December 14, 2017 3:33 PM
**To:** Kinney, Evelyn Y SENA-STX/A/381 <Evelyn.Kinney@shell.com>

Cc: Hadnot, Bridgette A SENA-STX/A/381 <Bridgette.Hadnot@shell.com>; Tipp, Eric A SENA-FST/LCG <eric.tipp@shell.com>
**Subject:** Exco Resources / Raider Marketing - Halt Payments
**Importance:** High

Hi Evelyn,

As discussed, please halt all payments to the below counterparties and get approval from credit prior to finalizing invoices / releasing payment.

### List of customer addresses

| Customer | Name 1 | Street name | Ctry | Postal code | Location |
|----------|--------|-------------|------|-------------|----------|
| 2205274 | EXCO RESOURCES INC | 6500 GREENVILLE AVENUE SUITE 600LO | US | 75206 | DALLAS |
| 2216702 | EXCO OPERATING COMPANY LP | 12377 MERIT DRIVE SUITE 1700 | | 75251 | DALLAS |
| 2238621 | EXCO PRODUCTION COMPANY LP | 12377 MERIT DRIVE SUITE 1700 | | | DALLAS |
| 2500347 | EXCO RESOURCES PA LLC | 12377 MERIT DR STE 1700 | | 75251-2256 | DALLAS |
| 2260284 | RAIDER MARKETING LP | 12377 MERIT DR STE 1700 | | | DALLAS |

Thank you,

**Eric Reese**
Sr. Credit Analyst
**Shell Energy North America (US), L.P.**
1000 Main Street I Level 12 I Houston, TX 77002 I USA
Office: +1 (713) 230-4067
Email: Eric.W.Reese@Shell.com

---

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

**From:** Heather Summerfield
**Sent:** Friday, December 22, 2017 1:08 PM
**To:** eric.w.reese@shell.com
**Cc:** Hal Hickey; Tyler Farquharson; evelyn.kinney@shell.com; g.cameron@shell.com; Michael Larimer; Steve Estes; Becky Lopez; Harold Jameson; Brian Gaebe; eric.tipp@shell.com
**Subject:** Raider Marketing Response to SENA email re: Non-Payment of Gas Sales

Dear Eric:

I write in response to an email sent by Evelyn Kinney to Lori Harris and a marketing email group on Friday morning, December 22nd regarding amounts owed by Shell Energy North America ("SENA") to Raider Marketing, LP ("Raider") for November gas sales pursuant to a Base Contract for Sale and Purchase of Natural Gas between and among EXCO Operating Company, LP, EXCO Production Company, LP and BG Energy Merchants, LLC dated August 14, 2009 (the "NAESB").  SENA and Raider are successors to the NAESB.  Ms. Kinney advised SENA intends to not pay Raider for November gas sales, which are estimated to be ~$16.5mm and additional gas sales due to other EXCO entities totaling ~$1.5mm.  Pursuant to Section 7.2 of the NAESB, the payment date is the 25th day of the month following the month of the gas sales.  Thus, payment for November gas sales is due to Raider no later than Tuesday, December 26, 2017, making allowance for Monday, December 25th being a federal holiday.  ***Raider hereby provides notice that if SENA fails to make the payments owed to Raider on Tuesday, December 26, 2017, Raider will pursue all available remedies available at law and equity for SENA's breach of the NAESB, which include, but are not limited to, Raider's right to terminate the NAESB for non-payment after expiration of the two day cure period following receipt of default notice per Sections 2.7 and 10.2(vii) of the NAESB.***

Please feel free to contact me at the number below should you wish to discuss this matter further.

Regards,

Heather

*Heather L. Lamparter*
Vice President, General Counsel and Secretary
EXCO Resources, Inc.
12377 Merit Drive Suite 1700
Dallas, TX 75251
Office: 214-210-8397
Cell: 724-766-5744

1

**EXHIBIT G**

Raider Marketing, L.P. and
EXCO Operating Company, LP,
Affilitates of EXCO Resources, Inc.
12377 Merit Drive, Suite 1700
Dallas, Texas 75251
(214) 706-3348 (Phone)
(214) 438-1401 (Fax)

December 27, 2017

Jill Davies
SVP Shell Energy North America (US), L.P.
1000 Main Street, Level 12
Houston, TX 77002
(713) 767-5414 (Fax)
(713) 265-1718 (Fax)
Jill.Davies@Shell.com

Re:     Base Contract for Sale and Purchase of Natural Gas, dated August 14, 2009, as amended, and any Transaction Confirmations thereunder, including, but not limited to, that certain Transaction Confirmation dated and effective as July 9, 2010, as amended (collectively, the "Contract") between Raider Marketing, LP, as successor-in-interest to EXCO Operating Company, LP ("EXCO") and Shell Energy North America (US), L.P., as assignee and successor-in-interest of BG Energy Merchants, LLC, ("Shell Energy")

Dear Ms. Davies:

Please be advised that I am writing this letter on behalf of Raider Marketing LP, EXCO Resources, Inc. and EXCO Operating Company, LP (collectively, "EXCO").

This letter is sent to notify Shell that it is in default of the Contract. Pursuant to Sections 7.2 and 10.2(viii) of the Base Contract for Sale and Purchase of Natural Gas ("NAESB"), Shell is in default because it has failed to pay the amount of at least $16,140,608.757, which amount was for November gas sales, and was invoiced pursuant to the following five invoices, each dated December 8, 2017: (1) Enable Holly 2, (2) Holly 8, (3) Mansfield 12, (4) Shelby 16, and (5) Wildcat 21. The amounts referable to these invoices were due on or before December 26, 2017. In addition to this monetary default, Shell's written refusal to pay for EXCO's December sales of gas to Shell Energy and violations of Texas law, including, without limitation, Tex. Bus. & Comm. Code §§ 1.201(20) and 2.609, are further material breaches of and defaults under the Contract. Furthermore, insofar as the Contract is an Associated Agreement under Section 15.1 of the same, that certain Joint Development Agreement, dated August 14, 2009 ("JDA"), this also constitutes a default under Section 5.1 of the JDA.

This notice of default is without prejudice to EXCO asserting any other claims, rights, and remedies it may have against Shell Energy, all of which are expressly reserved.

If you should have any questions, please direct them in writing to the address above.

# EXHIBIT H

Sincerely,

Heather L. Lamparter
Vice President, General Counsel and Secretary
EXCO Resources, Inc.
12377 Merit Drive Suite 1700
Dallas, TX 75251
Office: 214-766-5744



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

Sales to:

Shell Energy NA Coral

Gas Accounting

909 Fannin - Plaza Level 1

Houston, TX 77010

ATTN:

Phone:

Fax:

Email: Venkatraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com; Arlandra.A.McClure@shell.com

| Invoice, Rev No.: | WILDCAT.10 |
|---|---|
| Invoice Date: | January 2, 2018 |
| Due Date: | January 25, 2018 |
| Prod. Month: | December , 2017 |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg.) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| Wildcat Midstream Caddo LLC | | Shell Wildcat Tiger PA Base | 12/1 | 12/31 | Nom | 420,000.00 | $2.958700 | $1,242,654.00 |
| Wildcat Midstream Caddo LLC | | Shell Wildcat Tiger PA Swing | 12/1 | 12/31 | Nom | 63,500.00 | $2.655354 | $168,614.98 |
| | | | | | Invoice Totals: | 483,500.00 | | $1,411,268.98 |
| | | | | | | ============ | | ============ |

