

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
04/22/2020

| | | |
|---|---|---|
| IN RE: | § | |
| **EXCO SERVICES, INC.** | § | **CASE NO: 18-30167** |
| | § | |
| **EXCO RESOURCES, INC.,** *et al* | § | **CASE NO: 18-30155** |
| | § | **Jointly Administered Order** |
| **Debtors** | § | |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION

EXCO Operating Company, L.P. ("EXCO"),[1] along with Admiral A Holding L.P., TE Admiral A Holding L.P., and Colt Admiral A Holding L.P. (collectively, "Admiral"), are parties to two joint operating agreements for certain oil and gas assets.  EXCO intends to assume both operating agreements following confirmation of its Chapter 11 plan.  Admiral filed a motion to determine the cure amount for alleged breaches of the operating agreements.  The parties filed motions for summary judgment on the limited issue of whether the operating agreements permit EXCO to charge marketing fees.

This dispute centers around whether EXCO properly charged Admiral for marketing oil and gas production.  EXCO and Admiral jointly held interests in certain oil and gas wells.  Production from those wells was originally dedicated to Chesapeake Energy.  Admiral argues that EXCO could not deduct marketing fees from Admiral's share of production proceeds as long as that dedication remained in place.  EXCO believes its joint operating agreements with Admiral required it to market production.

---

[1] EXCO Operating Company, L.P. is one of a number of Reorganized Debtors in this case.  The other Reorganized Debtors include: EXCO Resources, Inc.; EXCO GP Partners Old, L.P.; EXCO Holdings (PA), Inc.; EXCO Holding MLP, Inc.; EXCO Land Company, LLC; EXCO Midcontinent MLP, LLC; EXCO Operating Company, L.P.; EXCO Partners GP, LLC; EXCO Partners OLP GP, LLC; EXCO Production Company (PA), LLC; EXCO Production Company (WV), LLC; EXCO Resources (XA), LLC; EXCO Services, Inc.; Raider Marketing GP, LLC; and Raider Marketing L.P.

The joint operating agreements make EXCO's marketing rights subject to EXCO's existing marketing agreements with Chesapeake. The central question before the Court is whether the marketing agreements between EXCO and Chesapeake allowed EXCO to charge a marketing fee. The answer depends on EXCO's marketing of oil over which Chesapeake had a right of first refusal. The summary judgment record fails to deal with this factual issue. Summary judgment is denied.

## BACKGROUND

EXCO acquired interests in oil and gas assets from Chesapeake Exploration, LLC ("Chesapeake") in July 2013. EXCO and Admiral entered Joint Operating Agreements ("JOAs"), dated July 25, 2016 and August 9, 2016, covering wells which EXCO acquired from Chesapeake, located in Zavala and Frio County, Texas. (ECF No. 238 at 3). The parties refer to the former agreement as the "Settlement JOA," and the latter as the "Subject Well JOA." (ECF No. 212 at 4). The provisions of the two JOAs are substantially similar. (ECF No. 211 at 4). Pursuant to the JOAs, EXCO is the operator of the wells and Admiral is the non-operating working interest owner. (ECF No. 238 at 3).

Following EXCO's original purchase of the assets, EXCO entered into two separate agreements to sell the production from the wells back to Chesapeake. (ECF No. 238 at 4). The "Chesapeake Oil Contract" called for the sale of oil production from EXCO to Chesapeake Energy Marketing, Inc. ("CEMI"). (ECF No. 238 at 4). Transaction Confirmation No. 7, "related to an underlying Base Contract for Sale and Purchase of Natural Gas," also known as the "Chesapeake Gas Contract," arranged for the sale of natural gas production to CEMI. (ECF No. 238 at 4).

The Chesapeake Oil Contract required CEMI to purchase the oil produced from the wells assigned to EXCO for an original term of one year.  (ECF No. 238 at 4).  The original term expired on July 31, 2014.  (ECF No. 238 at 4).  After the expiration of the original term, the Chesapeake Oil Contract renewed annually for twelve more years, subject to CEMI's right of first refusal.  (ECF No. 238 at 5).  The Chesapeake Oil Contract granted CEMI "a preferential right to continue purchasing the subject production . . . by matching any bona fide third party written purchase offer received by EXCO."  (ECF No. 211, Ex. 6 at 1).

EXCO argues that at the conclusion of each year, it was required to solicit bids for the following year's oil production, which Chesapeake could then match.  (ECF No. 238 at 5).  EXCO claims, but Admiral does not concede, that since August 2016 Chesapeake has purchased all oil delivered by pipeline, but not the portion of oil delivered via truck.  (ECF No. 238 at 5).  Because Chesapeake supposedly declined its right of first refusal on the trucked oil, EXCO was required to market and sell the trucked oil to third parties.  (ECF No. 238 at 5).  It is unclear how much oil was delivered by truck or what percentage of the total production was delivered by truck.