REMIT PAYMENT TO:
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

**EXHIBIT I**

## INVOICE DETAILS

Prod. Month: December, 2017

Invoice, Rev No.: WILDCAT.10

**Facility:** Wildcat Midstream Caddo LLC   **Description:** Shell Wildcat Tiger PA Base                    Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15,000.00 | $2.9587 | 9 | 15,000.00 | $2.9587 | 17 | 15,000.00 | $2.9587 | 25 | 15,000.00 | $2.9587 |
| 2 | 15,000.00 | $2.9587 | 10 | 15,000.00 | $2.9587 | 18 | 15,000.00 | $2.9587 | 26 | 15,000.00 | $2.9587 |
| 3 | 15,000.00 | $2.9587 | 11 | 15,000.00 | $2.9587 | 19 | 15,000.00 | $2.9587 | 27 | 15,000.00 | $2.9587 |
| 4 | 15,000.00 | $2.9587 | 12 | 15,000.00 | $2.9587 | 20 | 15,000.00 | $2.9587 | 28 | 15,000.00 | $2.9587 |
| 5 | 15,000.00 | $2.9587 | 13 | 15,000.00 | $2.9587 | 21 | 15,000.00 | $2.9587 | 29 | 0.00 | $2.9587 |
| 6 | 15,000.00 | $2.9587 | 14 | 15,000.00 | $2.9587 | 22 | 15,000.00 | $2.9587 | 30 | 0.00 | $2.9587 |
| 7 | 15,000.00 | $2.9587 | 15 | 15,000.00 | $2.9587 | 23 | 15,000.00 | $2.9587 | 31 | 0.00 | $2.9587 |
| 8 | 15,000.00 | $2.9587 | 16 | 15,000.00 | $2.9587 | 24 | 15,000.00 | $2.9587 | | | |

420,000.00     $2.958700

$1,242,654.00

**Facility:** Wildcat Midstream Caddo LLC   **Description:** Shell Wildcat Tiger PA Swing                    Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2,500.00 | $2.8337 | 9 | 2,500.00 | $2.6637 | 17 | 2,500.00 | $2.5437 | 25 | 2,000.00 | $2.5187 |
| 2 | 2,500.00 | $2.7587 | 10 | 2,500.00 | $2.6637 | 18 | 2,500.00 | $2.5437 | 26 | 2,000.00 | $2.5187 |
| 3 | 2,500.00 | $2.7587 | 11 | 2,500.00 | $2.6637 | 19 | 2,500.00 | $2.6387 | 27 | 2,000.00 | $2.6187 |
| 4 | 2,500.00 | $2.7587 | 12 | 2,500.00 | $2.7287 | 20 | 2,000.00 | $2.6687 | 28 | 0.00 | $2.6837 |
| 5 | 2,500.00 | $2.7987 | 13 | 2,500.00 | $2.7137 | 21 | 2,000.00 | $2.5637 | 29 | 0.00 | $2.8987 |
| 6 | 2,500.00 | $2.7837 | 14 | 2,500.00 | $2.5887 | 22 | 2,000.00 | $2.4937 | 30 | 0.00 | $2.8987 |
| 7 | 2,500.00 | $2.8337 | 15 | 2,500.00 | $2.5887 | 23 | 2,000.00 | $2.5187 | 31 | 0.00 | $2.8987 |
| 8 | 2,500.00 | $2.7037 | 16 | 2,500.00 | $2.5437 | 24 | 2,000.00 | $2.5187 | | | |

63,500.00     $2.655354

$168,614.98

Invoice Transaction Total:                    $1,411,268.98



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

| Sales to: | | | | | | | | | Invoice, Rev No.: | | SPRINGRIDGE 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Shell Energy NA Coral | | | | | | | | | Invoice Date: | | January 2, 2018 |
| Gas Accounting | | | | | | | | | Due Date: | | January 25, 2018 |
| 909 Fannin - Plaza Level 1 | | | | | | | | | Prod. Month: | | December , 2017 |
| Houston, TX 77010 | | | | | | | | | | | |
| ATTN: | | | | | | | | | | | |
| Phone: | | | | | | | | | | | |
| Fax: | | | | | | | | | | | |
| Email: | Venkatraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com; Ariandra.A.McClure@shell.com | | | | | | | | | | |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| Magnolia Midstream Gas Services | | Shell Springridge Tiger PA Swing | 12/1 | 12/31 | Nom | 24,100.00 | $2.654355 | $63,969.96 |
| Magnolia Midstream Gas Services TIK | | Shell Springridge TIK Tiger PA Swing | 12/1 | 12/31 | Nom | 75,200.00 | $2.634744 | $198,132.75 |
| Magnolia Midstream Gas Services | | Shell JV Springridge Swing | 12/1 | 12/31 | Nom | 24,100.00 | $2.329310 | $56,136.37 |
| | | | | | **Invoice Totals:** | 123,400.00 | | $318,239.08 |

REMIT PAYMENT TO:
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

1/2/2018                    2:46:12 PM

## INVOICE DETAILS

**Prod. Month:** December, 2017

**Invoice, Rev No.:** SPRINGRIDGE 7

**Facility:** Magnolia Midstream Gas Services  **Description:** Shell Springridge Tiger PA Swing          **Prod. Month:** December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | $2.8337 | 9 | 850.00 | $2.6637 | 17 | 800.00 | $2.5437 | 25 | 900.00 | $2.5187 |
| 2 | 1,000.00 | $2.7587 | 10 | 850.00 | $2.6637 | 18 | 800.00 | $2.5437 | 26 | 900.00 | $2.5187 |
| 3 | 1,000.00 | $2.7587 | 11 | 850.00 | $2.6637 | 19 | 800.00 | $2.6387 | 27 | 900.00 | $2.6187 |
| 4 | 1,000.00 | $2.7587 | 12 | 850.00 | $2.7287 | 20 | 800.00 | $2.6687 | 28 | 0.00 | $2.6837 |
| 5 | 1,000.00 | $2.7987 | 13 | 850.00 | $2.7137 | 21 | 900.00 | $2.5637 | 29 | 0.00 | $2.8987 |
| 6 | 1,000.00 | $2.7837 | 14 | 850.00 | $2.5887 | 22 | 900.00 | $2.4937 | 30 | 0.00 | $2.8987 |
| 7 | 1,000.00 | $2.8337 | 15 | 850.00 | $2.5887 | 23 | 900.00 | $2.5187 | 31 | 0.00 | $2.8987 |
| 8 | 850.00 | $2.7037 | 16 | 800.00 | $2.5437 | 24 | 900.00 | $2.5187 | | 24,100.00 | $2.654355 |

============
$63,989.96

**Facility:** Magnolia Midstream Gas Services  **Description:** Shell Springridge TIK Tiger PA Swing          **Prod. Month:** December, 2017
TIK

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2,000.00 | $2.8337 | 9 | 3,000.00 | $2.6637 | 17 | 3,100.00 | $2.5437 | 25 | 3,100.00 | $2.5187 |
| 2 | 2,000.00 | $2.7587 | 10 | 3,000.00 | $2.6637 | 18 | 3,100.00 | $2.5437 | 26 | 3,100.00 | $2.5187 |
| 3 | 2,000.00 | $2.7587 | 11 | 3,000.00 | $2.6637 | 19 | 3,100.00 | $2.6387 | 27 | 3,100.00 | $2.6187 |
| 4 | 2,000.00 | $2.7587 | 12 | 3,000.00 | $2.7287 | 20 | 3,100.00 | $2.6687 | 28 | 0.00 | $2.6837 |
| 5 | 2,000.00 | $2.7987 | 13 | 3,000.00 | $2.7137 | 21 | 3,100.00 | $2.5637 | 29 | 0.00 | $2.8987 |
| 6 | 2,000.00 | $2.7837 | 14 | 3,000.00 | $2.5887 | 22 | 3,100.00 | $2.4937 | 30 | 0.00 | $2.8987 |
| 7 | 2,000.00 | $2.8337 | 15 | 3,000.00 | $2.5887 | 23 | 3,100.00 | $2.5187 | 31 | 0.00 | $2.8987 |
| 8 | 3,000.00 | $2.7037 | 16 | 3,100.00 | $2.5437 | 24 | 3,100.00 | $2.5187 | | 75,200.00 | $2.634744 |