According to EXCO, the gas production was sold to Chesapeake at a loss until December 2017.  (ECF No. 238 at 5).  Since then, all gas production has been flared.  As such, there have not been proceeds from gas production, and EXCO claims it never charged Admiral a marketing fee for natural gas.  (ECF No. 238 at 5).

EXCO formed Raider Marketing in August 2016 to serve as a marketing affiliate.  (ECF No. 238 at 3).  Shortly thereafter, EXCO entered into a Marketing Services Agreement with Raider to market oil and gas produced from the EXCO-Admiral leases.  (ECF No. 238 at 3).  The Marketing Services Agreement provides a three percent marketing fee for Raider's services.

(ECF No. 238 at 3).  EXCO pays its share of the marketing fee in proportion with its ownership interest.  (ECF No. 238 at 3).  EXCO claims that both itself and Admiral receive the same price for production after deduction of the marketing fee.  (ECF No. 238 at 4).

EXCO proposes to assume both of the JOAs with Admiral.  (ECF No. 211 at 2).   If EXCO's marketing arrangement with Raider breached the JOAs, Admiral is entitled to cure payments in conjunction with EXCO's assumption of those contracts.  (ECF No. 211 at 3).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  FED. R. BANK. P. 7056 incorporates FED. R. CIV. P. 56 in adversary proceedings.  A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).  A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party.  *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times.  *Ben-Levi v. Brown*, 136 S. Ct. 930 (2016).  Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence.  *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012).   "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence."  *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*,

136 S. Ct. 1715 (2016).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Wheat v. Fla Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2). Moreover, the Court is not bound to search the record for the non-moving party's evidence of material issues. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322–24. The

non-moving party must cite to specific evidence demonstrating a genuine dispute.  FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324.  The non-moving party must also "articulate the manner in which that evidence supports that party's claim."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  Even if the movant meets its initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

**DISCUSSION**

The JOAs dictate whether EXCO may deduct Raider's marketing fee from Admiral's share of sales proceeds.  Articles I through XV of the Joint Operating Agreement come from a form operating agreement.  Article XVI contains specific provisions negotiated between EXCO and Admiral.  Both parties agree that provisions of Article XVI control over the general form provisions of Articles I-XV.  (*See* ECF No. 211, Ex. 3 at 27).  Article XVI.Y governs marketing and states, in relevant part, that:

> Subject to [EXCO's] obligations under the Existing Marketing Agreements with respect to its and [Admiral's] share of Oil and Gas that is produced from the Leases, [EXCO] shall market (or cause to be marketed) all of [Admiral's] share of such Oil and Gas in good faith consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.  Without limitation of the foregoing, the weighted average price paid to [Admiral] for its share of Oil and Gas produced from the Leases that is so marketed by [EXCO] hereunder shall not be less than the weighted average price paid to [EXCO] for [EXCO's] share of Oil and Gas produced from the Leases; *provided* that [EXCO] shall use commercially reasonable efforts to obtain the best available market price in the area for [EXCO's] and [Admiral's] share of Oil and Gas produced from the Leases.  Subject to [EXCO's] obligations under the Existing Marketing Agreements with respect to its and [Admiral's] share of Oil and Gas that is produced from the Leases, [Admiral] shall have the ability to terminate any future marketing arrangement by [EXCO] with respect to [Admiral's] share of Oil and Gas that is produced from the Leases upon not less than thirty (30) days' written notice.

(ECF No. 211, Ex. 3 at 33).  The "Existing Marketing Agreements" include the August 1, 2015 Crude Oil Purchase Agreement and Transaction #7, dated July 31, 2013, both executed between EXCO and CEMI.  (ECF No. 211, Ex. 3 at 26).

The plain language of the JOAs make EXCO's right to market the oil and gas subject to EXCO's pre-existing obligations to CEMI.  EXCO's authority to market oil and gas production under the JOAs is subject to its "Existing Marketing Agreements."  EXCO's oil and gas purchase agreements with CEMI are defined as "Existing Marketing Agreements."  (ECF No. 211, Ex. 3

at 26).   Thus, the JOAs look to EXCO's pre-existing arrangements with CEMI to determine EXCO's marketing rights with respect to Admiral's share of production.