============
$198,132.75

**Facility:** Magnolia Midstream Gas Services  **Description:** Shell JV Springridge Swing          **Prod. Month:** December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | $2.5167 | 9 | 850.00 | $2.3490 | 17 | 800.00 | $2.2136 | 25 | 900.00 | $2.1987 |
| 2 | 1,000.00 | $2.4297 | 10 | 850.00 | $2.3490 | 18 | 800.00 | $2.2136 | 26 | 900.00 | $2.1987 |
| 3 | 1,000.00 | $2.4297 | 11 | 850.00 | $2.3490 | 19 | 800.00 | $2.3167 | 27 | 900.00 | $2.2931 |
| 4 | 1,000.00 | $2.4297 | 12 | 850.00 | $2.4012 | 20 | 800.00 | $2.3353 | 28 | 0.00 | $2.3391 |
| 5 | 1,000.00 | $2.4645 | 13 | 850.00 | $2.3751 | 21 | 900.00 | $2.2633 | 29 | 0.00 | $2.5527 |
| 6 | 1,000.00 | $2.4533 | 14 | 850.00 | $2.2608 | 22 | 900.00 | $2.1652 | 30 | 0.00 | $2.5527 |
| 7 | 1,000.00 | $2.5055 | 15 | 850.00 | $2.2670 | 23 | 900.00 | $2.1987 | 31 | 0.00 | $2.5527 |
| 8 | 850.00 | $2.3751 | 16 | 800.00 | $2.2136 | 24 | 900.00 | $2.1987 | | 24,100.00 | $2.329310 |

============
$56,136.37

============
**Invoice Transaction Total:**          $318,239.08

1/2/2018                    2:46:12 PM



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

| Sales to: | | Invoice, Rev No.: | SHELBY .6 |
|---|---|---|---|
| Shell Energy NA Coral | | Invoice Date: | January 2, 2018 |
| Gas Accounting | | Due Date: | January 25, 2018 |
| 909 Fannin - Plaza Level 1 | | Prod. Month: | December , 2017 |
| Houston, TX 77010 | | | |
| ATTN: | | | |
| Phone: | | | |
| Fax: | | | |

Email:  Venkatraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com; Arlandra.A.McClure@shell.com

| Facility | Meter | Description | Start | End | Stat | Volume | Price(Avg) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| NGPL | | Shell Shelby Base | 12/1 | 12/31 | Nom | 644,000.00 | $2.900000 | $1,867,600.00 |
| NGPL | | Shell Shelby Swing | 12/1 | 12/31 | Nom | 328,000.00 | $2.592896 | $850,469.89 |
| | | | | | Invoice Totals: | 972,000.00 | | $2,718,069.89 |

REMIT PAYMENT TO:
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

1/2/2018                                   2:47:22 PM

**INVOICE DETAILS**

Prod. Month: December, 2017

Invoice, Rev No.: SHELBY.6

Facility: NGPL      Description: Shell Shelby Base      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|-----|-----|-------|-----|-----|-------|-----|-----|-------|-----|-----|-------|
| 1 | 23,000.00 | $2.9000 | 9 | 23,000.00 | $2.9000 | 17 | 23,000.00 | $2.9000 | 25 | 23,000.00 | $2.9000 |
| 2 | 23,000.00 | $2.9000 | 10 | 23,000.00 | $2.9000 | 18 | 23,000.00 | $2.9000 | 26 | 23,000.00 | $2.9000 |
| 3 | 23,000.00 | $2.9000 | 11 | 23,000.00 | $2.9000 | 19 | 23,000.00 | $2.9000 | 27 | 23,000.00 | $2.9000 |
| 4 | 23,000.00 | $2.9000 | 12 | 23,000.00 | $2.9000 | 20 | 23,000.00 | $2.9000 | 28 | 23,000.00 | $2.9000 |
| 5 | 23,000.00 | $2.9000 | 13 | 23,000.00 | $2.9000 | 21 | 23,000.00 | $2.9000 | 29 | 0.00 | $2.9000 |
| 6 | 23,000.00 | $2.9000 | 14 | 23,000.00 | $2.9000 | 22 | 23,000.00 | $2.9000 | 30 | 0.00 | $2.9000 |
| 7 | 23,000.00 | $2.9000 | 15 | 23,000.00 | $2.9000 | 23 | 23,000.00 | $2.9000 | 31 | 0.00 | $2.9000 |
| 8 | 23,000.00 | $2.9000 | 16 | 23,000.00 | $2.9000 | 24 | 23,000.00 | $2.9000 | | | |

644,000.00    $2.900000
==============
$1,867,600.00

Facility: NGPL      Description: Shell Shelby Swing      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|-----|-----|-------|-----|-----|-------|-----|-----|-------|-----|-----|-------|
| 1 | 12,000.00 | $2.7450 | 9 | 12,000.00 | $2.6050 | 17 | 12,000.00 | $2.4750 | 25 | 11,000.00 | $2.5150 |
| 2 | 12,000.00 | $2.6850 | 10 | 12,000.00 | $2.6050 | 18 | 12,000.00 | $2.4750 | 26 | 11,000.00 | $2.5150 |
| 3 | 12,000.00 | $2.6850 | 11 | 12,000.00 | $2.6050 | 19 | 12,000.00 | $2.5850 | 27 | 11,000.00 | $2.5550 |
| 4 | 12,000.00 | $2.6850 | 12 | 12,000.00 | $2.6550 | 20 | 12,000.00 | $2.5850 | 28 | 11,000.00 | $2.6350 |
| 5 | 12,000.00 | $2.7400 | 13 | 12,000.00 | $2.6000 | 21 | 12,000.00 | $2.5150 | 29 | 0.00 | $2.9100 |
| 6 | 12,000.00 | $2.7200 | 14 | 12,000.00 | $2.5200 | 22 | 10,000.00 | $2.4400 | 30 | 0.00 | $2.9100 |
| 7 | 12,000.00 | $2.7350 | 15 | 12,000.00 | $2.5250 | 23 | 11,000.00 | $2.5150 | 31 | 0.00 | $2.9100 |
| 8 | 12,000.00 | $2.6150 | 16 | 12,000.00 | $2.4750 | 24 | 11,000.00 | $2.5150 | | | |

328,000.00    $2.592896
==============
$850,469.89
==============

Invoice Transaction Total:      $2,718,069.89



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

| Sales to: | | Invoice, Rev No.: | MANSFIELD |
| Shell Energy NA Coral | | Invoice Date: | January 2, 2018 |
| Gas Accounting | | Due Date: | January 25, 2018 |
| 909 Fannin - Plaza Level 1 | | Prod. Month: | December , 2017 |
| Houston, TX 77010 | | | |
| ATTN: | | | |
| Phone: | | | |
| Fax: | | | |
| Email: | Venketraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com; Arlandra.A.McClure@shell.com | | |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| LA Midstream Gas Services | Mansfield | Shell Mansfield Tiger PA Swing | 12/1 | 12/31 | Nom | 722,000.00 | $2.653132 | $1,915,561.30 |
| LA Midstream Gas Services- TIK | Mansfield | Shell Mansfield TIK Tiger PA Swing | 12/1 | 12/31 | Nom | 61,300.00 | $2.648178 | $162,333.31 |
| LA Midstream Gas Services | Mansfield | Shell Mansfield Tiger PA Base | 12/1 | 12/31 | Nom | 1,064,000.00 | $2.958700 | $3,148,056.80 |
| | | | | | Invoice Totals: | 1,847,300.00 | | $5,225,951.41 |
| | | | | | | ============= | | ============= |

REMIT PAYMENT TO:
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888833356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

1/2/2018                    2:48:19 PM

**INVOICE DETAILS**

Prod. Month: December, 2017

Invoice, Rev No.: MANSFIELD

Facility: LA Midstream Gas Services   Description: Shell Mansfield Tiger PA Swing   Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 30,000.00 | $2.8337 | 9 | 28,000.00 | $2.6637 | 17 | 26,000.00 | $2.5437 | 25 | 26,000.00 | $2.5187 |
| 2 | 28,000.00 | $2.7587 | 10 | 28,000.00 | $2.6637 | 18 | 26,000.00 | $2.5437 | 26 | 26,000.00 | $2.5187 |
| 3 | 28,000.00 | $2.7587 | 11 | 28,000.00 | $2.6637 | 19 | 26,000.00 | $2.6387 | 27 | 26,000.00 | $2.6187 |
| 4 | 28,000.00 | $2.7587 | 12 | 28,000.00 | $2.7287 | 20 | 26,000.00 | $2.6687 | 28 | 0.00 | $2.6837 |
| 5 | 28,000.00 | $2.7987 | 13 | 24,000.00 | $2.7137 | 21 | 26,000.00 | $2.5637 | 29 | 0.00 | $2.8987 |
| 6 | 28,000.00 | $2.7837 | 14 | 24,000.00 | $2.5887 | 22 | 26,000.00 | $2.4937 | 30 | 0.00 | $2.8987 |
| 7 | 28,000.00 | $2.8337 | 15 | 24,000.00 | $2.5887 | 23 | 26,000.00 | $2.5187 | 31 | 0.00 | $2.8987 |
| 8 | 28,000.00 | $2.7037 | 16 | 26,000.00 | $2.5437 | 24 | 26,000.00 | $2.5187 | | | |

|  |  |  |  |  |  |  |  |  | 722,000.00 | $2.653132 |
| | | | | | | | | | | $1,915,561.30 |