Admiral argues that because EXCO could not charge CEMI for marketing, EXCO could not charge Admiral for marketing.   Admiral is correct that EXCO could not charge CEMI for marketing, but that does not mean the JOAs prohibit EXCO from charging Admiral a marketing fee.   Although EXCO's right to charge Admiral is not directly tied to EXCO's right to charge CEMI, the Court includes a general discussion of the marketing rights between EXCO and CEMI for the sake of clarity.   As discussed in detail below, EXCO was not primarily responsible for marketing production sold to CEMI.   However, EXCO's purchase agreements with CEMI permitted EXCO to solicit higher offers after the first year of the contracts.   CEMI held a right of first refusal ("ROFR") to match higher offers.   If EXCO undertook marketing that caused CEMI to exercise the ROFR, EXCO's marketing benefitted Admiral.   In that case, despite the fact that EXCO could not pass those marketing fees along to CEMI, EXCO could share those fees with Admiral.

The EXCO-CEMI purchase agreements do not specify EXCO's right to market oil and gas production.   The Crude Oil Purchase Agreement dedicated all oil production to CEMI for a period of one year, which concluded in July 2014, and then granted CEMI a right of first refusal for the following twelve years.   That contract goes on to set forth the manner of delivery, calculation of the price, and method of payment, but it is silent as to marketing.

Section 6 of the Crude Oil Purchase Agreement determines the price, as follows:

    a.  From the date of closing until the first day of the month following the date that Plains' Corpus Christi dock is fully operational, the price to be paid by CEMI for crude oil purchased from the subject properties will be CEMI's net weighted average sales price for sales of crude oil from the Eagle Ford Shale area, less all applicable deductions and transportation costs actually used to transport such oil.   For the avoidance of doubt, CEMI shall not deduct from

proceeds payable to EXCO or otherwise charge EXCO for any costs attributable to unutilized firm transportation.

b.  Starting on the first day of the month following Plains' Corpus Christi dock being fully operational, the price will be CEMI's weighted average sales price at Corpus Christi and Houston less transportation to Corpus Christi or Houston, currently estimated at $4.00 per barrel, consisting of, but not limited to, actual trucking costs incurred and actual pipeline fees (escalated annually as per the applicable tariff) less the Corpus Christi or Houston Market Value (the value of Eagle Ford crude oil at the Plains' Corpus Christi dock or Enterprise Echo Terminal) currently estimated at $4.00/Bbl.  For avoidance of doubt, CEMI shall not deduct from proceeds payable to EXCO or otherwise charge EXCO for any costs attributable to unutilized firm transportation.

c.  Unless the price is otherwise determined pursuant to Section 6(d) below, at any time if CEMI sells the oil at the well head to a 3rd party the price will be the contracted price to the third party.

d.  During the ROFR Term, the price will be equal to the price obtained on the bona fide third party written purchase offer received by EXCO.

(ECF No 211, Ex. 6 at 1-2).

Section 6.d of the Crude Oil Purchase Agreement does state that during the right of first refusal term, the oil price is "equal to the price obtained on [a] bona fide third party written purchase offer received by EXCO."  (ECF No. 211, Ex. 6 at 2).  This provision allows, but does not require EXCO to engage in marketing of the oil in order to obtain third party offers.  CEMI, not EXCO, held primary responsibility for marketing and selling the oil.   Section 6.a contemplates that prior to the completion of a dock in Corpus Christi, CEMI will effectuate the sale of the oil to third parties.  (*See* ECF No. 211, Ex. 6 at 1 ("[T]he price to be paid by CEMI for crude oil purchased from the subject properties will be CEMI's net weighted average sales price for sales of crude oil from the Eagle Ford Shale area . . . .") ("CEMI shall not deduct from proceeds payable to EXCO or otherwise charge EXCO for any costs attributable to unutilized firm transportation.")).  Likewise, Section 6.b uses similar language to indicate that CEMI will be responsible for selling oil following completion of the Corpus Christi dock.  (*See* ECF No.

211, Ex. 6 at 1).  Finally, Section 6.c determines the price when "CEMI sells the oil at the well head."  (ECF No. 211, Ex. 6 at 1).  Although Section 6.c does not apply if EXCO receives a superior third party offer during the ROFR term, Section 6.b and 6.c are not otherwise limited to the initial term.  Those price provisions apply for the life of the Crude Oil Purchase Agreement.

Piecing the provisions of the Crude Oil Purchase Agreement together, the mechanics are clear.  EXCO operated the wells and delivered its dedicated oil production to CEMI.  CEMI, in turn, marketed and sold the oil to third parties, then paid EXCO based on either a) the third party price obtained at the point of sale, or b) a prearranged price based on a written third party offer.  Each subsection of Section 6 makes clear that the parties contemplated that CEMI would handle, market, and sell the oil production.

Section 6.d does allow EXCO, during the ROFR term, to solicit higher offers for the oil.  If EXCO obtained a higher offer, CEMI could then exercise its ROFR and match the price.

EXCO argues that it was required to market the oil in order to obtain third party offers, which CEMI could match pursuant to the ROFR.  While Section 6.d does, in some instances, set the price based on written third party offers, nowhere in the contract is EXCO required to solicit offers.  EXCO's argument to the contrary is directly at odds with the other provisions of Section 6.