Facility: LA Midstream Gas Services- TIK Description: Shell Mansfield TIK Tiger PA Swing   Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2,400.00 | $2.8337 | 9 | 2,000.00 | $2.6637 | 17 | 2,200.00 | $2.5437 | 25 | 2,500.00 | $2.5187 |
| 2 | 2,400.00 | $2.7587 | 10 | 2,000.00 | $2.6637 | 18 | 2,200.00 | $2.5437 | 26 | 2,500.00 | $2.5187 |
| 3 | 2,400.00 | $2.7587 | 11 | 2,000.00 | $2.6637 | 19 | 2,200.00 | $2.6387 | 27 | 2,500.00 | $2.6187 |
| 4 | 2,400.00 | $2.7587 | 12 | 2,000.00 | $2.7287 | 20 | 2,200.00 | $2.6687 | 28 | 0.00 | $2.6837 |
| 5 | 2,400.00 | $2.7987 | 13 | 2,000.00 | $2.7137 | 21 | 2,500.00 | $2.5637 | 29 | 0.00 | $2.8987 |
| 6 | 2,400.00 | $2.7837 | 14 | 2,000.00 | $2.5887 | 22 | 2,500.00 | $2.4937 | 30 | 0.00 | $2.8987 |
| 7 | 2,400.00 | $2.8337 | 15 | 2,000.00 | $2.5887 | 23 | 2,500.00 | $2.5187 | 31 | 0.00 | $2.8987 |
| 8 | 2,000.00 | $2.7037 | 16 | 2,200.00 | $2.5437 | 24 | 2,500.00 | $2.5187 | | | |

|  |  |  |  |  |  |  |  |  | 61,300.00 | $2.648178 |
| | | | | | | | | | | $162,333.31 |

Facility: LA Midstream Gas Services   Description: Shell Mansfield Tiger PA Base   Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 38,000.00 | $2.9587 | 9 | 38,000.00 | $2.9587 | 17 | 38,000.00 | $2.9587 | 25 | 38,000.00 | $2.9587 |
| 2 | 38,000.00 | $2.9587 | 10 | 38,000.00 | $2.9587 | 18 | 38,000.00 | $2.9587 | 26 | 38,000.00 | $2.9587 |
| 3 | 38,000.00 | $2.9587 | 11 | 38,000.00 | $2.9587 | 19 | 38,000.00 | $2.9587 | 27 | 38,000.00 | $2.9587 |
| 4 | 38,000.00 | $2.9587 | 12 | 38,000.00 | $2.9587 | 20 | 38,000.00 | $2.9587 | 28 | 38,000.00 | $2.9587 |
| 5 | 38,000.00 | $2.9587 | 13 | 38,000.00 | $2.9587 | 21 | 38,000.00 | $2.9587 | 29 | 0.00 | $2.9587 |
| 6 | 38,000.00 | $2.9587 | 14 | 38,000.00 | $2.9587 | 22 | 38,000.00 | $2.9587 | 30 | 0.00 | $2.9587 |
| 7 | 38,000.00 | $2.9587 | 15 | 38,000.00 | $2.9587 | 23 | 38,000.00 | $2.9587 | 31 | 0.00 | $2.9587 |
| 8 | 38,000.00 | $2.9587 | 16 | 38,000.00 | $2.9587 | 24 | 38,000.00 | $2.9587 | | | |

|  |  |  |  |  |  |  |  |  | 1,064,000.00 | $2.958700 |
| | | | | | | | | | | $3,148,056.80 |

Invoice Transaction Total: $5,225,951.41



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

### INVOICE FOR NATURAL GAS

| | |
|---|---|
| Sales to: | |
| Shell Energy NA Coral | |
| Gas Accounting | |
| 909 Fannin - Plaza Level 1 | |
| Houston, TX 77010 | |
| ATTN: | |
| Phone: | |
| Fax: | |
| Email: | Venkatraman.Kandan@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com; Arlandra.A.McClure@shell.com |

| | |
|---|---|
| Invoice, Rev No.: | ENABLE HOLLLY |
| Invoice Date: | January 2, 2018 |
| Due Date: | January 25, 2018 |
| Prod. Month: | December , 2017 |

| Ref(lo) | Meter | Description | Beg | End | Stat | Volume | Price (Avg) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| Enable Midstream Partners, LP TIK | | Shell Enable OP Swing | 12/1 | 12/31 | Nom | 131,500.00 | $2.649806 | $348,449.49 |
| | | | | | Invoice Totals: | 131,500.00 | | $348,449.49 |
| | | | | | | ============== | | ============== |

**REMIT PAYMENT TO:**
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

1/2/2018                    2:50:29 PM

**INVOICE DETAILS**

Prod. Month: December, 2017

Invoice, Rev No.: ENABLE HOLLLY

Facility: Enable Midstream Partners, LP    Description: Shell Enable OP Swing                    Prod. Month: December, 2017
TIK

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|-----|-----|-------|-----|-----|-------|-----|-----|-------|-----|-----|-------|
| 1 | 5,000.00 | $2.8650 | 9 | 4,500.00 | $2.6750 | 17 | 4,700.00 | $2.5350 | 25 | 4,600.00 | $2.5150 |
| 2 | 5,000.00 | $2.7600 | 10 | 4,500.00 | $2.6750 | 18 | 4,700.00 | $2.5350 | 26 | 4,600.00 | $2.5150 |
| 3 | 5,000.00 | $2.7600 | 11 | 4,500.00 | $2.6750 | 19 | 4,700.00 | $2.6300 | 27 | 4,600.00 | $2.6100 |
| 4 | 5,000.00 | $2.7600 | 12 | 4,500.00 | $2.7150 | 20 | 4,700.00 | $2.6500 | 28 | 4,600.00 | $2.6650 |
| 5 | 5,000.00 | $2.7900 | 13 | 4,500.00 | $2.6800 | 21 | 4,600.00 | $2.5700 | 29 | 0.00 | $2.8750 |
| 6 | 5,000.00 | $2.7800 | 14 | 4,500.00 | $2.6800 | 22 | 4,600.00 | $2.4900 | 30 | 0.00 | $2.8750 |
| 7 | 5,000.00 | $2.8350 | 15 | 4,700.00 | $2.5900 | 23 | 4,600.00 | $2.5150 | 31 | 0.00 | $2.8750 |
| 8 | 4,500.00 | $2.7000 | 16 | 4,700.00 | $2.5350 | 24 | 4,600.00 | $2.5150 | | | |

| | |
|---|---|
| 131,500.00 | $2.649806 |
| ================= | ================= |
| | $348,449.49 |
| | ================= |

Invoice Transaction Total:                    $348,449.49



**Raider Marketing, LP**
**a Subsidiary of EXCO Resources, Inc.**
12377 Merit Drive, Suite 1700 * Dallas, Texas 75251
Direct Line: (214) 438-1360 * Fax (214) 438-1401