Unlike the Crude Oil Purchase Agreement, Transaction Confirmation #7, which governs the sale of natural gas from EXCO to CEMI, could imply that EXCO would be responsible for marketing gas.  Although Transaction Confirmation #7 does not include any detailed provision concerning marketing, it might allow EXCO to deduct marketing costs.  (ECF No. 211 Ex. 7 at 1 ("100% of the applicable [CEMI] weighted average sales price for gas and for natural gas liquids (NGLs) less [EXCO's] proportionate share of . . . any applicable fees incurred in marketing such

production. . . .")).  Transaction Confirmation #7 contemplates marketing of gas, however, it is ambiguous as to whether EXCO or CEMI was responsible for such marketing.  Regardless, EXCO states that it has never sold gas for a profit.  Instead, it has flared the gas from the Admiral leases during all periods applicable to this dispute.

Putting the oil and gas agreements between EXCO and CEMI together, EXCO could not charge CEMI for marketing oil, and EXCO never sold gas for a profit.  However, EXCO could market oil on its own in order to obtain a higher price.   Transaction Confirmation #7 allowed EXCO to charge a marketing fee on gas. However, by EXCO's own admission none of the gas has been sold for a profit.

Returning to the JOAs, EXCO's right to market Admiral's share of production was expressly subject to the existing marketing agreements between EXCO and CEMI.  As discussed, those agreements did not permit EXCO to charge CEMI for marketing oil.  All of the production from the EXCO-Admiral leases was originally dedicated to CEMI.  However, Admiral's interest in the subject leases is carved out of EXCO's property interests.  As stated, the Crude Oil Purchase Agreement permitted EXCO to solicit higher offers for oil.  Thus, if EXCO ever obtained a higher price, causing CEMI to exercise its ROFR, both EXCO and Admiral would benefit from that marketing.  In that instance, EXCO could properly charge Admiral its proportionate share of the fees.  Discovery is necessary to determine the extent of any such marketing efforts, and the results of those efforts.

EXCO offers a different interpretation of the contracts.  It asserts that Admiral is attempting to enforce the CEMI marketing agreements against EXCO, despite Admiral not being party to those agreements.  However, Admiral is not enforcing the marketing agreements.  Admiral's JOAs with EXCO explicitly reference the existing marketing agreements.  EXCO

clings to the mistaken belief that Admiral's interpretation modifies the JOAs by invoking language found in the CEMI marketing agreements. EXCO states that "Admiral claims the [CEMI marketing agreements] effectively supersede its right to take in kind even though Admiral is not a party to either of the [CEMI marketing agreements]." (ECF No. 211 at 21). As mentioned, the JOAs went into effect three years *after* EXCO entered the CEMI marketing agreements. The JOAs explicitly condition EXCO and Admiral's marketing rights on the continued effectiveness of the CEMI marketing agreements. How EXCO believes that earlier-in-time contracts might change the meaning of later-in-time contracts, which specifically reference the earlier contracts, is beyond the Court's comprehension. The paradox is Escher-esque. Admiral is correct that EXCO's marketing rights under the JOAs were subject to the existing marketing agreements with CEMI.

The next question is whether CEMI ever released any of the oil from the dedication by declining to exercise its ROFR. If so, EXCO would have been permitted to market Admiral's share of such oil production pursuant to the JOAs. Further discovery is necessary on that issue. The parties appear to agree that some portions of the produced oil entered pipelines while other portions were trucked from the wells. CEMI may have released the trucked oil from the dedication. However, the summary judgment record does not indicate how much oil was trucked or what proportion of the overall production was trucked. Nor does it show whether CEMI released any portion of the piped oil from the dedication. Before the court can determine whether EXCO properly charged Admiral a fee for Raider's services, the record must show what production CEMI released. Before the court can determine the proper amount of any permitted fees, the court must know the volumes of released production and the proportion of total production.

If CEMI released some production from the dedication, the JOAs required EXCO to market such production.  The Court does not decide, at this time, whether EXCO paid Raider commercially reasonable rates on any released production pursuant to the JOAs.  Nor does the Court decide whether Raider's actual marketing efforts warranted the full amount of fees.

For the reasons above, EXCO could only charge Admiral for marketing if the marketing was undertaken in furtherance of the ROFR.  The effect of the marketing may also be considered if it was undertaken.   Marketing fees could also be charged if they applied to oil and gas released from the dedication to CEMI.

## CONCLUSION

Both EXCO and Admiral's motions for summary judgment are denied.  A separate order will be entered.

**SIGNED** <u>April 22, 2020.</u>

_____
**Marvin Isgur**
**UNITED STATES BANKRUPTCY JUDGE**