INVOICE FOR NATURAL GAS

| | |
|---|---|
| Sales to: | |
| Shell Energy NA Coral | |
| Gas Accounting | |
| 909 Fannin - Plaza Level 1 | |
| Houston, TX 77010 | |
| ATTN: | |
| Phone: | |
| Fax: | |
| Email: | Venkatraman.Kanden@Shell.com; Evelyn.Kinney@shell.com; SENA.customersupport@shell.com; Mercedez.Livingston@shell.com; Ariandra.A.McClure@shell.com |

| | |
|---|---|
| Invoice, Rev No.: | HOLLY.73, REVISED |
| Invoice Date: | January 11, 2018 |
| Due Date: | January 25, 2018 |
| Prod. Month: | December , 2017 |

| Facility | Meter | Description | Start | End | Stat | Volume | Price (Avg.) | Invoice Amount |
|---|---|---|---|---|---|---|---|---|
| ETC Tiger Pipeline | Tiger | Tiger Demand Reimbursement | 12/1 | 12/28 | Cont | 0.00 | $0.000000 | $0.00 |
| | | Demand | | | | | -$10.9200 | -$1,092,000.00 |
| Acadian Gas P/L | | Shell Spot Holly Swing | 12/1 | 12/31 | Nom | 28,000.00 | $2.741250 | $76,765.00 |
| Acadian Gas P/L | | Shell Spot Holly Base | 12/1 | 12/31 | Nom | 420,000.00 | $2.948000 | $1,238,580.00 |
| Azure Midstream Holdings LLC | Holly-GS/Acadian/Tiger meters | Shell Holly JV Swing | 12/1 | 12/31 | Nom | 659,000.00 | $2.340950 | $1,542,686.05 |
| KinderHawk Field Services LLC - BHP TIK | | Shell Spot Greenwood Swing | 12/1 | 12/31 | Nom | 2,924.00 | $2.555253 | $7,471.56 |
| Azure Midstream Holdings LLC | Holly-GS/Acadian/Tiger meters | Shell Holly JV | 12/1 | 12/31 | Nom | 1,932,000.00 | $2.639650 | $5,099,603.80 |
| | | | | | **Invoice Totals:** | 3,041,924.00 | | $6,873,296.41 |

**REMIT PAYMENT TO:**
JPMorgan Chase
ABA #021000021
Acct. Name: Raider Marketing,LP.
Acct. # 888633356

Email us at:
BackOffice-Raider@raidermarketing.com for any questions
or contact information updates. Please confirm volumes
and dollars. Payment is due on the 25th of each month.

**INVOICE DETAILS**

Prod. Month: December, 2017      Invoice, Rev No.: HOLLY.73, REVISED

**Facility:** ETC Tiger Pipeline      **Description:** Tiger Demand Reimbursement      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0.00 | $4.6190 | 9 | 0.00 | $4.6190 | 17 | 0.00 | $4.6190 | 25 | 0.00 | $4.6190 |
| 2 | 0.00 | $4.6190 | 10 | 0.00 | $4.6190 | 18 | 0.00 | $4.6190 | 26 | 0.00 | $4.6190 |
| 3 | 0.00 | $4.6190 | 11 | 0.00 | $4.6190 | 19 | 0.00 | $4.6190 | 27 | 0.00 | $4.6190 |
| 4 | 0.00 | $4.6190 | 12 | 0.00 | $4.6190 | 20 | 0.00 | $4.6190 | 28 | 0.00 | $4.6190 |
| 5 | 0.00 | $4.6190 | 13 | 0.00 | $4.6190 | 21 | 0.00 | $4.6190 | 29 | | |
| 6 | 0.00 | $4.6190 | 14 | 0.00 | $4.6190 | 22 | 0.00 | $4.6190 | 30 | | |
| 7 | 0.00 | $4.6190 | 15 | 0.00 | $4.6190 | 23 | 0.00 | $4.6190 | 31 | | |
| 8 | 0.00 | $4.6190 | 16 | 0.00 | $4.6190 | 24 | 0.00 | $4.6190 | | | |

         0.00   $0.000000

         $0.00

**Facility:** Acadian Gas P/L      **Description:** Shell Spot Holly Swing      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7,000.00 | $2.8200 | 9 | 0.00 | $0.0000 | 17 | 0.00 | $0.0000 | 25 | 0.00 | $0.0000 |
| 2 | 7,000.00 | $2.7150 | 10 | 0.00 | $0.0000 | 18 | 0.00 | $0.0000 | 26 | 0.00 | $0.0000 |
| 3 | 7,000.00 | $2.7150 | 11 | 0.00 | $0.0000 | 19 | 0.00 | $0.0000 | 27 | 0.00 | $0.0000 |
| 4 | 7,000.00 | $2.7150 | 12 | 0.00 | $0.0000 | 20 | 0.00 | $0.0000 | 28 | 0.00 | $0.0000 |
| 5 | 0.00 | $0.0000 | 13 | 0.00 | $0.0000 | 21 | 0.00 | $0.0000 | 29 | 0.00 | $0.0000 |
| 6 | 0.00 | $0.0000 | 14 | 0.00 | $0.0000 | 22 | 0.00 | $0.0000 | 30 | 0.00 | $0.0000 |
| 7 | 0.00 | $0.0000 | 15 | 0.00 | $0.0000 | 23 | 0.00 | $0.0000 | 31 | 0.00 | $0.0000 |
| 8 | 0.00 | $0.0000 | 16 | 0.00 | $0.0000 | 24 | 0.00 | $0.0000 | | | |

         28,000.00   $2.741250

         $76,755.00

**Facility:** Acadian Gas P/L      **Description:** Shell Spot Holly Base      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15,000.00 | $2.9490 | 9 | 15,000.00 | $2.9490 | 17 | 15,000.00 | $2.9490 | 25 | 15,000.00 | $2.9490 |
| 2 | 15,000.00 | $2.9490 | 10 | 15,000.00 | $2.9490 | 18 | 15,000.00 | $2.9490 | 26 | 15,000.00 | $2.9490 |
| 3 | 15,000.00 | $2.9490 | 11 | 15,000.00 | $2.9490 | 19 | 15,000.00 | $2.9490 | 27 | 15,000.00 | $2.9490 |
| 4 | 15,000.00 | $2.9490 | 12 | 15,000.00 | $2.9490 | 20 | 15,000.00 | $2.9490 | 28 | 15,000.00 | $2.9490 |
| 5 | 15,000.00 | $2.9490 | 13 | 15,000.00 | $2.9490 | 21 | 15,000.00 | $2.9490 | 29 | 0.00 | $2.9490 |
| 6 | 15,000.00 | $2.9490 | 14 | 15,000.00 | $2.9490 | 22 | 15,000.00 | $2.9490 | 30 | 0.00 | $2.9490 |
| 7 | 15,000.00 | $2.9490 | 15 | 15,000.00 | $2.9490 | 23 | 15,000.00 | $2.9490 | 31 | 0.00 | $2.9490 |
| 8 | 15,000.00 | $2.9490 | 16 | 15,000.00 | $2.9490 | 24 | 15,000.00 | $2.9490 | | | |

         420,000.00   $2.949000

         $1,238,580.00

**Facility:** Azure Midstream Holdings LLC    **Description:** Shell Holly JV Swing      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 23,000.00 | $2.5167 | 9 | 33,000.00 | $2.3490 | 17 | 21,000.00 | $2.2136 | 25 | 18,000.00 | $2.1087 |
| 2 | 27,000.00 | $2.4297 | 10 | 33,000.00 | $2.3490 | 18 | 21,000.00 | $2.2136 | 26 | 18,000.00 | $2.1087 |
| 3 | 27,000.00 | $2.4297 | 11 | 33,000.00 | $2.3490 | 19 | 18,000.00 | $2.3167 | 27 | 18,000.00 | $2.2931 |
| 4 | 27,000.00 | $2.4297 | 12 | 22,000.00 | $2.4012 | 20 | 20,000.00 | $2.3353 | 28 | 18,000.00 | $2.3391 |
| 5 | 31,000.00 | $2.4645 | 13 | 20,000.00 | $2.3751 | 21 | 18,000.00 | $2.2533 | 29 | 0.00 | $2.5527 |
| 6 | 31,000.00 | $2.4533 | 14 | 19,000.00 | $2.2608 | 22 | 21,000.00 | $2.1652 | 30 | 0.00 | $2.5527 |
| 7 | 33,000.00 | $2.5055 | 15 | 19,000.00 | $2.2670 | 23 | 18,000.00 | $2.1987 | 31 | 0.00 | $2.5527 |
| 8 | 33,000.00 | $2.3751 | 16 | 21,000.00 | $2.2136 | 24 | 18,000.00 | $2.1987 | | | |

         659,000.00   $2.340950

         $1,542,686.05

**Facility:** KinderHawk Field Services LLC    **Description:** Shell Spot Greenwood Swing - BHP TIK      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 107.00 | $2.7350 | 9 | 107.00 | $2.5650 | 17 | 115.00 | $2.4450 | 25 | 90.00 | $2.4200 |
| 2 | 107.00 | $2.6600 | 10 | 107.00 | $2.5650 | 18 | 115.00 | $2.4450 | 26 | 90.00 | $2.4200 |
| 3 | 107.00 | $2.6600 | 11 | 107.00 | $2.5650 | 19 | 115.00 | $2.5400 | 27 | 90.00 | $2.5200 |
| 4 | 107.00 | $2.6600 | 12 | 107.00 | $2.6300 | 20 | 115.00 | $2.5700 | 28 | 90.00 | $2.6850 |
| 5 | 107.00 | $2.7000 | 13 | 115.00 | $2.6150 | 21 | 90.00 | $2.4650 | 29 | 0.00 | $2.8000 |
| 6 | 107.00 | $2.6850 | 14 | 115.00 | $2.4900 | 22 | 90.00 | $2.3950 | 30 | 0.00 | $2.8000 |
| 7 | 107.00 | $2.7350 | 15 | 115.00 | $2.4900 | 23 | 90.00 | $2.4200 | 31 | 0.00 | $2.8000 |
| 8 | 107.00 | $2.6050 | 16 | 115.00 | $2.4450 | 24 | 90.00 | $2.4200 | | | |

         2,924.00   $2.555253

         $7,471.56

**Facility:** Azure Midstream Holdings LLC    **Description:** Shell Holly JV      Prod. Month: December, 2017

| Day | Vol | Price | Day | Vol | Price | Day | Vol | Price | Day | Vol | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 69,000.00 | $2.6397 | 9 | 69,000.00 | $2.6397 | 17 | 69,000.00 | $2.6397 | 25 | 69,000.00 | $2.6397 |
| 2 | 69,000.00 | $2.6397 | 10 | 69,000.00 | $2.6397 | 18 | 69,000.00 | $2.6397 | 26 | 69,000.00 | $2.6397 |
| 3 | 69,000.00 | $2.6397 | 11 | 69,000.00 | $2.6397 | 19 | 69,000.00 | $2.6397 | 27 | 69,000.00 | $2.6397 |
| 4 | 69,000.00 | $2.6397 | 12 | 69,000.00 | $2.6397 | 20 | 69,000.00 | $2.6397 | 28 | 69,000.00 | $2.6397 |
| 5 | 69,000.00 | $2.6397 | 13 | 69,000.00 | $2.6397 | 21 | 69,000.00 | $2.6397 | 29 | 0.00 | $2.6397 |
| 6 | 69,000.00 | $2.6397 | 14 | 69,000.00 | $2.6397 | 22 | 69,000.00 | $2.6397 | 30 | 0.00 | $2.6397 |
| 7 | 69,000.00 | $2.6397 | 15 | 69,000.00 | $2.6397 | 23 | 69,000.00 | $2.6397 | 31 | 0.00 | $2.6397 |
| 8 | 69,000.00 | $2.6397 | 16 | 69,000.00 | $2.6397 | 24 | 69,000.00 | $2.6397 | | | |

|  |  |
|---|---|
| 1,932,000.00 | $2.639650 |
| | $5,098,803.80 |

Invoice Transaction Total: $7,965,296.41



Shell Energy North America (US), L.P.
One Thousand Main
1000 Main Street, Level 12
Houston, TX 77002
Tel +1 713-767-5344
www.shell.com

December 22, 2017

Raider Marketing, LP
c/o EXCO Resources, Inc.
Attn: Becky Lopez
*Via Facsmile:* (214) 438-1401
*Via E-mail:* blopez@EXCOResources.com

**ADEQUATE ASSURANCE OF PERFORMANCE**

Re:    Base Contract for Sale and Purchase of Natural Gas, dated August 14, 2009, as amended, and any Transaction Confirmations thereunder, including, but not limited to, that certain Transaction Confirmation dated and effective as of July 9, 2010, as amended (collectively, the "Contract") between Raider Marketing, LP, as successor-in-interest to EXCO Operating Company, LP ("Exco") and Shell Energy North America (US), L.P. (as assignee of BG Energy Merchants, LLC) ("Shell Energy")

To Whom It May Concern:

As you know, Exco has publicly announced that it may seek bankruptcy protection or otherwise need to restructure its debt obligations in the coming days or weeks (as reported in Exco's recent press releases and in filings made by Exco with the United States Securities and Exchange Commission).

While Shell Energy values its relationship with Exco and wishes to continue doing business with Exco on mutually agreeable terms, Shell Energy has reasonable grounds for insecurity regarding Exco's ability to perform its obligations under the Contract including the ongoing gas deliveries to Shell Energy and the payment of all amounts owing to Shell Energy, including, without limitation, with respect to the Fixed Payment (as defined in that certain Transaction Confirmation dated and effective as of July 9, 2010).

Therefore, Shell Energy is hereby requesting, pursuant to the above referenced Contract, Adequate Assurance of Performance (as defined in Section 10.1 of the Contract) in the

# EXHIBIT J

amount of **Forty-Four Million Three Hundred and Fifty-Three Thousand One Hundred and Forty Dollars ($44,353,140.00).**

The form of Adequate Assurance of Performance to be provided is cash to be wired to Shell Energy using the following instructions (Account No. 30603902, ABA Routing No. 021000089, Citibank, N.A., 111 Wall Street, New York City, NY 10043, Tax I.D. No. 76-0480645. Please note: If payment is via ACH method, please adjust your payment setup to insure payment is credited to Shell Energy's account on due date.), or an irrevocable standby letter of credit in substantially similar form as that attached hereto as Schedule A issued by a Qualified Institution (as defined below), which letter of credit is to be delivered to the following address:

Shell Energy North America (US), L.P.
1000 Main Street, Level 12
Houston, Texas 77002
Attn: Credit Manager

"Qualified Institution" means (i) the U.S. office of a commercial bank or trust company (that is not an affiliate of either Party) organized under the laws of the United States (or any state or a political subdivision thereof), or (ii) the U.S. branch of a foreign bank (that is not an affiliate of either Party), in each case having assets of at least ten billion dollars ($10,000,000,000), and having Credit Ratings of at least A3 by Moody's and at least A- by S & P.

If such Adequate Assurance of Performance is not received by Shell Energy by December 26, 2017, Shell Energy will suspend and withhold the payments otherwise due to Exco as of December 26, 2017 in accordance with its rights including Section 10.2 of the Contract.   Due to the holidays and Shell Energy's desire to reach a mutually agreeable solution and assuming there are no further developments or changes with respect to Exco's financial status, Shell Energy does not intend to take any other steps based on the failure to provide Adequate Assurance of Performance besides withholding the payments until Exco and Shell Energy can further discuss the issues.

This letter is without prejudice to, and Shell Energy hereby reserves, all rights and remedies available under the Contract, at law, or in equity.

Please contact Eric Reese at 713-230-4067 or eric.w.reese@shell.com or Jo Anne Apilado at Jo-Anne.Apilado@shell.com upon receipt of this notification.   We look forward to hearing from you.

Sincerely,

**Shell Energy North America (US), L.P.**

By: _____

Printed Name: Jill Davles

Title: SVP Shell Enrgy North America

Schedule A

FORM OF IRREVOCABLE STANDBY LETTER OF CREDIT

IRREVOCABLE STANDBY L/C NO.: _____

Issued in _____ on _____, 20___

BENEFICIARY:
    **Shell Energy North America (US), L.P.**
    1000 Main Street, Level 12
    Houston, TX 77002

APPLICANT:
    _____
    _____
    _____
    _____

AMOUNT:
    USD $_____
    _____ Million and no/100 U.S. Dollars

EXPIRY DATE:
    The close of business on _____, 20___

We hereby establish our Irrevocable Standby Letter of Credit in favor of **Shell Energy North America (US), L.P.** (hereinafter referred to as "Beneficiary") for the account of:

    _____
    _____
    _____
    _____

For an aggregate amount of _____ Million and no/100 U.S. Dollars (USD _____) available at [Bank's address] _____, by payment against your drafts at sight (in the form attached hereto as Exhibit A) to be accompanied by either:

(i) a signed statement by a purportedly authorized representative of Beneficiary that the amount drawn under this Letter of Credit represents an amount due and owing to Beneficiary and unpaid by [_____] under the terms of one or more

agreements and/or confirmations for natural gas (collectively, the "Agreements") between [_____] and Beneficiary, or

(ii) a signed statement by a purportedly authorized representative of Beneficiary that (a) [_____] has contractual obligations to Beneficiary which extend beyond the expiration date of this Letter of Credit, and (b) [_____] has not provided a substitute letter of credit prior to ten (10) business days before the expiration date of this Letter of Credit, and (c) Beneficiary is therefore drawing upon this Letter of Credit and will hold the proceeds as collateral in accordance with the Agreements.

Presentation of a draft and statement may also be made by fax transmission to fax no. _____.   It is not necessary to present the original Letter of Credit in connection with any drawing hereunder.

This Letter of Credit may not be amended, changed or modified without the express written consent of Applicant, Beneficiary and us; provided, however, the amount available for drawing under this Letter of Credit may be reduced from time to time by written instructions to us executed by both Applicant and Beneficiary.

Except as otherwise stated, this Letter of Credit is subject to the International Standby Practices (ISP98) and the laws of the State of New York.

We will be responsible for the acts and omissions of our branches, agencies or other offices.  In the event this Letter of Credit is stolen, lost, mutilated or destroyed, we will issue a replacement Letter of Credit (marked as such) provided we have received indemnities and assurances from Beneficiary satisfactory to us with respect to the original Letter of Credit.

Beneficiary's drawing rights under this Letter of Credit are fully transferable in their entirety and we are bound to transfer such drawing rights except where doing so would violate any applicable law or regulation. It shall not be necessary to present the original of the Letter of Credit in connection with such a transfer.

We engage with you that drafts drawn and presented under and in compliance with the terms of this credit will be duly honored.

Reimbursement instructions: Payment to be effected per your instructions against conforming documents presented at our counters or by fax transmission.

Sincerely,

**[NAME OF BANK]**

_____
Authorized Signature(s)

Contact Name: _____
Telephone:_____
Fax:_____

EXHIBIT A

SIGHT DRAFT FOR PAYMENT DRAWN
LETTER OF CREDIT NO. _____

Date: _____

TO:      **[insert Bank information]**
         _____
         _____
         _____

         Attn:  Letter of Credit Department


PAY AT SIGHT TO: the order of **Shell Energy North America (US), L.P.** the sum of _____ Million and no/100 U.S. Dollars (USD _____).

                         **Shell Energy North America (US), L.P.**


                         By: _____
                         Name: _____
                         Title: _____


Drawn under Irrevocable Letter of Credit No. _____ dated _____
issued by _____.

Form 8-K

8-K 1 d644828d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

**Date of report (Date of earliest event reported): January 15, 2018**

# EXCO RESOURCES, INC.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Texas** | **001-32743** | **74-1492779** |
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **12377 Merit Drive** | |
| **Suite 1700** | |
| **Dallas, Texas** | **75251** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (214) 368-2084**

**Not Applicable.**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter)

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

# EXHIBIT K

Form 8-K

### Item 1.03.    Bankruptcy or Receivership.

*Voluntary Petition for Reorganization*

On January 15, 2018, EXCO Resources, Inc. (the "Company") and certain of its subsidiaries, including EXCO Services, Inc., EXCO Partners GP, LLC, EXCO GP Partners OLP, LP, EXCO Partners OLP GP, LLC, EXCO Operating Company, LP, EXCO Midcontinent MLP, LLC, EXCO Holding (Pa), Inc., EXCO Production Company (PA), LLC, EXCO Resources (XA), LLC, EXCO Production (WV), LLC, EXCO Land Company, LLC, EXCO Holding MLP, Inc., Raider Marketing, LP, Raider Marketing GP, LLC (collectively, the "Filing Subsidiaries" and, together with the Company, the "Debtors"), filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors have filed a motion with the Court seeking joint administration of their Chapter 11 cases under the caption *In Re EXCO Resources, Inc., Case No. 18-30155 (MI)*.

The Debtors have filed motions with the Court seeking authorization to continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.

### Item 2.04.    Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement.

The filing of the Bankruptcy Petitions described in Item 1.03 above constitutes an event of default that accelerated the Company's obligations under the following debt instruments (collectively the "Debt Instruments"):

- The Company's Reserve-Based Revolving First Lien Credit Facility, under that certain Amended and Restated Credit Agreement, dated as of July 31, 2013, among the Company, the guarantors party thereto and JPMorgan Chase Bank, as administrative agent;

- The Company's 7.500% Senior Notes due 2018 and its 8.500% Senior Notes due 2022, issued pursuant to that certain Indenture, dated September 15, 2010 among the Company, the guarantors party thereto and Wilmington Savings Fund Society, FSB, as trustee;

- The Company's 8.0% / 11.0% 1.5 Lien Senior Secured PIK Toggle Notes due 2022, issued pursuant to that certain Indenture, dated March 15, 2017, among the Company, the guarantors party thereto and Wilmington Trust, National Association, as trustee and collateral trustee; and

- The Company's 1.75 Lien Term Loan Facility, pursuant to that certain Credit Agreement, dated March 15, 2017, by and among the Company, the guarantors party thereto and Wilmington Trust, National Association as administrative agent and collateral trustee.

On January 15, 2018, the Company issued a press release announcing the filing of the Chapter 11 Cases. A copy of the press release is attached hereto as Exhibit 99.1 and incorporated herein by reference.

The Debt Instruments provide that as a result of the Bankruptcy Petitions the principal and interest due thereunder shall be immediately due and payable. Any efforts to enforce such payment obligations under the Debt Instruments are automatically stayed as a result of the Bankruptcy Petitions, and the creditors' rights of enforcement in respect of the Debt Instruments are subject to the applicable provisions of the Bankruptcy Code.

Form 8-K

Item 7.01.        Regulation FD Disclosure.

On November 9, 2017, the Company entered into a confidentiality agreement (the "NDA") and commenced discussions with legal and financial advisors (the "Advisors") for certain holders (the "Holders") of the Company's 1.5 Lien Senior Secured Notes and 1.75 Lien Term Loans regarding the possibility of a potential financing, recapitalization, material asset or equity sale, reorganization and/or restructuring transaction or series of such transactions or alternative transactions for the Company. Subsequent to the dates of the execution of the confidentiality agreement, the Advisors (i) conducted due diligence on the Company and (ii) engaged in discussions with the Company and its advisors. Pursuant to the NDA, a public disclosure of all material non-public information provided to the Holders is required as of the date that the Company commences a case under Chapter 11 of the Bankruptcy Code.

Following entry into the NDA, the Company and the Holders engaged in discussions regarding potential restructuring transactions, including potential sales of certain assets of the Company. On several occasions in late 2017, the Advisors provided the Holders with certain presentation materials regarding the Company's assets, historical and projected business plans and other background information (the "Presentation Materials"), which are attached as Exhibit 99.2 hereto. The Presentation Materials included certain projections and forecasts of the Company. The descriptions in this Form 8-K of the Presentation Materials do not purport to be complete and are qualified in their entirety by reference to the complete text of the Presentation Materials attached as Exhibit 99.2 hereto.

In addition, on January 16, 2018, the Company distributed certain non-public information with respect to its assets (the "Asset Summary") to potential interested parties in connection with a marketing process for a sale of certain of the Company's assets, which materials are attached as Exhibit 99.3. The descriptions in this Form 8-K of the Asset Summary do not purport to be complete and are qualified in their entirety by reference to the complete text of the Asset Summary attached hereto as Exhibit 99.3.

The information in the Presentation Materials and the Asset Summary is dependent upon assumptions with respect to commodity prices, production, development capital, exploration capital, operating expenses, availability and cost of capital and performance as set forth in the Presentation Materials and the Asset Summary. Any financial projections or forecasts included in the Presentation Materials and the Asset Summary were not prepared with a view toward public disclosure or compliance with the published guidelines of the Securities and Exchange Commission or the guidelines established by the American Institute of Certified Public Accountants regarding projections or forecasts. The projections do not purport to present the Company's financial condition in accordance with accounting principles generally accepted in the United States. The Company's independent accountants have not examined, compiled or otherwise applied procedures to the projections and, accordingly, do not express an opinion or any other form of assurance with respect to the projections. The inclusion of the projections herein should not be regarded as an indication that the Company or its representatives consider the projections to be a reliable prediction of future events, and the projections should not be relied upon as such. Neither the Company nor any of its representatives has made or makes any representation to any person regarding the ultimate outcome of the Company's proposed restructuring compared to the projections, and none of them undertakes any obligation to publicly update the projections to reflect circumstances existing after the date when the projections were made or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying the projections are shown to be in error.

The information included in this Form 8-K under Item 7.01 and 99.2 and 99.3 attached hereto is being furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to liabilities of that Section, unless the registrant specifically states that the information is to be considered "filed" under the Exchange Act or incorporates it by reference into a filing under the Exchange Act or the Securities Act of 1933, as amended.

Form 8-K

Item 9.01.        **Financial Statements and Exhibits.**

The exhibits listed below are filed herewith.

(d) Exhibits.

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
| --- | --- |
| 99.1 | Press Release, dated January 15, 2018. |
| 99.2 | Presentation Materials. |
| 99.3 | Asset Summary. |

Form 8-K

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

EXCO RESOURCES, INC.

Date: January 16, 2018

By:      /s/ Heather L. Lamparter
Name:  Heather L. Lamparter
Title:   Vice President, General Counsel and Secretary



Shell Energy North America (US), L.P.
One Thousand Main
1000 Main Street, Level 12
Houston, TX 77002
Tel +1 713-767-5344
www.shell.com

December 26, 2017

Raider Marketing, LP
c/o EXCO Resources, Inc.
Attn: Becky Lopez
*Via Facsmile:* (214) 438-1401
*Via E-mail:* blopez@EXCOResources.com

### DEFAULT AND TERMINATION NOTICE

Re:     Base Contract for Sale and Purchase of Natural Gas, dated August 14, 2009, as amended, and any Transaction Confirmations thereunder, including, but not limited to, that certain Transaction Confirmation dated and effective as of July 9, 2010, as amended (collectively, the "Contract") between Raider Marketing, LP, as successor-in-interest to EXCO Operating Company, LP ("Exco") and Shell Energy North America (US), L.P. (as assignee of BG Energy Merchants, LLC) ("Shell Energy")

To Whom It May Concern:

Reference is made to that certain letter of Shell Energy dated and delivered to Exco December 22, 2017, wherein Shell Energy requested that Exco timely provide Adequate Assurance of Performance (as defined in the Contract) pursuant to Section 10.1 of the Contract ("Adequate Assurance Letter") and the further correspondence received from Exco whereby Exco is refusing to provide Adequate Assurance of Performance or otherwise entertain discussions regarding a mutually agreeable resolution.   Please also note that Shell Energy's Adequate Assurance Letter was made pursuant to the express terms of the Contract and was not based on any rights under the U.C.C.

Shell Energy hereby notifies you that Exco is in default of the Contract, as a result of its failure to timely satisfy Shell Energy's request for Adequate Assurance of Performance (as defined in the Contract) pursuant to its Adequate Assurance Letter.   Such failure constitutes an Event of Default (as defined in the Contract), pursuant to Section 10.2(vii) of the Contract.   In addition, upon information and belief, Exco is in default of the

# EXHIBIT L

Contract and Transaction Confirmation by virtue of its "defaults under a material credit agreement" as described in Exco's own press releases.

Consequently, in accordance with its rights under Section 10.3 of the Contract and under the Transaction Confirmation, Shell Energy hereby effective immediately (i) withholds and suspends the payments otherwise due to be paid by Shell Energy (including the payment otherwise due today) and any other performance obligations by Shell Energy under the Contract; and (ii) accelerates all Fixed Payments that would otherwise be due to be paid by Exco to Shell Energy during the remainder of the Delivery Period. The Accelerated Amount is $43,914,000 as calculated pursuant to the formula contained in the Transaction Confirmation. This amount correlates to the amount of Adequate Assurance of Performance that had been requested by Shell Energy.

In addition to the foregoing, Shell Energy hereby terminates all Transaction Confirmations (as defined in the Contract) between it and Exco under the Contract, **effective as of the earlier of the date Exco files a petition for relief under Title 11 of the United States Code (the "Bankruptcy Code") or twenty (20) days from the date hereof at 11:59:59 pm, Houston time,** which date will be the Early Termination Date (as defined in the Contract) for all such Transaction Confirmations. Any termination resulting from any such petition for relief by Exco shall be pursuant to the Bankruptcy Code (including without limitation 11 U.S.C. §§ 362(b)(6) and 556).

Shell Energy intends to separately calculate the single Net Settlement Amount (as defined in the Contract) as provided under Section 10.3.2 of the Contract and provide notice of such amount as contemplated by Section 10.4 of the Contract.

This letter is without prejudice to, and Shell Energy hereby reserves, all rights and remedies available under the Contract, at law, or in equity.

Please contact Russ Miller at Russel.Miller@shell.com if you have any questions concerning this notice.


Sincerely,

**Shell Energy North America (US), L.P.**


By: _____

Printed Name: JILL DAVIES
Title: SVP POWER TRADING.
Shell Energy North America

Raider Marketing, L.P. and
EXCO Operating Company, LP,
Affiliates of EXCO Resources, Inc.
12377 Merit Drive, Suite 1700
Dallas, Texas 75251
(214) 706-3348 (Phone)
(214) 438-1401 (Fax)

December 26, 2017

Jill Davies
SVP Shell Energy North America (US), L.P.
1000 Main Street, Level 12
Houston, TX 77002
(713) 767-5414 (Fax)
(713) 265-1718 (Fax)
Jill.Davies@Shell.com

Re:   Base Contract for Sale and Purchase of Natural Gas, dated August 14, 2009, as amended, and any
Transaction Confirmations thereunder, including, but not limited to, that certain Transaction
Confirmation dated and effective as July 9, 2010, as amended (collectively, the "Contract") between
Raider Marketing, LP, as successor-in-interest to EXCO Operating Company, LP ("EXCO") and Shell
Energy North America (US), L.P., as assignee and successor-in-interest of BG Energy Merchants, LLC,
("Shell Energy")

Dear Ms. Davies:

Please be advised that I am writing this letter on behalf of Raider Marketing LP, EXCO Resources, Inc.
and EXCO Operating Company, LP (collectively, "EXCO") in response to your December 22, 2017 request for
adequate assurances.

As you know, the above-referenced Transaction Confirmation controls in the event of a conflict with the
Base Contract for Sale and Purchase of Natural Gas (NAESB), including Sections 10.1 and 10.2 thereof. For at
least the following reasons, your request is unreasonable, unjustified under the parties' Contract and under
Texas law, and not in good faith: (1) Shell Energy has materially breached the Contract by failing to pay
$16,140,608.75, which sum has been invoiced for November gas deliveries and is currently due and owing; (2)
your December 22nd letter fails to provide any sort of calculation for the approximately $44 million figure cited
therein, and to the extent you are referencing the Accelerated Amount under the Transaction Confirmation,
there has never been an Acceleration Notice (as defined therein) provided to EXCO, nor could there be, because
EXCO is admittedly not in default (monetary or otherwise) of any obligation to Shell Energy, and (3) Texas law
is relatively straightforward respecting adequate assurances. At a minimum, no such demand can be made due
to the fact that you have already received the "agreed return" of the November and December gas sales under
the Contract. *See* TEX. BUS & COMM CODE § 2.609.  This response is without prejudice to EXCO asserting any
claims, rights, and remedies it may have against Shell Energy, all of which are expressly reserved.

If you should have any questions, please direct them in writing to the address above.

# EXHIBIT M

Sincerely,

Heather L. Lamparter
Vice President, General Counsel and Secretary
EXCO Resources, Inc.
12377 Merit Drive Suite 1700
Dallas, TX 75251
Office: 214-766-5744